FILED
2019 Dec-03 AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

DERRICK JAMES WILLIAMSON, JR.,
PRO SE

*PLAINTIFF*

V.

ALABAMA DEPARTMENT OF MENTAL
HEALTH AND MENTAL RETARDATION,
ET AL

*DEFENDANTS*

2019 DEC -2 A :0: 20

U.S. DISTRICT COURT
N.D. OF ALABAMA

CASE NO.: **7:19-CV-00669-LSC**

JURY TRIAL DEMANDED

## PLAINTIFF'S SECOND AMENDED & VERIFIED COMPLAINT

VIOLATIONS OF FIRST & FOURTEENTH AMENDMENTS, TITLE VII & 42 U.S.C. § 1981
DISCRIMINATION & RETALIATION, CONSPIRACY, BREACH OF CONTRACT, STATE EMPLOYEES
PROTECTION ACT (WHISTLEBLOWING), DEFAMATION, NEGLIGENCE, WANTONNESS, TORTIOUS
INTERFERENCE, MISREPRESENTATION & DECEIT

## REQUEST FOR DECLARATORY & INJUNCTIVE RELIEF

Plaintiff, Derrick James Williamson, Jr. (hereinafter referred to as *"Plaintiff"*), brings this Second

Amended & Verified Complaint, herein eighteen claims of action, against Defendants Alabama

Department of Mental Health & Mental Retardation (hereinafter referred to as *"ADMH"* or *"the*

*department"*) and its employees, agents, successors in office, Commissioner Lynn Beshear, Associate

Commissioner Zelda Diane Baugher, Director of Human Resources Lynn Hubbard, Facility Director

Annie Delois Jackson, Personnel Manager Joe Long, Captain Robert Anderson, Jr., Senior Special Agent

Joseph Rittner, Captain Jeremy Lain Booth, and irrespectively, Director of the State of Alabama

Personnel Department, Jacqueline Graham, and in support thereof, shows the Court as follows:

## PLAINTIFF

1.      The Plaintiff is **Derrick James Williamson, Jr.** who resides at 8816 Old Greensboro Road APT 20104, Tuscaloosa, Alabama, 35405. Plaintiff may be reached at (205) 422-9664 or via email at aeonpctech@live.com.

2.      The Plaintiff is a "Mental Health Security Officer II" or "Police Lieutenant" as a designated working title established by the department. Plaintiff began employment with ADMH as a "Mental Health Security Officer I" or "Police Officer"; receiving no discipline while in such position. Plaintiff is a law enforcement officer pursuant to Alabama Code § 22-50-21 which establishes operating under a class of insular and discrete individuals. The Plaintiff is an African American which establishes operating under a *"protected class "*. Furthermore, the Plaintiff, along with all other police officers employed by department, and are under employment contracts.

3.      Prior to a report of discrimination and unlawful/illegal conduct instituted by supervisory staff, the Plaintiff was promoted within six months of employment from Police Officer to Police Lieutenant, received *"exceeding standards "* performance appraisals, received a recommendation from senior leadership, and had received no disciplinary action under the department (including verbal counseling), and presented several advancements/proposals which were approved and/or reviewed.

4.      The Plaintiff currently possesses abundant professional certifications and training along with a Certificate in Law Enforcement (Academic), Advance Certificate in Law Enforcement (Academic), Associate of Science Degree in Criminal Justice (3.2 GPA), Associate of Applied Science Degree in Law Enforcement (3.2 GPA), Bachelor of Science Degree in Criminal Justice (3.9 GPA), and a Master of Science Degree in Justice Administration (4.0 GPA). The Plaintiff currently possesses approximately eleven years of experience in public safety. The Plaintiff was additionally ranked second of his law enforcement academy class of 2016 with a 92% academic average and highest score on the academy's legal exam during such class. Plaintiff has received a total of eight professional recommendations depicting a total of eleven signatures; beginning his employment with ADMH as highly recommended.

Furthermore, Plaintiff has 546 hours of supplementary training in addition to 520-hour minimum standards training received at such law enforcement academy.

5.      Following complaints of discrimination, retaliation, unlawful/illegal conduct, and whistleblower activity regarding ADMH supervisory staff, the department and the Defendants have disciplined the Plaintiff and presented that his performance has declined.

# DEFENDANTS

6.      The **Alabama Department of Mental Health and Mental Retardation** (hereinafter referred to as *"ADMH"* or *"department"*) is a state agency or department tasked with overseeing the State of Alabama's mission in combating mental illness.

7.      The department's name changed in 2009 to the "Alabama Department of Mental Health" although future references to the former name remain appropriate. Such is presented in Alabama Code § 22-50-2.1:

*"Any existing or future reference to the Department of Mental Health and Mental Retardation, or any other name by which the department has been known, in any existing law, contract. or other instrument shall constitute a reference to the Department of Mental Health."*

The department is headquartered at 100 North Union Street, Montgomery, Alabama, 36130. ADMH can be reached at (334) 242-0725 and via email at alabama.dmh@mh.alabama.gov.

8.      The department provides mental illness, disability, and substance abuse services throughout the State of Alabama. The department is supervised by Commissioner Lynn Beshear who is appointed by the Governor. The Commissioner is responsible for appointing Associate Commissioners who lead various divisions of the department. The Associate Commissioner, Zelda Diane Baugher, is the head of the Division of Mental Health and Substance Abuse and oversees all three state hospitals including Taylor Hardin Secure Medical Facility (hereinafter referred to as *"THSMF"*) located at 1301 Jack Warner Parkway NE, Tuscaloosa, Alabama, 35404.

9.      THSMF is the only forensic medical facility owned and/or completely controlled by the State of Alabama and receives predominantly criminal commitments. The department classifies the facility as a "hospital" in most instances.

10.     The department employs Police Officers under Alabama Code § 22-50-21 in which the department designates a written title of *"Mental Health Security Officer"* and a presented title of *"Police Officer"*.

11.     Each police officer employed by the department are sworn law enforcement officers of the State of Alabama with arrest authority. Such police officers are additionally required to be certified as law enforcement officers by the Alabama Peace Officer Standards & Training Commission.

12.     The below individual Defendants as presented in ¶¶ 13 – 21 are *public officials* acting predominantly under the *color of law* and each exceed the age of 19:

13.     **Commissioner Lynn Beshear** (hereinafter referred to as *"Beshear"*) is operating from 100 North Union Street, Montgomery, Alabama, 36130. Beshear can be reached at (334) 242-3454 and via email at lynn.beshear@mh.alabama.gov. Claims are against Beshear in her official and/or individual capacity.

14.     **Associate Commissioner Zelda Diane Baugher** (hereinafter referred to as *"Baugher"*) is operating from 100 North Union Street, Montgomery, Alabama, 36130. Baugher can be reached at (205) 554-4302 and via email at diane.baugher@mh.alabama.gov. Claims are against Baugher in her official and/or individual capacity.

15.     **Director of Human Resources Lynn Hubbard** (hereinafter referred to as *"Hubbard"*) is operating from 100 North Union Street, Montgomery, Alabama, 36130. Hubbard can be reached at (334) 242-3112 and lynn.hubbard@mh.alabama.gov. Claims are against Hubbard in her official and/or individual capacity. Defendant is the Chief Human Resources Director for ADMH.

16.     **Facility Director Annie Delois Jackson** (hereinafter referred to as *"Jackson"*) is operating from 1301 Jack Warner Parkway NE, Tuscaloosa, Alabama, 35404. Jackson can be reached at

(205) 462-4506 and annie.jackson@hardin.mh.alabama.gov. Claims are against Jackson in her official and/or individual capacity. Defendant is the Facility Director and Appointing Authority of THSMF.

17. **Personnel Manager Joe Long** (hereinafter referred to as *"Long"*) is operating from 1301 Jack Warner Parkway NE, Tuscaloosa, Alabama, 35404. Long can be reached at (205) 462-4511 and joe.long@hardin.mh.alabama.gov. Claims are against Long in his official and/or individual capacity. Defendant is the Personnel Manager for THSMF.

18. **Captain Robert Anderson, Jr.** (hereinafter referred to as *"Anderson"*) was previously operating from 1301 Jack Warner Parkway NE, Tuscaloosa, Alabama, 35404. Anderson can be reached at 390 Revere Road, Tuscaloosa, Alabama, 35405. Claims are against Anderson in his official and/or individual capacity. Defendant is the Former Chief Law Enforcement Officer of THSMF following 37 years in said position.

19. **Senior Special Agent Joseph Rittner** (hereinafter referred to as *"Rittner"*) is operating from 100 North Union Street, Montgomery, Alabama, 36130. Rittner can be reached at (334) 242-3274 and joseph.rittner@mh.alabama.gov. Claims are against Rittner in his official and/or individual capacity. Defendant is the Chief Law Enforcement Officer of ADMH Bureau of Special Investigations (hereinafter referred to as *"BSI"*).

20. **Captain Jeremy Lain Booth** (hereinafter referred to as *"Booth"*) is operating from 1301 Jack Warner Parkway NE, Tuscaloosa, Alabama, 35404. Booth can be reached at (205) 462-4553 or (205) 399-0104. Claims are against Booth in his official and/or individual capacity. Defendant is the Chief Law Enforcement Officer of THSMF.

21. **Director Jacqueline Graham** (hereinafter referred to as *"Graham"*) is operating from 64 North Union Street, Suite 300, P.O. Box 304100, Montgomery, Alabama, 36130-4100. Graham can be reached at (334) 242-3389. Claims are against Graham in her official and/or individual capacity. Defendant is the Director of State of Alabama Personnel Department.

## JURISDICTION & VENUE

22.     This action arises under the United States Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction). Plaintiff's state law claims are closely related to the foregoing federal claims of action.

23.     Plaintiff's claims for declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, Ex Parte Young, and by the general legal and equitable powers of this Court. Plaintiff's claims for damages are authorized pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), Alabama Code § 36-26A-5, and Alabama Code § 36-1-12(d).

24.     Plaintiff's claims for preliminary injunctive relief are authorized pursuant to Rule 65 of the Federal Rules of Civil Procedure.

25.     Venue is proper pursuant to 28 U.S.C. § 1391. At all times relevant, such facts have occurred within this District and the Plaintiff's residence has been within this District.

## PREREQUISITES

26.     The Plaintiff has fulfilled all prerequisites to the institution of this action under Title VII of the Civil Rights Act of 1964 with reception of several "Notice of Suit Rights" letters from the Equal Employment Opportunity Commission (hereinafter *"EEOC"*) and United States Department of Justice (hereinafter *"USDOJ"*). (Reference: ¶¶ 351 – 355 and Doc. 39). Further, the Continuing Violation Doctrine may be applied in appropriate circumstances and the Plaintiff's charges are to be "construed broadly in a liberal manner to effect the remedial and humanitarian underpinnings of Title VII and of the crucial role played by the private litigant in the statutory scheme."

# FACTS

### *Establishment of Relationship with State of Alabama*

27.    On 4/16/2016, the Plaintiff was sworn in as a "Peace Officer" or law enforcement officer

with the State of Alabama. Such oath was administered by the Alabama Peace Officer Standards &

Training Commission (hereinafter *"APOSTC"*) on such date and signed by Chief R. Alan Benefield. Such

continuing oath reads:

*"I, Derrick James Williamson, Jr., a certified Law Enforcement Officer in the State of Alabama, do solemnly swear (of affirm) that I will, to the best of my skill and ability, faithfully discharge all duties required of me, and execute the orders of my superior officers, and in all cases uphold and enforce the criminal laws and constitution of the State of Alabama, the ordinances of my jurisdiction, and the criminal laws and the Constitution of the United States."*

*"I furthermore do pledge to obey the rules governing my agency and report all violations of the same that may come to my knowledge"*

*"I will not persecute the innocent, nor help to shield the guilty from punishment. Neither will I be influenced in the discharge of my duty by fear, promise of favor or affection, or the hope for or offer of reward."*

*"In all my deeds, I will be governed by the rules set forth in this testament of my dedication. And by my signature below, I assign to these a pledge of faith."*

*"So help me God"*

Such oath was administered in accordance with Section 279 of the Constitution of Alabama.

28.    Henceforth, Plaintiff had a contractual and business relationship with the State of Alabama

as an officer of the Executive Branch in the performance of his duties.

### *Establishment of Employment Contract with ADMH*

29.    Prior to the Plaintiff's employment, the individual Defendants (excluding Graham) were

provided contractual duties, rights, and powers as "assignees" from ADMH, by and through the

Commissioner of Mental Health, following their consideration. Such contractual duties as assignees set

forth "specific laws, regulations, instructions, manuals, or procedures that must be followed in performing

the job" which included ADMH policies and procedures; facility specific policies were included by

extension. Such duties, rights, and powers were provided by the "Assignor(s)"; the Commissioner of Mental Health and ADMH. Pursuant to Alabama Code § 22-50-11, "additional and cumulative powers" through the former Commissioner and Beshear include authority to 1) "supervise, coordinate, and establish standards for all operations and activities of the state related to mental health and the providing of mental health services", 2) "enter into contracts with any other state or federal agency or with any private person", 3) "establish and promulgate reasonable rules, policies, orders and regulations providing details of carrying out its duties and responsibilities, including bylaws for its own organization, government and procedures", 4) "prosecute civil actions in any court", and a requirement to 5) "be governed by personnel Merit System rules and regulations, the same as other employees in state service".

30.     ADMH and the respective Commissioners, including Beshear, transferred their respective power and rights to the individual Defendants (excluding Graham). Such Defendants were hired prior to the Plaintiff's employment and their duties and assignments were established at such time. Several Defendants' duties as assignee are presented in the foregoing.

31.     On 11/16/2016, the Plaintiff accepted employment by ADMH at its Bryce Hospital location. The Plaintiff was required to sign a "Position Classification Questionnaire" labelled as a "Form 40" as well as documents detailing his receipt of policies and procedures; Plaintiff received the department's key policies and procedures on such date. Plaintiff was also "required to accept responsibility of use of DMH computer hardware, software, and internet services in accord with applicable Federal and State laws and DMH policy." Plaintiff was also required to sign under ADMH Policy 19-10 ("Abuse, Neglect, Mistreatment and Exploitation"), 70-20 ("Drug Free Workplace"), and 70-25 ("Drug Testing"), "1 understand these policies and I am committed to their implementations during my employment." Plaintiff also "must abide by the terms" of the "Drug Free Workplace Policy" via signature.

32.     The job announcement for such position read:

*"High school graduation or GED equivalency supplemented by an approved course conducted by a police academy."*

*"Must be certified by the Alabama Peace Officer Standards and Training (APOST) Commission in **LAW ENFORCEMENT** and current with all required training and education required by APOST... Perform other police work as assigned... Arrest (interrogate/detain) staff, visitors, patients, and others when violations of the Facility/State policies, rules, regulations, and criminal activities occur. Serve legal papers."*

33.     On 11/17/2016, Plaintiff was required to agree to abide by ADMH Policy 70-5

("Employee Conduct and Performance"), which was included under "privacy and confidentiality"

policies. Plaintiff had to sign under "I understand that non-compliance with DMH privacy and

confidentiality policies will be cause for disciplinary action up to and including dismissal from DMH".

34.     Plaintiff interpreted his employment as secured under such provisions if followed. The

Plaintiff, thereafter, premised his performance, as presented within the following, and complied with the

provided terms in such policy and procedure upon consideration.

35.     On 5/5/2017, the Plaintiff was offered a promotion:

*"Failure to demonstrate satisfactory completion of your working test period, which includes failure to satisfactory complete designated training; failure to acquire job specific competencies, related knowledge, skills and abilities; inability/unwillingness to perform assigned job duties satisfactorily and/or any other reason that deems you unsuitable for continued service in this classification, will result in demotion or termination of employment."*

Plaintiff' probationary period was six months from the commencement of such promotion on

6/1/2017.

36.     On 7/10/2017, Beshear was appointed as Commissioner for ADMH. Upon appointment,

Beshear assumed responsibility, powers, and rights pursuant to Alabama Code § 22-50-11.

37.     On 6/1/2017, the Plaintiff began his employment at THSMF via the referenced promotion.

The Plaintiff was required to sign a "Position Classification Questionnaire" labelled as a "Form 40" as

well as documents detailing his receipt of policies and procedures thereafter. Such documents and offer of

promotion detailed new and changed conditions of employment; Plaintiff accepted changes regulated

through updated and/or revised policies and procedures by signature and upon consideration.

38.     The job announcement for such position read:

*"High school diploma or GED equivalency, supplemented by an approved course conducted by a police academy."*

*"Must be certified as a law enforcement officer by the Alabama Peace Officer Standards and Training (APOST) Commission and current with all required training and education required by APOST."*

*"This is supervisory police work in protecting property and maintaining safety and security of a state mental health facility. An employee in this class supervises police activities on a particular shift at a state mental health facility."*

*"Work conforms with established laws, rules and policies..."*

39.     According to THSMF Supplement Policy 5-1, "Adherence to approved policies/supplements is the responsibility of all employees." Alabama Administrative Code § 580-6-34-.01 also advised "the Department shall publish personnel policies and procedures to regulate matters..."

40.     Plaintiff, henceforth, was required to sign his receipt, acceptance, and understanding of changes to policies and procedures. Such policies and procedures contained no disclaimer reserving a right to deviate from such policies and procedures or a disclaimer presenting they did not constitute an employment contract.

41.     As of 7/21/2017, such Form 40 presented "specific laws, regulations, instructions, manuals, or procedures that must be followed in performing the job" which included: "SMF Policies, DMH Policies, Title 13A, Title 32A, and FCC Regulations".

42.     Further on such date, Plaintiff signed a document titled "Policy Instructions" advising that he had "received a copy of the Indexes of all policies and procedures" as well as a document detailing the receipt of specific policies and procedures to include "Employee Conduct and Accountability" and "Code of Conduct". The following statement was presented: "I have had the opportunity to ask questions and understand completely the policies" as displayed in such document. Plaintiff signed such document upon consideration.

43.     As of 6/1/2017, ADMH employed the following quantity of written policies which were required to be followed by the Plaintiff: ADMH departmental policies: 189, Taylor Hardin Secure Medical Facility ("THSMF") facility-only policies: 136, THSMF supplemental policies to ADMH Policy:

126, THSMF Police policies: 58, and the ADMH Incident Management Plan. This was a total of 509

policies exceeding 1,300 pages. The department had hundreds of additional pages of policies which did

not pertain directly to the Plaintiff's division of employment.

44.     The following laws, rules, and policies, in significance, overcame the at-will employment

relationship. ADMH Policy 20-112 sets forth the following to be conducted prior to termination or

suspension; presenting Plaintiff's employment was not terminable at-will:

> *"Employees who have successfully completed a probationary/working test period are afforded the opportunity to exercise an option of attending a pre-disciplinary conference prior to the enactment of suspension or termination by the appointing authority."*

> *"Pre-disciplinary Conference (PDC): A conference in which an employee is given an opportunity to meet with the appointing authority or the appointing authority's designee to hear and to respond to a charge/allegation that would warrant consideration of disciplinary action at the level of suspension or termination."*

> *"Prior to suspension or termination action being taken by the appointing authority, the employee is notified in writing of the charge/allegation made against him/her, informed of his/her right to a pre-disciplinary conference, and notified of the scheduled meeting to include the date, time, and location."*

> *"All information presented at the pre-disciplinary conference should be taken into consideration prior to making a decision whether or not to take disciplinary action."*

> *"In the case of a suspension or termination the burden of proof lies with the appointing authority."*

Termination, according to ADMH Policy 60-40, is defined as:

> *"A documented involuntary personnel action applied by the appointing authority based on a serious violation(s) or repeated violation(s) of departmental rules or policies, or uncorrected conduct preceded by due process procedure."*

According to Alabama Administrative Code § 580-6-34-.10, the Plaintiff could not be suspended or

terminated without due process:

> *"It is the policy of the Department of Mental Health and Mental Retardation to afford all employees the opportunity to exercise their due process rights. Due process has been defined as the right to be presented with the charges/allegations that are being considered against an employee in regard to suspension or termination, and an effective opportunity to submit a response to the charges/allegations orally and in writing to the appointing authority. If the disciplinary action being contemplated is suspension, the appointing authority may*

*designate a representative, to present the charges and receive the employee's oral response."*

As previously cited elsewhere in policy, THSMF Police Policy 320 states,

*"It is the duty of any THSMF Officer to obey and observe State and Federal laws, local laws, ordinances and the policies and procedures of the Taylor Hardin Secure Medical Facility and the Department of Mental Health. A THSMF Officer will perform their duties without prejudice or partiality to such duties that may be required."*

According to Alabama Administrative Code § 580-6-34-.11 & .12, the Plaintiff could not be

disciplined unless "warranted" or for "sufficient reasons". The Plaintiff has an employment contract.

## *Hubbard's Powers, Rights & Duties as Assignee*

45.     On 6/16/2017, Hubbard re-acknowledged her contractual duties, rights, and powers as an

assignee of the employment contract between her, the Plaintiff, Beshear, and ADMH; Hubbard agreed via

signature to such duties, rights, and powers upon consideration. Such duties as assignee re-iterated

Hubbard's responsibility to:

1. *"Plan, direct, and monitor human resource management so that the application and interpretation of the rules and regulations are equitably enforced";*

2. *"Advise departmental administrators and employees so that there is a clear understanding of departmental and State Personnel policies and procedures";*

3. *"Serve as liaison to the State Personnel Department, state agencies, and other entities so that the Department maintains communication and is adequately represented";*

4. *"Oversee and monitor the Department's employee complaint procedure so that the implementation is consistent and equitable and findings and recommendations are addressed";*

5. *"Oversee and monitor the screening, interviewing and selection process so that appropriate recommendations can be made to Bureau Directors and Associate Commissioners"; and*

6. *"Write, monitor and amend HR contracts as needed"*

Additionally, "specific laws, regulations, instruction, manuals or procedures that must be followed in

performing this job" included: "State Personnel Board rules and policies, DMH Policy and Procedure

Manual, Administrative Code, Civil Rights Act, and HIPAA Regulations".

### *Long's Powers, Rights & Duties as Assignee*

46.    Long was provided with his contractual duties as an assignee of the employment contract

between him, the Plaintiff, Beshear, and ADMH; Long agreed via signature to such duties, rights, and

powers upon consideration. Such duties as assignee presented Long's responsibility to:

1.    *"Supervises and evaluates performance of employees";*

2.    *"Develops and implements policies and procedures by interpreting policies of the ADMH policies, federal and state laws and regulations, relating policies to staff; monitoring compliance with policies and review policies to maintain quality treatment and care of patients";*

3.    *"Maintains and monitors credentialing and privileging files";*

4.    *"Provides consultative services to other departments to ensure that policies, procedures, etc. are being followed and to enhance overall management of the facility"; and*

5.    *"Composes, compiles and distributes documents for management of the Human Resource Services and facility"*

Additionally, "specific laws, regulations, instruction, manuals or procedures that must be followed in

performing this job" included: "Federal laws, State Laws, State Personnel Rules and Regulations, DMH

Policies, and Facility Policies".

### *Preliminary Incident (Report of Discrimination)*

47.    Establishing the precursor of this Complaint; on 12/6/2017, the Plaintiff made an initial

verbal complaint of discrimination to his former immediate supervisor, Anderson. Anderson was advised

that his decisions were inconsistent with the decisions made in reference to fellow co-workers who were

Caucasian resulting in discrimination and disparate treatment following the attempted administration of an

annual performance appraisal. The Plaintiff alleged that Caucasian workers under Anderson's supervision

always received highly favorable performance appraisals resulting in two-step pay raises and disciplinary

actions imposed on African Americans weren't consistent with the practices imposed on Caucasian

counterparts.

48.     The Plaintiff had received numerous reports of inconsistencies and discrimination upon his promotion to the facility. Anderson, while appearing nervous and highly agitated, immediately notified Jackson after refuting the allegations.

49.     Anderson documented that the Plaintiff had "unsatisfactory cooperation" with coworkers in which he advised the Plaintiff had questioned the judgment of nursing staff when administering a Pro Re Nata (hereinafter referred to as *"PRN"*) which was, indeed, a duty assigned to the Plaintiff via the employment contract in order to "take charge" of such situations pursuant to THSMF Policy 115-10(1). Such policy further presented: "Once the situation is under control, the Police Officer shall instruct that a CODE GREEN should be issued".

50.     Several other officers, including Bessie Carter, Lorenzo Gamble, and James Washington had filed and voiced complaints regarding discriminatory practices, prior to the Plaintiff's promotion, which later led to the Plaintiff being interviewed and competitively selected by an external/impartial panel.

51.     THSMF Police Services, premised upon "poor management practices", had been restricted in overseeing its own interviews and designated positions for law enforcement supervisory positions by the department's Human Resources Department premised upon Gamble's complaint. Such recommendations and provisions were set forth on 9/29/2016 by Hubbard.

52.     The Plaintiff noted that a fellow law enforcement supervisor, Kevin McDaniel, who was indeed Caucasian, had questioned nursing staff in a similar matter and received no recourse for his action; McDaniel advised the Plaintiff and Anderson was aware of this occurrence. Additionally, the employment contract authorized the Plaintiff to question matters concerning patient safety and in efforts to maintain detailed records of accounts of events resulting in forced medication administration; the Plaintiff completed detailed reports.

53.     Anderson was able to reference one additional matter in this circumstance involving the change of computer monitor setups within THSMF's Control Room. The Plaintiff was a supervisor, and

in efforts to correct the unauthorized modification of monitor setups inside the Control Room by a Caucasian officer, Shane Pike, the Plaintiff restored the monitors to correct settings.

54.    Anderson was aware of this; as he was informed weeks prior by the Plaintiff that the officer had made unofficial modifications. Anderson did not administer disciplinary action or counsel the similarly situated Caucasian employee who was also under his supervision.

55.    The Plaintiff began drafting a written complaint regarding the situation in which Anderson became unsettled, advised that he would change the appraisal, and returned with modifications.

56.    On 12/14/2017, the Plaintiff received a favorable performance appraisal which was revised by Anderson to portray factual information following the Plaintiff's verbal complaint and attempt to file a written complaint in regard to discrimination. Anderson's initial performance appraisal portrayed the Plaintiff's performance as *"meets standards"* while noting ill-cooperation with coworkers. The Plaintiff's subsequent performance appraisal was labelled as *"exceeds standards"*, scored a *"28"*, with pleasant notes attached regarding the Plaintiff's probationary period. Such notes presented:

> *"Lt. Williamson is very creative on the computer with graphics and designs, brings a new perspective on the use of the computer, he has developed a share drive for the department to use. Lt. Williamson is very punctual and hasn't missed anytime since his start date, ensures that his is covered. Willing to take on extra duties and/or assignments when needed or requested. Lt. Williamson has come in on his off-days, or move his off-days to ensure coverage on the 2nd shift. Lt. Williamson has also taken time to install lights on the police vehicles and personally checks the police vehicles for maintenance problem/issues."*

> *"There has been some "perception issues" regarding Lt. Williamson and other staff, but those issues has been identified and resolved."*

> *"Lt. Williamson has identified training needs for police services, and plans for addressing these needs will be coming in the near future. There are plains for Lt. Williamson to take on more duties and responsibilities forthcoming very soon."*

### Commencement of Pattern of Retaliation

57.    Henceforth, the referenced Defendants exhibited the commencement of targeting and a pattern or practice of scrutinizing the Plaintiff's employment through willful, malicious, arbitrary, and capricious adverse actions which subjected the Plaintiff to harassment in his continued employment. Plaintiff has endured, and continues to endure, adverse and detrimental actions which continue to

exacerbate injuries alleged herein. Such plan and practice is presented to this Court in the following; as the Plaintiff began to experience unwarranted and targeted adverse action. Defendants' official positions, in prominence, were utilized to pursue such plan. Several actions exceeded a lawful scope of authority and presented malicious motives at their foundation.

## *First Obtained Warrant*

58.     On 12/27/2017, Plaintiff notified Anderson that the facility was defined as a "detention facility" according to state law and the crime of "Promoting Prison Contraband" applied to subjects within the facility.

59.     On 1/15/2018, the Plaintiff typed an investigative memo regarding potentially charging a THSMF patient with the crime of "Promoting Prison Contraband". Such memo was provided with the case file taken before the Tuscaloosa County Magistrate's Office.

60.     On 1/22/2018, Jackson was notified of criminal activity within Taylor Hardin Secure Medical Facility being prosecuted by the Tuscaloosa County District Attorney's Office (hereinafter referred to as *"DA"*) regarding the referenced patient/inmate housed within the facility.

61.     This notification spawned from the Plaintiff's lawful authority established by Alabama state law to operate as a law enforcement officer in representation of the State of Alabama pursuant to Alabama Code § 22-50-21.

62.     The Plaintiff referred a deposition (criminal complaint/affidavit) to the DA for a determination in which a warrant was issued under the authority of the Assistant District Attorney Jonathan Cross. Cross was advised of the circumstances regarding the patient.

63.     Jackson advised that officers should follow an administrative/non-criminal process in lieu of seeking criminal action and advised she wished to have a factor in law enforcement determinations.

64.     Jackson also advised that everyone should be cognizant of media attention which is just as important as safety concerns which was rebutted by the Plaintiff as oblivious and that media was not his initial concern; safety and security was as per his contractual duties.

## *Preliminary Report of Ethical Concerns*

65.     On 1/26/2018, Anderson was advised by the Plaintiff of potential ethical violations being committed by Jackson (Anderson's immediate supervisor) and the Plaintiff advised that he intended to contact external agencies regarding illegal activity. This concern was relayed to Jackson by Anderson.

## *Warrants & Arrest for Theft of Government Property*

66.     On 3/13/2018, Plaintiff filed criminal charges upon two contract Food Services workers who were confirmed to be stealing government property. Plaintiff received several complaints from patients housed within THSMF that they were not receiving their ticketed food items. Tamika Cotton and Tarneice Henderson had been observed by the Plaintiff via video footage to be removing food products designated for patients from the facility and leaving the property. Plaintiff had obtained seven total warrants issued for these incidents. Jackson presented reprisal for the Plaintiff having not sought her permission to make such arrests and disseminated the ideal that the Plaintiff should have not arrested the subjects. The suspects plead guilty and were appropriately sentenced. Plaintiff's authority in these circumstances was derived from Alabama Code § 22-50-21.

## *Report of Staff's Theft of Government Time*

67.     On 3/27/2018, Anderson administered a written memorandum following a complaint that Kevin McDaniel, a fellow law enforcement supervisor (Caucasian), was committing fraud in the theft of government time. The Plaintiff was advised by staff that this was not the first occurrence or presentation of such behavior by the referenced subject. Anderson had failed to adequately address these concerns on a former occasion. Staff advised that a former officer, who was indeed African American, had been accused of similar circumstances and Anderson actively sought his termination which was later enacted. Anderson presented that it was Long who sought the termination.

68.     Human Resources at THSMF advised the Plaintiff of this matter and had confirmed that the fellow law enforcement supervisor was indeed misrepresenting documented time in order to receive unrestricted paid time off.

69.     Anderson was notified by Human Resources as well of the incident and the provided

memorandum addressed all staff of the Police Services Division rather than directing action or conducting

discipline on the similarly situated Caucasian employee. Anderson violated ADMH Policy 80-10

requiring "any allegation of a crime committed by a Mental Health Police Officer or any allegation of

Conduct Unbecoming an Officer (CUBO)" be investigated by BSI (Rittner at such time). McDaniel was

under the supervision of Anderson.

### *Overlooking Caucasian's Abuse of THSMF Patient*

70.     On 4/5/2018, Anderson presented evidence showing a Caucasian staff member physically

harassing and assaulting a patient to the Plaintiff. Anderson consciously and willingly avoided completing

an incident report and declined to transmit the matter to appropriate staff. The facility's Risk Manager,

Kimberly McAlpine, became abreast of the circumstances and also witnessed the occurrence.

### *First Issued Written Discipline*

71.     On 5/2/2018, Anderson administered a written reprimand expressing the Plaintiff had

violated ADMH Policy 15-1 relating to legislative process. Anderson advised that the transmission of a

bill (truly a resolution) speaking on mental health police authority, jurisdiction modifications, *etcetera*, by

the Plaintiff violated such policy; in which it did not. Plaintiff sought to clarify ambiguous details

presented within Alabama Code § 22-50-21 and to obtain subsistence pay for unsafe conditions within

THSMF for his fellow officers operating under the department. Such reprimand also presented the

following instituting an ongoing prior restraint on speech:

*"Lt. Williamson, you are not to send any information pertaining to the Department of Mental
Health, Taylor Hardin Secure Medical Facility to any other agency, personal without the
approval of the Director of Police Services and/or Facility Director.*

*Lt. Williamson is to submit all information related to Department of Mental Health and/or
Taylor Hardin Secure Medical Facility for review and approval by the Director of Police
Services and/or Facility Director"*

72.     Of importance, Jackson had been provided with such legislation according to such policy and had been advised the bill was being transmitted to the Plaintiff's collective bargaining association; ASEA. Jackson noted on her response to the Plaintiff's recommendations:

*"Spoke w/ LT Williamson 9-27-17… Dept high priority leg related to lawsuit… He stated he understood"*

73.     Anderson advised the Plaintiff that the written reprimand had been instigated by Jackson but presented the written reprimand on his own fruition.

74.     The Plaintiff filed a complaint regarding the reception of the written reprimand detailing civil rights and statutory violations but was declined an appeal by Beshear, Jackson, Long, Hubbard, Baugher, and department counsel. Such reprimand was never rescinded.

75.     The Plaintiff advised Hubbard that such a directive would hinder and intimidate contact with governing external agencies. Hubbard advised, although poorly written, she saw no reason to rescind the issued reprimand while advising the Plaintiff to litigate if he feels he has been harmed. Hubbard additionally advised the Plaintiff that he would go far within the department if he learned to follow protocols.

76.     Anderson had previously authorized the issuance of a commendation provided to McDaniel (Caucasian), former supervisor under the supervision of Anderson, for going "above and beyond his scope of duties in assisting the department" by making "necessary contacts" in August of 2016. McDaniel is a similarly situated comparator.

### *General Facts*

77.     Additionally, the Plaintiff filed detailed internal complaints regarding illegal activity in relation to Anderson and Jackson, including discrimination, to Beshear, Baugher, and Hubbard. Rittner was additionally provided a copy of such complaints. Such internal complaints included a grievance regarding Jackson's and Anderson's methods of obstructing, intimidating, and restricting the Plaintiff.

78. Plaintiff expressed his methods to correct unlawful conduct via access to state courts and administrative agencies; Defendants presented deliberate indifference due to such authority to utilize state courts to vindicate rights and presented discipline in response to such concerns.

79. On 5/3/2018, the Plaintiff filed a complaint with the Alabama Attorney General's Office alleging unlawful conduct within the department. Beshear and Hubbard were directly notified of this occurrence by the Plaintiff.

## *Jackson's Advisement Regarding Plaintiff's Advancement*

80. Additionally, on 5/2/2018, Jackson advised the Plaintiff in a personal meeting that he would not be promoted if he did not learn to follow her protocols (no written documentation regarding specified directives was previously provided). Jackson also documented this communication for transmission to other subjects named as Defendants in this action in the following notification.

## *Notification the Plaintiff Intended to File Suit*

81. On 5/2/2018 at 2:57 PM following the Plaintiff's receipt of the written reprimand and the meeting with Jackson, Jackson notified Hubbard and Baugher that the Plaintiff was intending to file this instant lawsuit (referred to as an "EEO suit"). Jackson stated in part:

*"I relayed to him that thought he was interested in moving up and not remaining in the same position over time. I stated to him that if that is true he needed to learn how to follow protocols... but if he failed to follow protocol he may not have any job long term."*

## *Declined Promotion: Mental Health Special Agent I*

82. On 5/4/2018, the Plaintiff was denied a promotion to Mental Health Special Agent I. The Plaintiff applied for the position setting forth the following requirements:

*"**MINIMUM QUALIFICATIONS:** Bachelor's degree in Criminal Justice, Public Safety, Law, Public/Business Administration, Psychology, Forensic Services, Homeland Security, or a related field, plus experience (24 months or more) in criminal investigative work with a law enforcement or regulatory agency. Experience in criminal investigative work above the minimum requirement may substitute for the bachelor's degree on a year-for-year basis."*

The Plaintiff was interviewed among several other applicants. Among the applicants, minorities were in possession of the indicated bachelor's degree (the Plaintiff and Frankie Gonzales, a Hispanic; confirmed at the time of this amendment) while the selected Caucasian applicant (Kevin McDaniel) did not have a degree.

83.     Luther Davis, an African American, was chosen by the panel via the highest score according to the ratings but was not selected by Rittner.

84.     It was noted by the Plaintiff that the interview panel asked questions which were subjective to having operated previously in a similar position.

85.     Rittner was aware of the selected Caucasian's former and brief employment as an Investigator with the University of Alabama Police Department. Presented questions during the interview for ratings appeared to be geared towards the selected candidate's former employment. Rittner was also the creator of the utilized questions.

86.     Defendants additionally deviated from the provided method of selection as stated below:

*"**METHOD OF SELECTION:***     *Applicants will be rated on the basis of an evaluation of their education, training, and experience and should provide adequate work history identifying experiences related to duties and minimum qualifications as mentioned above. All relevant information is subject to verification.  Drug screenings and security clearance will be conducted on prospective applicants being given serious consideration for employment and whose job requires direct contact with clients."*

Defendants used a rating point system rather than relying on written documentation.

87.     Drug screenings were not conducted for such position prior to hire/promotion.

88.     A security clearance was not conducted for such position prior to hire/promotion.

89.     Such job also required direct contact with clients/patients in the course of conducting criminal investigations.

90.     The Plaintiff received the "lowest score" in which Rittner provided a lower rating to the Plaintiff; avoiding his hiring. The indicated rating point system also contained a subjective component which was previously deemed insufficient by the 11th Circuit.

91.     Of all the applicants, the Plaintiff possessed superior education (associates and bachelor's degree), extensive training, and was highly recommended by senior law enforcement officials within the department in a written recommendation but was still not selected. Plaintiff additionally provided seven alternate recommendations for his selection.

92.     The interview panel consisted of three Caucasians and one African American.

93.     Plaintiff additionally noted that several subjects within the department were under the perception that such position was particularly for the selected Caucasian; as if the decision was pre-determined. Rittner was the final decision maker for this position.

### General Facts Cont'd

94.     On 5/9/2018, Jackson requested clarification of the Plaintiff's law enforcement discretion. Rittner advised Jackson that the Plaintiff has the authority to arrest subjects on outstanding warrants and the authority to advise external agencies of wanted subjects' locations. Jackson refuted the advisement of Rittner and questioned the Plaintiff's motives to enforce the law.

95.     On 5/14/2018, it was reported to the Plaintiff by a fellow African American officer (Antonio Washington) that Anderson attempted to coerce him into resigning to seek external employment by offering to present a favorable recommendation. The event was perceived by the fellow officer to be retaliatory, discriminatory, and coercive.

### Warrant for Disorderly Conduct (Gosa)

96.     On 5/16/2018, the Plaintiff filed criminal charges upon Justin Gosa for Disorderly Conduct pursuant to Alabama Code § 13A-11-7 by and through an affidavit sworn before a magistrate. Such affidavit was transmitted to the Tuscaloosa County District Court.

### NCIC Privileges Revoked

97.     On 5/17/2018, Anderson revoked the Plaintiff's privileged and certified access to the National Crime Information Center (NCIC) as afforded by the Alabama Criminal Justice Information Center based upon arbitrary means. Anderson revised policy after stating the Plaintiff had violated policy

in order to accommodate his actions. The Plaintiff later filed a complaint regarding this matter on 6/18/2018. The Plaintiff presented that his privileges were arbitrarily revoked in such Complaint which was not considered by Anderson.

98.     Anderson was not certified on such system to make such a determination and had no prior training in the use of the system. Anderson did not have access to such system.

### *Investigated for Internal Portfolio*

99.     Additionally, on this date, Hubbard advised the Plaintiff that portfolios utilized in internal law enforcement interviews was concerning to her. Hubbard directed the Plaintiff that he was not to recreate or utilize the "Department/Taylor Hardin documents" that he created for the department for any purpose. The Plaintiff had been given authority from Anderson and Captain Noah Reeves to create documents portrayed in such portfolio(s).

100.    The Plaintiff had created the referenced portfolio to portray his efforts to advance the Police Services Division and such portfolio was only reviewed by law enforcement personnel for promotion decisions which were internal to ADMH.

101.    Hubbard referred her concerns to the ADMH Legal Services Division for investigation.

### *Anderson's Powers, Rights & Duties as Assignee*

102.    On 5/30/2018, Anderson re-acknowledged his contractual duties as an assignee of the employment contract between him, the Plaintiff, Beshear, and ADMH; Anderson agreed via signature to such duties, powers, and rights upon consideration. Such contractual duties re-iterated Anderson's responsibility to:

1.  *"Directly supervise… Derrick Williamson, Lieutenant";*

2.  *"Develop/implement/review policies";*

3.  *"Supervise Assistant Chief and Lieutenants";*

4.  *"Evaluate/review/performance"; and*

5.  *"Maintain Peace Officer Standards"*

Additionally, "specific laws, regulations, instruction, manuals or procedures that must be followed in performing this job" included: "DMH/MR Policy Manual, SMF Policy Manual, Title 13A, NCIC Policy Manual, Security Dept. Manual, and Safety Manual". Further responsibilities included "responsibility for the appearance, discipline, efficiency, and effectiveness of subordinate police officers engaged in safeguarding facility property, residents/patients, and employees against fire, theft, vandalism, and other hazards.

### *Sexual Abuse of THSMF Patient*

103.     Additionally, on 5/30/2018, the Plaintiff was verbally counseled by Anderson for advising fellow law enforcement officers of a public safety concern regarding sexual abuse of a THSMF patient. Anderson stated that the information was sensitive although a fairly large amount of non-law enforcement staff were discussing the incident in confidence. Indeed, Anderson had advised the Plaintiff of the very information he thereafter deemed as confidential following the closing of such investigation.

104.     Anderson advised that the Plaintiff had violated HIPAA although the Plaintiff was aware of law enforcement exceptions under the Health Insurance Portability and Accountability Act. Such exceptions are outlined within 45 CFR § 164.512. Anderson advised that he had read HIPAA just as the Plaintiff; this advisement was clearly erroneous and untruthful.

105.     The Plaintiff advised his staff in the confidence of a secure environment where only law enforcement staff were present in order to make them aware to pay special attention to the safety of a fellow co-worker who was non-law enforcement. The Plaintiff's subordinates were already discussing the circumstances of the incident seeing that the subject avoided a felony charge prior to the Plaintiff's entry.

106.     This fellow co-worker was alleged to have transferred a sexually transmitted disease (Hepatitis) to a patient/inmate housed within the facility and information regarding these circumstances was circulating among staff as well as patients/inmates. Several patients/inmates had begun to target the alleged staff member and the subject who mentioned/reported the incident, James Gray.

107.    According to reports, the subject had entered the facility after hours in presentation that she was working, removed two male patients from wards, and had one present in her locked office after relocating them. It was reported that sensual sounds were heard. Such staff member was alleged to be receiving personal phone calls from the patient even several months following the incident; in which the Plaintiff attempted to investigate a method of receiving phone records through consultation with Jacob Harrison (Fiscal Manager and Account Manager).

108.    The Plaintiff advised of his first amendment right to protect the interest of the public and to ensure the safety/security of the staff as presented in his employment contract. Plaintiff furtherly advised that the discussion of felony charges pertaining to the matter did not violate HIPAA; as HIPAA has law enforcement exceptions.

109.    Anderson became upset in the presence of a fellow officer (Michael Kelley) and stated that such instance did violate HIPAA. Anderson additionally advised the Plaintiff that he did not trust him due to insufficient reasoning which was perceived by the Plaintiff to be discriminatory and retaliatory.

110.    On 6/8/2018, the Plaintiff filed an internal complaint regarding Anderson's inability to communicate with subordinate staff regarding safety concerns within the facility and a complaint regarding his sudden change in behavior towards the Plaintiff. The instance spawned from Jackson conducting an administrative investigation in lieu of requesting a criminal investigation regarding the prior staff being alleged to have had sexual intercourse with the mentally ill patient/inmate housed within THSMF.

111.    Jackson didn't notify the department's BSI so that the sexual abuse event could be criminally investigated. Rittner later advised that he had handled this occurrence. The facility also violated THSMF Police Policy 322.6 outlying a list of procedures to be followed upon the report of such sexual contact. The facility additionally did not utilize state law procedures including a "rape kit" to secure DNA.

***Report of Unethical Practices, Obstruction, & Plaintiff's Notification of his Authority***

112.     On 6/15/2018, a meeting occurred with Jackson and Anderson in which a disagreement occurred with the Plaintiff. Jackson received a verbal complaint in regard to her illegal activity in making inappropriate decisions hindering the administration of justice from the Plaintiff. Jackson failed to address a hostile work environment concern (unlawful harassment - criminally) reported to the Plaintiff regarding two staff members (Justin Gosa and Tony Hinton). Gosa had threatened to injure Hinton following Hinton's report of Gosa's use of his cellular phone in the presence of patients in violation of department policy; Gosa was observed and heard via video footage to be extremely disorderly. Hinton also reported that Gosa smelled of marijuana while in the presence of THSMF patients. The party requesting to press charges in regard to this matter was African American. Plaintiff charged Gosa for Disorderly Conduct as presented precedingly in this Complaint and notified Jackson on this date prior to the subsequent conversation.

113.     Jackson urged following administrative procedures regarding criminal behavior. Jackson advised taking immediate actions in emergency situations were authorized but minor violations should be presented to her prior.

114.     Jackson was advised by the Plaintiff that he would make decisions within his power (lawful authority as a peace officer pursuant to Alabama Code § 22-50-21) in the presence of inappropriate decisions rendered by THSMF administration which prevent the administration of justice; Jackson advised that she would terminate the Plaintiff's employment in such event.

115.     Jackson was then advised by the Plaintiff that he would seek court resolution (sue the department) in which Jackson replied that was "fucking fine!"

116.     Gosa was later terminated upon the Plaintiff's notification that Gosa was thereafter arrested for drug trafficking of Hydrocodone and the illegal possession of a firearm. The Plaintiff made his report to Long.

### District Attorney's Notification to Maintain Oath

117.    The Plaintiff was advised by the District Attorney of Tuscaloosa County, Hays Webb, to

maintain his oath of office in the highest regards despite Jackson's behavior following an in-person

meeting. Plaintiff agreed to continue to conform to his oath.

### *Jackson May Circumvent Arrests & Criminal Prosecutions*

118.    ADMH legal counsel advised that Jackson has the authority to circumvent lawful action

pursuant to police powers in her position as appointing authority for THSMF.

119.    On 11/30/2018, such counsel stated:

*"Therefore, if the Facility Director determines in her judgment, or after consultation with
other Department personnel, that prosecution is not prudent under the circumstances, then
it is within her authority to instruct subordinates within THSMF Police not to press criminal
charges"*

This was expressed in an official position statement submitted to the Equal Employment Opportunity

Commission (hereinafter referred to as *"EEOC"*). Particular reference to Alabama Code §§ 6-5-338, 15-

27-18, 22-50-21, and 36-21-6.

120.    Jackson is not a law enforcement officer, does not have a Peace Officer certification, has

no law enforcement training, and was advised by Rittner of the Plaintiff's law enforcement discretion on

5/9/2018. Jackson was also previously advised by the Plaintiff of the crime of Obstructing Governmental

Operations.

### *General Facts Cont'd*

121.    On 6/19/2018, the Plaintiff filed a complaint of a hostile work environment to Hubbard

regarding retaliation and discrimination in presenting arbitrary directives to prevent the Plaintiff from

entering the facility early to witness inappropriate behavior. Hubbard promptly dismissed the complaint

without sufficient investigation.

122.    On 7/13/2018, Plaintiff received notification from the Attorney General's Office that the

previous complaint had been received.

### *Report of Unlawful Criminal History Access*

123.    Additionally, on 7/13/2018, Anderson issued a directive permitting THSMF Psychologist to access criminal histories. Such directive was spawned from the Plaintiff's verbal complaint that Psychologist may not be lawfully utilizing such systems.

124.    It was determined that Psychologist may not view the screens directly and cannot control the computers themselves; according to what was reported as an issue by the Plaintiff.

125.    Anderson did not consult with the Federal Bureau of Investigation or the appropriate entities to make an appropriate determination. Anderson relied upon information which was utilized by the department for decades instead of legitimately reviewing the Plaintiff's concerns.

### *Complaint Regarding 5/2/2018 Reprimand*

126.    On 7/17/2018, the Plaintiff filed a complaint regarding the received reprimand on 5/2/2018. The Plaintiff presented the following violations of the employment contract (policies and procedures), state law, and federal law for consideration:

1. *THSMF Policy 60-40 ("Progressive Discipline")*

2. *ADMH Policy 60-77 ("Hostile Work Environment")*

3. *Alabama Administrative Code § 670-X-19 ("Employee Work Rules")*

4. *Effects of such prior restraint on the: United States Labor Relations Act (29 U.S.C. §§ 151-169), State Employees Protection Act (Alabama Code § 36-26A-3), First Amendment Rights, Right to Contact Elected Officials, Criminal Investigations, Joint Commission Standard's Reporting, and Title VII of the Civil Rights Act.*

127.    Hubbard dismissed the complaint without sufficient investigation or inquiry into legal aspects. Hubbard advised:

*"… you cannot complain a written reprimand under ADMH Policy 60-102. I did review the complaint and found no valid issue raised that would support your request to have the written reprimand rescinded."*

### *Alabama State Employees Association – Assistance Declined*

128.    Within July of 2018, the Plaintiff requested the assistance of Alabama State Employees Association (hereinafter referred to as *"ASEA"*) who declined to assist following a conversation with the department.

129.    Plaintiff received a letter dated 7/17/2018 from Jason Manasco, General Counsel of ASEA,

which detailed such concerns. Manasco had previously spoke with the Plaintiff via phone, and at such

time, advised of such communications. ASEA advised that the Plaintiff potentially violated the

department's computer usage policy and they would not assist with other matters in concern. The Plaintiff

provided the department's computer usage policy which authorized business communication with external

agencies and ASEA declined to respond. The Plaintiff was in contact with Manasco and his respective

representative employed by the collective bargaining organization, Christopher Edwards.

### Jackson's Powers, Rights & Duties as Assignee

130.    On 7/26/2018, Jackson re-acknowledged her contractual duties, powers, and rights as an

assignee of the employment contract between her, the Plaintiff, Beshear, and ADMH; Jackson agreed via

signature to such duties, powers, and rights upon consideration. Such contractual duties, powers, and

rights re-iterated Jackson's responsibility to:

1.  *"Maintain facility compliance with DMH policy so that all facility operations and procedures are in keeping with DMH policy, direction and mission";*

2.  *Maintain an environment of care that provides for safety and protection of mentally ill forensic patients so that patients are not subject to harm, abuse or neglect";*

3.  *Manage facility personnel in accordance with DMH policy, regulatory standards and state personnel rules so that appropriate, qualified staff are available to carry out the mission and that overall relationships with staff are positive. "; and*

4.  *Provide direct supervision to key leadership staff so that the mission and direction are developed and carried out for the facility and communicated to facility staff."*

Additionally, "specific laws, regulations, instruction, manuals or procedures that must be followed in

performing this job" included: "The Joint Commission Manuals, Dept./Facility Policies, Medicare

Standards, State law re: Forensic Patients". Also, ADMH Policy 1-10 established Jackson was delegated

"responsibility and authority for the operation of" THSMF and authority to "function and operate as the

chief administrative officer and appointing authority for the facility."

### Declined Promotion: Administrator II (Clinical Investigator)

131. On 7/27/2018, the Plaintiff was denied a promotion to Administrator II (Clinical Investigator) for lacking four months of "mental health" experience.

### *Report of Unlawful Firearms Procedures*

132. On 8/1/2018, the Plaintiff filed an internal complaint regarding Anderson in reference to unlawful firearms qualification procedures and ill-management of law enforcement certifications. Baugher, Jackson, and Hubbard were in receipt of this internal complaint.

133. Rittner was verbally notified of concerns regarding this event by the Plaintiff; Rittner agreed that Anderson should seek emergency re-qualifications of all officers under his supervision immediately. McDaniel was present during this notification.

134. On 8/2/2018, the Plaintiff was verbally counseled by Anderson following the Plaintiff's prior report of illegal activity being undertaken by Porter who is Caucasian. The Plaintiff checked records which he had sufficient and authorized access to ascertain whether the department was following lawful standards regarding firearms qualifications.

135. It was furtherly presented in the Plaintiff's complaint that Anderson had unlawfully appointed a firearm's instructor (Tony Porter) and that officer had been unlawfully certifying firearms qualifications forms for over two decades. The Plaintiff also identified the following discrepancies: Anderson's scores were inconsistent, Porter's scores were in the 70 percentiles as a firearms instructor, Porter had been certifying himself, Porter was not certified as a firearms instructor, and Anderson had allowed such discrepancies.

136. It was additionally reported by a fellow officer who was African American (Bessie Carter), that the "firearms instructor" was maintaining unlawful standards or discriminatory standards as a supervisor.

137. During this conversation on 8/2/2018, the Plaintiff was yelled at and advised to not touch the firearms qualifications forms which were removed from the Plaintiff's access. Plaintiff was advised he was "borderline" insubordinate then Anderson abruptly exited the office.

138.     Additionally, on this date, the Plaintiff filed an affidavit (complaint) with the Alabama Peace Officer Standards & Training Commission (hereinafter referred to as *"APOSTC"*) regarding Anderson's negligence leading to fellow law enforcement officer certification suspensions and unlawful activity regarding firearm certifications.

139.     Plaintiff filed this complaint because it was apparent that Anderson did not wish to maintain lawful standards. Such complaint led to a prompt investigation by APOSTC, in which the Plaintiff received a phone call from APOSTC Investigator/Auditor John Perdue.

140.     Anderson and Montoya Madden (Terminal Agency Coordinator/Agency Information Security Officer) were required to attend investigation interviews in Montgomery, Alabama in order to assess the details of the Plaintiff's complaint. APOSTC later issued a state-wide notification causal to the Plaintiff's complaint as subsequently presented.

### *First EEOC Charge*

141.     On 8/17/2018, the Plaintiff filed a timely EEOC charge of discrimination/retaliation (EEOC Charge No. 420-2018-02230) in reference to the written reprimand, *etcetera*, received on 5/2/2018. Defendants Hubbard, Long, and Jackson were notified directly by the Plaintiff.

### *Beshear Attempts to Place Anderson on Mandatory Leave*

142.     On 8/21/2018, Beshear initiated disciplinary action placing Anderson on mandatory leave from his position as Director of Police Services of THSMF. The reasons presented for such mandatory leave from office included: failing to ensure appropriate training and maintaining of Officer William Hicks' law enforcement certification, failure to maintain Porter's law enforcement certification for approximately three years (Porter had been operating with a suspended certification while in complete uniform), failure to move Porter to day-shift on modified duty following directives, and failure to maintain firearms qualification standards. State Personnel Director Jackie Graham signed the mandatory leave notification.

143.     Each of these items were reported by the Plaintiff leading to this mandatory leave.

### *Second Issued Written Discipline*

144.    On 8/23/2018, the Plaintiff received a written warning. Prior to this occurrence, Hubbard presented the following statement regarding the Plaintiff to Baugher and Jackson:

*"One last thought (maybe), I would not be surprised if Williamson brings up whistleblower, stating this action was due to his reporting Anderson regarding the APOSTC certification of Porter. That being said, you might want to start with the fact that his reporting of the issue was appreciated and valuable…"*

145.    Statements presented during such administration of discipline were scripted according to be read to the Plaintiff and the Plaintiff received such "thank you" letter from Jackson.

146.    The presented written warning included information which was not previously acted upon by the department. The Defendants also failed to get the Plaintiff's side on several of such matters.

147.    Furthermore, Plaintiff had permission from Anderson to conduct numerous incidents set forth in such Complaint; according to the Plaintiff's supervisory file formerly maintained by Anderson, Anderson orchestrated the Plaintiff's failure in several instances.

148.    Jackson, Baugher, Hubbard, and Rittner were directly involved in the administration of this disciplinary action and refused to consider presented internal policy showing sufficient rebuttals and exoneration. The presented warning advised that the Plaintiff had been previously counseled and had numerous conversations with Jackson and failed to submit to her authority. Such warning presented reprisal for the conducting of lawful duties as per the employment contract and a law enforcement officer. Furthermore, Anderson was forced to retire from his duties as Director of Police Services due to the Plaintiff's thorough documentation and complaint filed with APOSTC, and the department, immediately preceding his receipt of this warning. Beshear had waited until this specified date.

149.    Additionally, on this date, Booth issued a memorandum advising officers that "mandatory" firearms qualifications would be held with the Gordo Police Department. Booth advised, *"This qualification is mandatory as you are all aware of our immediate need for firearms qualification."*

150.    Additionally, on this date, 8/23/2018, Hubbard responded to a complaint forwarded by the Plaintiff. Hubbard issued a directive, which stated, in part:

*"This is an attempt to assist you with a clear understanding of the authority under which you, as an APOSTC certified law enforcement officer employed by the Alabama Department of Mental Health (ADMH), must operate… While law enforcement is an aspect of that provision, it is not intended to be the primary focus. As the appointing authority under which the Mental Health police force operates, the Commissioner has full authority to define the work of that force. Therefore, your scope of responsibility and authority is determined by the Commissioner. The Commissioner has given appointing authority to each facility director who carries out that defined authority within their respective facilities. Your APOST certification in no way supersedes this authority."*

151.    The Plaintiff interpreted the directive as a method to supersede state law pursuant

to Alabama Code § 22-50-21 which vests mental health police officers with "all the powers of

police officers". Plaintiff's law enforcement authority is derived from state law and is a duty

vested by the State of Alabama, not Beshear, Jackson, or Hubbard.

152.    Plaintiff was advised by Senior Special Agent Joseph Rittner with the department's BSI

that he was receiving a "slap on the wrist" so that officials may establish a foundation for how they

wanted things to occur for the future in connection with the Plaintiff's former supervision by Anderson.

Plaintiff mentioned a current EEOC charge. Plaintiff furtherly recorded such communication.

153.    The Plaintiff has thoroughly expressed that he has the right to not submit to unethical,

immoral, and illegal practices as per APOSTC oath and public policy exception.

154.    Such exception is also found within Alabama Administrative Code § 670-X-19-.01:

*"Insubordination - Failure to follow an order; disobedience; failure to submit to authority as shown by demeanor or words, with the one exception of not following an order which the employee has good reason to believe is unsafe or illegal."*

Such written warning also presented reprisal for the filing of valid and lawful criminal charges.

155.    The Plaintiff has conducted all duties according to public policy and has ensured that

appropriate safety, security, and well-being is provided to the staff, patients, and visitors operating within

the confines of THSMF. The Plaintiff has been proactive in his duties according to department policy.

### *Second EEOC Charge*

156. On 8/28/2018, the Plaintiff filed a timely EEOC charge of retaliation (EEOC Charge No. 420-2018-03769) in reference to the previous receipt of a written warning, *etcetera*, on 8/23/2018. Defendants Jackson, Long, and Hubbard were directly notified by the Plaintiff.

### *Third Issued Written Discipline*

157. On or about 9/19/2018, the Plaintiff received a written reprimand in regard to an incident including arbitrary and un-factual information. Jackson deliberately avoided interviewing or receiving the Plaintiff's response to the charges in this matter; this was a normal occurrence before the issuance of any written discipline within THSMF. Jackson acted upon a single report from a Caucasian disgruntled employee who was upset that the Plaintiff did not gain her "permission". According to THSMF Policy 115-10(1), the Plaintiff was in charge of the circumstances and was responsible for ending the emergency situation once it was determined that no further interventions were being completed. Defendants refuted this stance, although interventions, as listed within the reprimand, had not occurred during the incident. A response was promptly filed in reference to this reprimand. Additionally, the Plaintiff received a notice of a pre-disciplinary conference (hereinafter referred to as *"PDC"*) for a separate incident which was scheduled for 9/28/2018.

### *Report to National Labor Relations Board*

158. On 9/21/2018, the Plaintiff filed a charge with the National Labor Relations Board regarding the received written reprimand of 5/2/2018. Long was notified of this charge directly by the Plaintiff. Such received charged was marked as: "Rec'd 9-24-18".

### *Third EEOC Charge*

159. On 9/25/2018, the Plaintiff filed a timely EEOC charge of retaliation (EEOC Charge No. 420-2018-04087) in reference to receipt of a written reprimand, *etcetera*, on or about 9/19/2018. Defendants Jackson, Long, and Hubbard were directly notified by the Plaintiff.

### *Random Directive to No Longer Wear Personal Badge*

160.    On 9/27/2018, Plaintiff was advised to not wear his personally owned and purchased badge which was of no concern prior to this date. Plaintiff was notified by Booth that such request was disseminated by Jackson.

### Fourth Issued Written Discipline

161.    On 9/28/2018, Attorney William Dawson (hereinafter referred to as *"Dawson"*) was present for the PDC and refuted details in reference to this separate incident.

162.    Jackson wished to institute discipline for circumstances which were not the Plaintiff's responsibility or job description as blatantly expressed in the employment contract (policies and procedures). Plaintiff notified an employee of proper protocols and was subsequently subjected to responsibility for the supervision of a THSMF Patient once the employee left his assigned post. The employment contract clearly set forth that the responsibility did not lie with the Plaintiff within THSMF Policy 19-20(1). Jackson acted as hearing officer.

163.    The Plaintiff presented ten defenses in relation to the presented charges and inevitably received a written warning on 10/17/2018 from Jackson. As no method existed to refute this action as well, a response was promptly filed.

### External & Transfer Employment Consideration

164.    On 10/1/2018, Plaintiff attempted to transfer to an alternate location within the department but was advised by the department that he would be required to compete for the same position at a different location. Plaintiff chose not to compete to avoid further retaliatory action.

165.    During this time, the Plaintiff was under consideration for employment with two respectable federal agencies (NSA and United States Secret Service) and was denied employment due to recent personnel issues within his current employment (referred to by one of the agencies as an *"unfavorable employment history"*).

166.    The department, and THSMF officials, provided disciplinary records and access to the Plaintiff's personnel file. Several instances of arbitrary, capricious, unlawful, and improper discipline

were present at the time of such background investigations. The Plaintiff was not selected by either agency due to such records.

167.    Record of such discipline had also been disseminated to several other agencies which did not select the Plaintiff.

168.    Defendant(s) in this action, as well as other subjects, were interviewed in connection with such background investigations.

### *Memorandum & Directive Regarding MOVE*

169.    On 10/10/2018, Booth instituted a directive prohibiting officers from utilizing the Mobile Officer Virtual Environment (MOVE).

170.    Although never properly utilized, such system was the facilities method of automatically reporting Uniform Crime Reporting (UCR) Statistics. The facility never transmitted the incident reports to the Alabama Law Enforcement Agency to ensure compliance with state law and UCR requirements. Plaintiff filed a complaint with Booth advising him of such discrepancies which he deliberately and willfully failed to address.

171.    The non-reporting of UCR statistics via an accepted method was a criminal act pursuant to Alabama Code § 41-9-600; malfeasance was also a criminal act pursuant to this statute.

### *Fourth EEOC Charge*

172.    On 10/17/2018, the Plaintiff filed a timely EEOC charge of retaliation (EEOC Charge No. 420-2019-00234) in reference to the receipt of the additional disciplinary action and the effects of written disciplinary action on an impeding performance appraisal *etcetera*. Defendants Jackson, Long, and Hubbard were directly notified by the Plaintiff.

### *General Facts Cont'd*

173.    On 10/18/2018, Booth verbally counseled the Plaintiff for coming into work early. Booth advised that a previous directive to only come inside the work area no more than seven minutes early was not rescinded. A meeting occurred with Former Captain Noah Reeves who rescinded the limitation for

shift supervisors so that supervisors could communicate prior to shift; the Plaintiff was present for this action. Booth advised that Reeves had not rescinded the directive which had come from Jackson and that the Plaintiff should not be in the work area early. Booth was Interim Captain; maintaining the same classification as the Plaintiff and not the Plaintiff's official supervisor.

174.    This discussion followed the Plaintiff's questioning of an unauthorized individual being inside the Control Room. The method of responding appeared to be retaliatory based upon the Plaintiff's report.

175.    On 10/19/2018, Dawson forwarded a letter requesting that re-consideration be made regarding the receipt of a written warning on 10/17/2018. The Defendant's counsel refuted the request and advised that no re-consideration would occur.

176.    On 10/20/2018 the positions of Mental Health Security Officer III (Police Captain) were posted by the department's Human Resources Division.

### Issued Performance Appraisal

177.    Subsequent the postings, on 10/20/2018, a performance appraisal was finalized and distributed to the Plaintiff which listed several inadequacies, false statements, and included documentation in relation to the previously presented discipline. The Plaintiff received a *"14.11"* which fell within a *"Partially Meets Standards (6.7 - 16.6)"* category.

178.    It should be noted that the Plaintiff had never received a performance appraisal, within the history of an approximate two-year employment with the department, which was below *"Exceeds Standards (26.7 – 36.6)"*.

179.    The Plaintiff was also noted to have *"Unsatisfactory: Cooperation with Coworkers"* and *"Unsatisfactory: Compliance with Rules"* based upon the previous disciplinary action.

180.    The Plaintiff attempted to appeal to Baugher who stated she would not consider making revisions besides changing the date on the presented performance appraisal in support of information documented by Jackson. Hubbard was present for this meeting. The Plaintiff was not afforded a pay raise

due this appraisal. The Plaintiff filed a fairly detailed response regarding such appraisal detailing legal concerns and constitutional violations.

181.    Plaintiff's performance appraisal was then disseminated to the State of Alabama Personnel Department (hereinafter referred to as *"personnel department"*) for review and recording. The personnel department sanctioned the non-reception of a monetary performance increase; subsequently ignoring the Plaintiff's complaints premised upon his legal rights.

182.    The Plaintiff additionally filed a notification of potential criminal violations regarding the received performance appraisal to Baugher on 10/25/2018.

### General Facts Cont'd

183.    The Plaintiff also filed internal complaints alleging non-utilized whistleblower protection, policy violations by the Defendants, and for a second time, a hostile work environment during this time period.

184.    On 10/25/2018, the Plaintiff requested a meeting with Beshear, the Commissioner for the department. The department's Office of the Commissioner advised that the Plaintiff had been placed on a schedule to meet with the Commissioner upon her return to work.

### Anxiety & Emotional Distress

185.    At some point following the onset of adverse actions by the department, the Plaintiff began experiencing physical symptoms of stress and was diagnosed with anxiety. The Plaintiff also suffered from panic attacks due to these employment discrepancies and such concerns are on-going.

186.    On 10/29/2018, the Plaintiff began Employee Assistance Program (hereinafter referred to as *"EAP"*) counseling. The Plaintiff met with an assigned counselor (Marian Delouche) weekly in order to ease stress and anxiety related symptoms while maintaining prescribed medication.

### Assistance with Vanbeek's Concerns

187.    On 10/30/2018, Dr. Erika Vanbeek notified the Plaintiff that she was under the impression that facility was inappropriately completing recommitments. Vanbeek requested the Plaintiff to assist by

conducting a legal review to ascertain if her concerns would be corroborated. The Plaintiff notified Vanbeek of the findings not in favor of the department to verify her concerns.

188.    Vanbeek subsequently had to resign her position due to discrepancies with Jackson regarding her professional certifications.

### *Culture of Patient Care Survey*

189.    Sometime during the month of November, 2018, the facility finalized its "Patient Care Survey". Such survey responses presented staffing, discriminatory, selective enforcement, and policy concerns to be addressed by facility management (Jackson). Such complaints through the use of this survey were numerous. Several staff even mentioned ill-reporting and the facility being extremely unsafe.

190.    Such survey presented that patient safety was significantly decreasing and positive responses continued a "downward trend with 26% this year [2018] compared to 38% in 2017, 53% in 2016 and 48.2% in 2015." The facility received the grade of "poor" at 23% and the grade of "failing" at 20%.

191.    Such survey presented that the facility's staff as well as its patients were under considerable safety concerns which needed addressing promptly. Several staff continue to be physically harmed regarding these circumstances; as the Plaintiff has also been physically injured.

### *General Facts Cont'd*

192.    On 11/6/2018, Facility Director of Bryce Hospital, Audrey McShan, would not sign a retirement certificate created by the Plaintiff. McShan stated that she did not see why the Plaintiff's name was listed when such certificate was being presented to an officer at Bryce Hospital. Such information was relayed to the Plaintiff by a fellow law enforcement officer at Bryce Hospital.

193.    On 11/8/2018, the Plaintiff's legislation, which he was reprimanded for on 5/2/2018, passed within the Alabama State Employees Association's convention to be addressed by the legislature. Although the department had reprimanded the Plaintiff for his efforts, a body of subjects exceeding 200 reached a consensus to pursue the Plaintiff's resolution.

### *APOSTC Announces Lawful Standards*

194.    On approximately 11/9/2018, the Alabama Peace Officer Standards & Training

Commission issued an announcement via ePOST to all law enforcement agencies regarding the Plaintiff's

complaint regarding the department. Such announcement read in part:

> *"The agency firearms instructor must be a certified firearms instructor… a firearms instructor shall not qualify themselves."*

### *Report to State of Alabama Ethics Commission*

195.    On 11/14/2018, the Plaintiff filed a complaint and request for an advisory opinion from the

State of Alabama Ethics Commission (hereinafter referred to as *"AEC"*) regarding unlawful conduct by

Defendants Baugher and Jackson.

### *Booth's Defamation of the Plaintiff*

196.    Additionally, on 11/14/2018, Booth disseminated the following statement(s) to Long

which was also provided to other Defendants in this action:

> *"Conclusion: Lt. Williamson left his assigned duty area and Jurisdiction to assist another department without approval of any member inside his chain of command. When questioned in the matter he did not tell the truth regarding the circumstances."*

> *"Lt. Williamson placed our department and administration in a potential position of liability without any forethought or insight. Lt. Williamson continues to be disruptive, refuses to accept proper supervision and sets a bad example for all officers in our department. It's inexcusable to conduct himself in the manner that he does while acting in a supervisory role. Lt. Williamson does not exhibit good qualities of leadership nor the moral fortitude of a good police officer in general."*

197.    Booth was "Interim Director of Police Services" during the occurrence and defamed the

Plaintiff during Defendants' consideration for the official position of Director of Police Services.

198.    Such statement was disseminated to officials with appropriate supervisory oversight

although overlooked for disciplinary action. Booth additionally conducted an arbitrary investigation prior

to making such statement in order to have the Plaintiff disciplined for assisting Bryce Hospital police

officers during an unsafe detail at a remote and condemned ADMH property.

199.    The Plaintiff was actually well within his jurisdiction and was in charge of the Police

Services department (Designee, referred to as Assistant Chief, in absence of Booth per Jackson). Booth

obtained statements from other candidates for such position; presenting the ideal that the goal was to

conspire to hinder the Plaintiff's chance of obtaining such promotion. Booth was aware that he and the

Plaintiff were the only subjects seeking the position of Director of Police Services within THSMF.

### *Declined Promotion: Administrator II*

200.    On 11/16/2018, the Plaintiff applied for an Administrator II (Court Liaison) promotion.

The Plaintiff received no invitation for interview despite being informed that he was indeed qualified

following his inquiry sometime hereafter.

201.    The Plaintiff received no indication, letter, or phone call to advise that a different subject

had been selected or that he was no longer under consideration for several months until the Plaintiff made

contact with the Human Resources Department led by Hubbard.

202.    It was a routine for the department to make such notifications. The Human Resources

department in Montgomery, Alabama, led by Hubbard, advised that the Plaintiff was not selected for

preliminary interviews and declined to provide the race of the selected individual.

203.    Plaintiff was the only qualified individual who was not interviewed although the

Defendant Hubbard and the department were aware of former protected activity.

### *Report of Discrimination to State Personnel Department*

204.    On 11/17/2018, the Plaintiff filed a complaint regarding unlawful and arbitrary personnel

matters with the personnel department including discriminatory conduct. Such complaint contained an

affidavit clause signed by the Plaintiff.

205.    The Plaintiff specifically referenced governing statutes in his request and received no

response from the personnel department.

206.    The Plaintiff forwarded this complaint to Jackie Graham (Director of the State Personnel

Department) and Alice Bryne (Assistant Director of the State Personnel Department). Graham and Bryne

deliberately did not respond to Plaintiff's concerns. Graham sent the Plaintiff a "read receipt", as requested, signifying her reception of the Plaintiff's complaint.

### *General Facts Cont'd*

207.    Additionally, on 11/17/2018, the Plaintiff requested by a "Records Inspection Request" to see the Performance Appraisals of Jeremy Booth and other individuals. The Plaintiff was shown Booth's most recent performance appraisal by Long.

208.    On 11/19/2018, the Plaintiff was declined a meeting with Beshear in reference to concerns regarding the department by the department's legal counsel although such meeting had been already scheduled. Beshear was advised and agreed to this action.

### *Charging of Jackson Declined*

209.    On 11/20/2018, although the Plaintiff presented probable cause regarding Jackson's obstruction of justice, the Plaintiff was advised by Rittner that *"the spirit of that law, or how that law was written, does not encompass Mrs. Jackson's actions"*. Probable cause is defined as:

*"Facts and evidences that lead many to believe that the accused actually committed the crime. A probable cause is not a fail proof evidence as it only provides enough grounds to deem the convicted guilty of the crime, and thus to arrest and put the accused to trial."*

210.    The Plaintiff advised Rittner that actions with probable cause are not within his purview to research case law and designate as "unfounded". This was outlined in ADMH Policy 70-35 as follows:

*"If an employee violates this policy and the facts indicate a possible violation of a criminal statute, the appropriate investigating person or entity shall present such facts to the district attorney or other prosecuting authority for consideration of initiation of criminal proceedings. The investigating person or entity will notify the Facility Director when this action is taken."*

211.    The Plaintiff additionally, on this date, advised that the matter should have been consulted with the DA for an appropriate determination of whether the DA would prosecute matters.

212.    Plaintiff's direct quote regarding this matter was:

*"Thank you for your response in this matter, If there are further issues of concern I will continue to forward them as appropriate (respective to the Incident Management Plan). As the Facility Director was the individual of concern, it was inappropriate to forward the indicated matters to her for a conflict of interest. All additional criminal complaints*

*involving facility management (non-confidential matters) shall also be to the Attorney General's Office to ensure compliance with applicable law. The research of case law pertaining to indicated matters should have been completed by a District Attorney seeing that adequate probable cause was present. It is a law enforcement officer's responsibility to identify potential criminal activity, establish probable cause, then forward cases to appropriate authorities for review whether an arrest accompanies concerns or not. In my personal opinion, which may not weigh respectively, the closing of these matters are to prevent potential prosecution."*

*"Please review the additional cases forwarded to you and provide a response to those as well if possible."*

213.    Rittner is a law enforcement officer with the responsibility of conducting investigations into matters of misconduct by Facility Directors under ADMH Policy 80-10 and has the subsequent responsibility of consulting with the District Attorney regarding prosecution when probable cause is present.

214.    Rittner additionally disregarded a matter of hindering prosecution and obstruction regarding Jackson's ill report of criminal activity as mentioned previously regarding sexual abuse of a THSMF patient.

### *Harassed for Following Policy*

215.    On 12/2/2018, the Plaintiff filed a complaint regarding working outside his established responsibility. The Plaintiff was harassed by Booth for having a subordinate officer contact him (Booth) according to the "Officer-in-Charge" policy. The Plaintiff did not receive a written response to such complaint according to ADMH Policy 60-102.

### *Declined Promotion(s): Mental Health Security Officer III*

216.    On 12/4/2018, the Plaintiff was interviewed for two promotions to Mental Health Security Officer III (Captain).

217.    The Plaintiff ranked the highest (presenting his selection by the panel) with a score of 76, Booth achieved a score of 71, and Owens achieved a score of 63.

218.    The announcement for such positions presented the following method of selection:

*Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the*

*duties and minimum qualifications as mentioned above. All relevant information is subject to verification. Drug screening required. Security Clearances will be conducted on prospective applicants being given serious consideration for employment and whose job requires direct contact with clients.*

219. Drug screenings were not conducted for such position(s) prior to hire/promotion.

220. Security clearances were not conducted for such position(s) prior to hire/promotion.

221. Such position requires, upon announcement and thereafter, direct contact with clients/patients.

222. Jackson excluded the use of education in her determination to make an appointment for such position.

223. On 12/10/2018, the Plaintiff was denied promotion to Mental Health Security Officer III (Captain). The Plaintiff, as well as Jeremy Booth (Caucasian), were in consideration for promotion within THSMF. Jackson immediately placed Booth into an "Interim" status when Anderson was released from employment on 8/23/2019 until she was able to make an appointment following interviews. Individuals were under the perception that Booth was already made Captain prior to interviews and Booth's title was referenced by Jackson as "Captain" and "Chief" verbally and written prior to interviews although the Plaintiff was in consideration as well. The department conducted interviews in which the Plaintiff was advised that he did fairly well by Rittner who was acting on the panel.

224. The Plaintiff was more qualified for the position based upon the combination of his post-secondary education (associates, bachelor's, and nearly completed master's degree), years of applicable experience (ten years), efforts to advance the Police Services Division, and his recommendation from senior law enforcement staff including the preceding Captains (Anderson and Reeves).

225. Plaintiff additionally possessed a superior level of training, provided eight recommendations for his hire with a total of eleven signatures, and presented a portfolio detailing advancements completed for the department. Despite being better suited for the position, Jackson ultimately selected Booth.

226.     The department initially presented that the decision was made by departmental seniority and subsequently presented that the decision was made only by years of applicable experience (as presented by Long); presenting shifting reasons. Long also stated that the panel had selected Booth; in contradiction of the highest rating being obtained by the Plaintiff.

227.     Plaintiff had received promotion to his current position following only 6 months of employment while individuals exceeding a decade with the department were not selected; Jackson was the final decision maker in both instances.

228.     The Plaintiff was additionally in consideration for this position at Bryce Hospital where a less qualified African American (Clarence Owens) was selected. Plaintiff received a verbal report that he had violated HIPAA by creating an organizational chart naming officers employed at both locations on 12/12/2018. The indicated officers were not patients of either facility and this chart indicated their placement so that internal law enforcement staff were aware of who was employed at each facility, therefore, presenting no HIPAA violation. Such notion was arbitrarily presented by McShan to a fellow law enforcement officer working within Bryce Hospital, Susie Patrick.

229.     Owens' application for such position was not complete and he was not qualified for such position due to only 10 months of supervisory experience as indicated on his submitted application. Owens omitted the following on his application: job title, legal residence, place of birth, locations to be considered for the position, minimum annual salary, willingness to do shift work, whether he had ever been involuntarily terminated, and whether he had been convicted of a felony or misdemeanor. Instructions indicated: "Complete all portions of this application. Failure to do so may result in your application being rejected."

230.     Plaintiff was notified of his non-selection for the Bryce Hospital location on 12/13/2018 via email from Bryce Hospital's Personnel Manager, Deborah Marks. Marks advised she was notified on 12/11/2018.

231. The department's pro-offered reason, as presented in an official EEOC position statement, is that both subjects were in possession of more departmental seniority which was not presented as a selection method or preferred trait in the presented announcements. The department had previously specified "preferences" in employment announcements. In the event departmental seniority was the only selection method, the Plaintiff would not have applied due to a non-competitive process.

### *Booth's Powers, Rights & Duties as Assignee*

232. On or about 12/16/2018, Booth was provided with his contractual duties as an assignee of the employment contract between him, the Plaintiff, Beshear, and ADMH; Booth agreed via signature to such duties, powers, and rights upon consideration. Such contractual duties, powers, and rights presented Booth's responsibility to:

1. *"Directly supervise… Derrick Williamson, Lieutenant";*

2. *"Develop/implement/review policies.";*

3. *"Supervise Assistant Chief and Lieutenants.";*

4. *"Evaluate/review/performance."; and*

5. *"Maintain Peace Officer Standards."*

Additionally, "specific laws, regulations, instruction, manuals or procedures that must be followed in performing this job" included: "DMH/MR Policy Manual, SMF Policy Manual, Title 13A, NCIC Policy Manual, Security Dept. Manual, and Safety Manual". Further responsibilities included "responsibility for the appearance, discipline, efficiency, and effectiveness of subordinate police officers engaged in safeguarding facility property, residents/patients, and employees against fire, theft, vandalism, and other hazards.

### *Report & Request for Appeal Rights*

233. On 12/18/2018, the Plaintiff filed an additional complaint regarding unlawful personnel matters with the personnel department to Graham and Bryne. The Plaintiff did not receive a response to this complaint as well. Such complaint requested "Appeal Rights" pursuant to Alabama Administrative

Code § 670-X-4-.03 for discrimination in "statutorily protected non-merit factors", discrimination in

violation of Title VII § 2000e-3, and discrimination in violation of Alabama Code § 36-26A-3. Plaintiff

additionally physically mailed such concerns to the personnel department with no response being

received.

### *Improper Complaint Method*

234.    Additionally, on this date, Jackson advised the Plaintiff that his complaints did not

coincide with the department's complaint policy; presenting that a complaint could not be filed in such

instances. Following chain of command, the Plaintiff was actually operating under THSMF Policy

Supplement 60-102(1) which expressed that the Plaintiff's concerns did coincide with policy.

### *Reassignment to Day-Shift & Five-Day Unpaid Suspension*

235.    On 12/31/2018, the Plaintiff was in consideration for transfer to day-shift (6:00 AM to 2:00

PM). Officers who were currently working day-shift, through false information, presented a letter to

Jackson refuting the Plaintiff's relocation to the shift based upon his previous whistle-blower activity and

receipt of retaliatory disciplinary action.

236.    Booth sanctioned and instigated such method of documenting concerns and also attempted

to block the Plaintiff's movement to day-shift prior to subsequent events by attempting to conduct

"interviews" for a shift re-assignment; contrary to departmental policy presenting that selection is based

only upon seniority.

237.    Officers presented their concerns in fact based upon the Plaintiff's former discipline and

unsubstantiated rumors.

238.    As the Plaintiff was also provided a copy of such letter from the officers, on 12/31/2018,

the Plaintiff provided a written response to all officers who signed the indicated letter and to the

addressees presenting clarity and transparency.

239.    The Plaintiff additionally provided a defamation/libel retraction letter to the Officer Darrin

Paris who was responsible for drafting and delivering the indicated letter according to Alabama Code § 6-

5-185 establishing the Plaintiff and the officer for legal action. Such legal process has been clearly established since 1907.

240.    Officers advised the Plaintiff that such officer had conducted the action following its occurrence and as the officer's supervisor, the Plaintiff, reviewed the matter and consulted with Booth for disciplinary matters.

241.    On 2/4/2019, the Plaintiff was notified of a scheduled PDC on 2/7/2019 in regard to disseminating the libel retraction letter although the retraction letter was in accordance to Alabama Code § 6-5-185, a state law, in the Plaintiff's "personal capacity".

242.    Plaintiff has chosen not to file suit at this time due to this intimidation and awaited the outcome of the scheduled PDC. The Plaintiff additionally requested an advisory opinion regarding the matter from the Ethics Commission. Plaintiff additionally filed a complaint with Booth for unfair work practices.

243.    On 2/7/2019, the Plaintiff attended the scheduled PDC, presented numerous rebuttals to charges presented regarding his use of legal action, presented his employment contract as well as sufficient authority to refute policy violations, presented the discipline drafted for the indicated officers based upon an investigatory review, and notified the Defendants of a potential violation of 42 U.S.C. § 1981 affording him a right to *"sue, be parties, give evidence"*. Jackson acted as hearing officer.

244.    Jackson was additionally informed by the Plaintiff of discriminatory concerns regarding the indicated officer who presented the retraction letter to her; this officer is Caucasian. Such officer had displayed several apprehensions regarding discrimination which were reported by fellow officers and such officer had presented an indifference to African American supervision, including the Plaintiff. Jackson did not act on or address this complaint of discrimination.

245.    Jackson acted solely on a statement that the Plaintiff had reviewed camera footage to ascertain details of the incident without any evidence to presented charges.

246.    It should be noted that the Plaintiff was a supervising officer of the indicated officers and was consulted by the Chief Law Enforcement Official (Booth) regarding what the Plaintiff wished to do regarding the matter; presenting the decision as the Plaintiff's to make, seeing that he was their supervisor.

247.    The Plaintiff additionally had authorization to utilize the cameras in such an incident/matter by Jackson. Subsequently and following the Plaintiff's punishment, a fellow and lower ranking Caucasian officer who was on probation deliberately used the camera system to monitor his personal consort who was interning with the department and received no disciplinary action as opposed to the Plaintiff's five-day unpaid suspension. The department was aware of this officer's conduct.

248.    On 2/14/2019, the Plaintiff was notified by Human Resources of Jackson's decision to suspend the Plaintiff for five days without pay. The Plaintiff had never been suspended by the department and Jackson superseded an initial one-day unpaid suspension.

249.    The Plaintiff promptly filed a formal complaint and appeal on this day in which Jackson was notified. Jackson additionally utilized former discipline to justify this decision and presented former charges in her decision in this matter. Jackson furtherly presented that the Plaintiff's speech was "disruptive", "abusive", and "threatening".

### ***Arrest of Boris Alan McCarroll***

250.    Additionally, on 12/31/2018, the Plaintiff became abreast of an employee entering the secure area who smelled of marijuana. The Plaintiff, based upon training and experience, investigated his concerns which led to a physical search of the staff and a search of his vehicle. The Plaintiff subsequently arrested McCarroll for possessing a bad of marijuana on facility property along with a firearm. McCarroll was transported to the Tuscaloosa County Jail by the Plaintiff.

### ***Letter of Concern to Beshear***

251. Additionally, on 2/14/2019, the Plaintiff forwarded a "letter of concern" to Beshear. Beshear was notified that Hubbard had not responded to concerns of a "Hostile Work Environment" and concerns of "Whistle-Blower Protection" according to department policy.

252. Beshear decided to not review these claims due to the previous review by her subordinates according to a letter provided to the Plaintiff on 2/28/2019 stating:

*"It is further my understanding that you have filed Equal Employment Opportunity Commission (EEOC) charges and that those filings are still under review by the EEOC. For those reasons, no further due process hearings will be provided to you for your past allegations and/or complaints."*

253. Baugher additionally refused to conduct a review, and according to several sources, Jackson and Baugher are close friends and such relationship has affected official decisions within the department; decisions in which the Plaintiff has been involved.

254. Baugher's and Jackson's relationship is apparent; as both utilized departmental email for personal communications.

### *Hubbard's Administrative & Human Resources Investigations*

255. In several complaints filed in regard to these concerns, Hubbard provided insufficient responses and conducted arbitrary human resources investigations. Hubbard simply asked the Defendants their side of the story and weighed in their favor. Hubbard then chose not to respond to the Plaintiff's secondary complaints in violation of the employment contract. No evidence collection/retrieval was done in regard to concerns other than review of the presented disciplinary action.

### *Post-Suspension Hearing*

256. On 3/1/2019, the Plaintiff was finally relocated to the 6:00 AM to 2:00 PM shift following a prolonged waiting period due to the previously submitted defamation (libel).

257. On 4/1/2019, the Plaintiff was afforded a post-hearing regarding his unpaid five-day suspension. Facility Director II Eric Carpenter (hereinafter referred to as *"Carpenter"*) acted as Hearing Officer as appointed by Beshear. Carpenter was recently appointed as Jackson's new supervisor and is an agent of the department.

258.     Carpenter had been noticed by the Plaintiff to be discussing matters with Jackson prior to the hearing and the Plaintiff expected a biased decision regarding the suspension; as Carpenter was a representative of the department and Jackson's supervisor.

259.     It was later reported by several officers that Carpenter expressed indifference to police officers being employed by the department. Paris attempted reaching out to state representatives and information pertaining to this reached Carpenter. Carpenter was reported to have advised that such officer was "lucky to have a job" and to refrain from contacting state representatives regarding seniority rights.

260.     On 4/25/2019, Beshear upheld the instituted five-day suspension based upon Carpenter's findings which presented no facts in the matter but ultimately presented that the Plaintiff stood up for his rights during his post-suspension hearing while presenting superficially plausible interpretations.

261.     Such findings additionally stated the Plaintiff responded with *"zealous threats and intimidation under the pretext of legal rights"*. Beshear presented that such findings were fact. ADMH Policy 60-102 states, *"the complaint procedure is to be used for the purpose of fact finding"*.

262.     Carpenter additionally presented an interpretation that the Plaintiff was responsible for producing evidence for exoneration while Jackson, the individual bringing charges, presented no evidence in this matter besides her reliance upon a single statement made by the Plaintiff while ADMH Policy 60-102 states, *"the department's representative shall first present evidence to establish the charge(s)"*.

263.     Subsequently in presented facts, Carpenter was terminated from his position for illegal activity and falsification of credentials/education.

### *Fifth EEOC Charge*

264.     On 4/15/2019, the Plaintiff filed a timely EEOC charge of retaliation (EEOC Charge No. 420-2019-01887) in reference to the non-selection of Mental Health Security Officer III and Administrator II, *etcetera*.

### *Report to Occupational Safety & Health Administration (OSHA)*

265. On 4/17/2019, the Plaintiff filed an Occupational Safety and Health Administration

(OSHA) complaint regarding the safety and staffing conditions within THSMF.

### *Detention & Arrest Permission Required*

266. On 4/26/2019, Booth, current Captain of THSMF, implemented a procedure directly

preventing the discretion of officers employed within the department to detain and/or make arrest.

Plaintiff was later informed of similar procedures implemented at an alternate location under the

department, Bryce Hospital. Such control of arrest was being mitigated by Facility Directors (non-law

enforcement). Such statements, in part, relayed:

*"Effective immediately, THSMF officers will not, without consult of the Director of Police Services, effect an arrest unless emergency circumstances arise in which an arrest or detainment is essential to the safety/security of the facility, patients, or staff."*

### *Jackson's & Baugher's Communication Regarding this Lawsuit*

267. On 5/7/2019, Baugher communicated with Jackson and advised that she had been served

with the Plaintiff's lawsuit. Jackson advised the Plaintiff "will not stop" in response to Baugher in which

Baugher presented that she hoped the department had enough evidence to discipline the Plaintiff; this was

subsequent the served complaint.

268. Such communication is quoted as:

*"Whatever became of the incident of Lt. Williamson countering an order from Dr. Glenn and the MHW following Lt. Williamson? I don't recall seeing an incident report or anything else on this situation."- Baugher*

*"I have this on my desk to complete recommendations to HR and Mr. Carpenter. The review and interviews were completed. I hope to have this completed tomorrow or Thursday. I am without a PI Director, so I am working on Governing Body Data and report. I should have this completed this afternoon." - Jackson*

*"Thanks. It came up today when Tommy came and shared that Lt. Williamson had filed suit against the Commissioner and myself. You were probably included too but he didn't say."- Baugher*

*"He will not stop"- Jackson*

*"No and I am hoping we have enough with this incident to do something about it." - Baugher*

*"I will work diligently tonight to finish the governing body so I can work on his in the morning." – Jackson*

*Sounds good. Thanks a lot. - Baugher*

### *General Facts Cont'd*

269.     On 5/9/2019, Jackson recommended reduced discipline to a Caucasian to conceal her

retaliatory motives toward the Plaintiff. Jackson stated:

*"I had noted a recommendation for a written reprimand for Lt. Hicks but the first corrective actions for Lt. Williamson was a written warning for failure to follow 70-5. I would like to be consistent and recommend the same for Hicks."*

270.     During the month of May of 2019, Plaintiff applied for Administrator II (Clinical

Investigator) located at Mary Starke Harper Geriatric Center (hereinafter *"Harper"*), a facility under the

department.

271.     On 5/22/2019, Plaintiff was interviewed for such position at Harper by four panel members

who were currently employees of the department.

272.     Approximately in the month of May 2019, Plaintiff was made aware of additional

disturbing details in the former employment of Booth which would lead to his unfitness to oversee the

National Crime Information Center (NCIC) system utilized by the department. Booth additionally

instituted procedures which could be deemed unlawful and failed to respond to complaints regarding such

system presented by the Plaintiff in October 2018. Such concerns presented violations of the National

Criminal Justice Information Center (CJIS) Security Policy.

273.     Booth had previously utilized the NCIC system for personal gain, his NCIC based account

had been completed locked/restricted by a previous agency, and such concerns led to his

resignation/termination from this former department.

### *Report of Unlawful Uniform Crime Reporting Statistics*

274.     Department officials, following the Plaintiff's complaint in October of 2018, determined

late September 2019 that the department had been required to file Uniform Crime Report statistics and

had not appropriately done so, if at all, in decades; such law was established in 1975.

275.    McShan, Jackson, Owens, and Booth were notified of this update from Rittner. Rittner additionally advised that it was a criminal violation to not report such information. Malfeasance was also a criminal violation for not reporting; Booth has not implemented procedures to correct these unlawful standards.

### General Facts Cont'd

276.    On 5/22/2019, a conversation occurred with the Plaintiff's immediate supervisor, Booth, who expressed that the Plaintiff should have been relocated by the department following discrepancies with Jackson.

### Investigated for Lawful Detention of Staff

277.    On 5/29/2019, the Plaintiff was interrogated by Booth as well as the Director of Nursing of THSMF regarding a lawful detention of an employee who was wanted for the charge of Possession of Marijuana 2nd Degree at the time of detention.

278.    Plaintiff, as proactive according to the department's policy, checks the Tuscaloosa County Sheriff's Office mobile application to ensure current staff are not wanted for criminal charges or are not being arrested for charges relating to current issues occurring within THSMF.

279.    There have been several occurrences where patients are found positive (via urine screening) for methamphetamine, marijuana, and/or MDMA as well as utilizing smokeless tobacco products. Plaintiff has expressed his concerns regarding these circumstances on numerous occasions.

280.    The facility has allowed subjects involved in illegal narcotics activity external to the facility (arrests for controlled substances and marijuana possession) to remain employed.

281.    Plaintiff was questioned in regard to his prior interactions with the staff member, how many direct interactions have occurred with the staff member, were there any personal issues with the staff, and how he became aware of the current charges. Plaintiff has not incurred discipline regarding these circumstances at the time of this amendment.

### General Facts Cont'd

282.    During the Month of June of 2019, Plaintiff was advised of a similarly situated comparator who utilized THSMF's video review system to track and monitor his significant other during her work hours. Plaintiff directly witnessed such occurrences after his lawsuit.

283.    This significant other was also working within THSMF. Although thoroughly notified of the inappropriate use, the subject was not appropriately disciplined by the department while still on probation. This similarly situated comparator is Caucasian, not of a protected class.

### *Declined Promotion: Administrator II (Clinical Investigator)*

284.    On 6/4/2019, Plaintiff was not selected for the position of Administrator II (Clinical Investigator) at Harper. Plaintiff received written notification via a letter dated 5/31/2019 by United States Postal Service mail. Plaintiff was most qualified through superior education, training, and having formerly conducted clinical investigations in their entirety.

### *General Facts Cont'd*

285.    On 7/15/2019, Plaintiff was advised a similarly situated comparator who also called a "Code Green" or "Code Clear" prematurely during the month of July 2019 who was not disciplined by the department. Plaintiff was directly advised by this similarly situated comparator. This similarly situated comparator is Caucasian, not of a protected class. The comparator advised that he completed an incident report regarding the incident which was disseminated to Jackson, Booth, and other administrative staff.

286.    On 7/22/2019, Plaintiff received a *Notice of Suit Rights* from the United States Department of Justice Civil Rights Division regarding Equal Employment Opportunity Commission Charge 420-2018-02230.

### *Report of Unfairness in Leave Usage*

287.    On 8/1/2019, Plaintiff voiced concerns of improprieties regarding the use of earned and sick leave to Booth who presented conflicting and shifting reasons for attempting to disallow the Plaintiff to take employment leave for sickness. Plaintiff was experiencing anxiety related medical issues which were expressed to Booth.

288.    Booth presented an intimidating stance of the Plaintiff's comments of improprieties and unfair standards. Booth ordered the Plaintiff to discontinue communication in his official capacity while both the Plaintiff and Booth were off-duty.

289.    Plaintiff returned from sick leave, following calling in to THSMF staff and making notification to Booth, with several instances of perceived retaliation (including loss of personal office space, privilege to attend meetings of prestige, being informed erroneously that his supervisory skills were not appropriate, and being made to remove certifications/professional accomplishments from office wall-space). Plaintiff was then assigned a clinical investigation to be completed within five business days while being placed under new supervisory requirements presenting unrealistic standards for managing two job classifications.

290.    Plaintiff further expressed that standards were not fair; as several other staff members were not being assigned such clinical investigations and were following different standards without reprisal or verbal counseling.

291.    Plaintiff filed an internal complaint regarding such instances of communication and retaliation. Such complaint was forwarded to Defendants' counsel.

292.     Plaintiff requested a meeting with Defendant Jackson, who is the immediate supervisor of Booth, who initially declined meeting with the Plaintiff so that she may consult with counsel.

### *General Facts Cont'd*

293.    On 8/16/2019, Hubbard issued an agency-wide email directing that supervisors shall be required to complete performance appraisal training in Relias (department training software). Such email was interpreted by the Plaintiff to be a method of notifying the department there were concerns with such procedures.

294.    On 8/22/2019, Plaintiff was informed of an article presented by the Alabama Political Reporter. Such article detailed grave issues and concerns of staff within THSMF. Such article additionally included an excerpt about the Plaintiff's lawsuit (this action). Plaintiff was additionally advised that

Jackson notified all administrative staff, who were currently attending a normal business day meeting, to not speak to media; presenting a restraint on their speech. Staff reported that Jackson's behavior was alarming and frantic.

295.    Jackson had been aware of such grave concerns for over two years which have resulted in the Plaintiff's and other staff's injuries while on duty. Plaintiff had previously incurred an injury to his hand and foot during separate interactions with patients housed within the facility while inappropriate staffing levels were present. Plaintiff did not receive appropriate assistance. Such concerns are presented in the following:

### THSMF Staff Shortage & Appalling Safety Concerns

296.    As of 9/24/2019, the facility was delinquent 37 Mental Health Workers (118 total positions – 31%) who are responsible for the direct care of THSMF patients.

297.    The facility remains consistently between 30% - 35% short regarding such staff who represent the majority of staff (backbone) within the facility to ensure safety. The department, in a Court of law, previously agreed to maintain sufficient staffing levels for patient safety. In typical occasions, Mental Health Workers and Police Officers respond to manage and/or intervene in physical altercations between patients. Such Mental Health Workers typically work 16-hour shifts several times weekly leading to exhaustion.

298.    Such percentages do not take into account call-ins, medical leave, and earned leave. Such conditions present a grave safety and security concern for the facility. THSMF has, on numerous occasions, cancelled venues and visitation of patients due to such understaffing. Jackson has additionally required police officers to fill in regarding duties not entailing the security of the facility to mitigate understaffing of Mental Health Workers; subjecting the facilities, already appalling, security to scrutiny.

299.    The Plaintiff, and numerous other employees, have been injured several times due to a lack of appropriate staffing. Such injuries to the Plaintiff have included sprained fingers, injured feet, lacerations, being body-slammed, and asphyxiation. Other staff have suffered bites, head locks,

asphyxiation, their eye sockets dislocated, being punched, lacerations, and a variety of other injuries.

Patients have suffered severe lacerations, asphyxiation, black eyes, dislocated limbs, and a variety of

physical assaults premised upon unqualified staff assaulting residents, attacks by co-patients, and

understaffing. Such observations of injuries have been observed by the Plaintiff from his start of

employment at THSMF in 2016.

### *Bryce Hospital Unlawful Obstruction of Arrest*

300. Pursuant to an update, on 8/20/2019, Bryce Hospital's (another facility under the

department), implemented policies and procedures hindering lawful arrest following Officer Kelley's

arrest of an employee for Disorderly Conduct. Such policy presented:

*"No arrest (vendor, visitors, etc.) will be made on State grounds unless authorized to so
by the Facility Director."*

### *General Facts Cont'd*

301. On 8/23/2019, Plaintiff was afforded a meeting with Jackson regarding the former

complaint against Booth following the Plaintiff's notification to department counsel on 8/8/2019. Jackson

advised during such meeting that she had previously informed Booth to revise his communications with

the Plaintiff and that other subjects would be doing so.

302. Jackson was furtherly advised that Booth may not utilize his official position in such

situation to intimidate and order the Plaintiff on his personal unpaid time. Jackson refuted the Plaintiff's

stance. Plaintiff presented that such communication method was not appropriate. Plaintiff interpreted that

Booth was being allowed or requested to revise the Plaintiff's responsibilities and/or duties.

### *Harassed by Staff Presented in this Action*

303. On 9/4/2019, Plaintiff was approached by a staff member who states she was referenced

within the article of the Alabama Political Reporter. Plaintiff was directly threatened by such staff

member who made the comment that she would have to "take action!" against the Plaintiff in a very

threatening manner. Plaintiff construed the subject's statements as if she was referring to alleged unlawful

sexual contact with a THSMF patient. (¶¶ 103 – 111). Plaintiff refused to cooperate with questions asked

of the subject and advised that such invoked conversation was inappropriate. Plaintiff advised that she

may speak to the Plaintiff's supervisor regarding her contentions.

304. Plaintiff notified Defendants Long, Jackson, Rittner, and other appropriate staff who are

not Defendants in this action.

305. Plaintiff has not sought formal criminal charges within his power to pursue officially or as

a citizen; the department has not taken action to protect the Plaintiff or to discipline the Caucasian

employee in this matter who the Plaintiff regularly sees while during his continued employment.

### Attempt to Force Plaintiff to Follow Arbitrary Directives

306. On 9/20/2019, a meeting occurred with Jackson and Booth. As recorded by Jackson and

expressed by Booth, the Plaintiff and other officers are under a directive to not follow the Officer-in-

Charge policy of the facility. Jackson stated that she was not aware of such directive.

307. The Plaintiff's, Booth's, and Jackson's pertinent exchange of words via recording was as

follows:

> **Booth** - *"They are required to report to you"*
> **Plaintiff** – *"Then you need to change your policy"*
> **Booth** – *"We haven't gone by the OIC policy"*
> **Plaintiff** – *"Okay, so you're saying you're not following your policies and procedures?"*
> **Booth** – *"I said we have not gone by the OIC policy… as a directive from Montgomery"*
> **Plaintiff** – *"The directive was for them to implement the policy… so why would they say not follow it?"*
> **Booth** – *"We have the OIC policy"*
> **Jackson** – *"I am not aware of any directive from Montgomery not to follow the OIC policy"*

308. Plaintiff perceived that the department was orchestrating his sabotage by imposing

arbitrary directives. Booth continues to seek discipline and/or termination of the Plaintiff founded

upon arbitrary and unlawful directives. Jackson, also during such meeting, presented directives

which were also contrary to policy.

309. Plaintiff forwarded a complaint regarding Booth's false statements and Jackson

declined to conduct a disciplinary review or to discipline Booth.

310. Such complaint was disseminated to Jackson, Long, Hubbard, and Baugher.

### *General Facts Cont'd*

311.    On 9/30/2019, Carpenter (former hearing officer) was terminated from his position

of employment with the department for falsifying his credentials and/or educational records.

Beshear presented the following in such termination letter:

> *"Based on the recommendation of your supervisor, this is to advise you that you are being separated during probation effective the close of business, September 30, 2019. It is regrettable that this action is necessary. This decision is made for the good of the Department."*

312.    On 10/16/2019, the Plaintiff's competency assessment was finally completed. The

competency assessment is responsible for showing that the Plaintiff is competent to complete

certain tasks within his job description and is due yearly. Plaintiff's competency assessment was

due 6/30/2018. It was noted that Booth provided the wrong competency assessment; presenting

that the Plaintiff was a "New Officer" rather than a non-probationary and experienced employee,

although, all statements presented the Plaintiff was competent for all job duties.

### *Preliminary Performance Appraisal*

313.    Additionally, on this date, Plaintiff was provided with a preliminary performance

appraisal. The Plaintiff was provided a score of "24" which was reduced to a "7" ("Partially Meets

Standards") due to the previously mentioned disciplinary action.

314.    Plaintiff's score presented that he was providing reduced performance from the

former performance appraisal which presented his score of a "14.11". Other supervisors received

higher scores.

315.    Per the Plaintiff's records inspection request as per state law, Lieutenant James

Washington received a "30" ("Exceeds Standards") and Lieutenant William Hicks received a "33"

("Exceeds Standards"); there were no comments justifying such inflated scores attached.

316.    Washington and Hicks are within the same classification as the Plaintiff. It was

noted that the Plaintiff sufficiently maintains many more tasks on a daily basis than such

supervisors which were not utilized or documented for the Plaintiff's benefit.

317.     Of further concern, under the entire supervision period of Booth (the rater),
Washington has worked standard hours not in contact with Booth and Hicks has worked standard
hours which have only afforded 1.5 hours of contact with Booth during normal shift hours. The
Plaintiff maintains subordinate contact with Booth 6.5 hours during normal work periods; when
Booth decides to not remain locked within his office and refusing to communicate with the
Plaintiff. Additionally, the Plaintiff oversees the facility's Police Services Division in the absence
of Booth which was not reflected upon his performance appraisal.

318.     Such performance appraisal would result in the Plaintiff not receiving a raise; just
as in the previous performance appraisal.

319.     The Plaintiff promptly filed an appeal and refused to sign such performance
appraisal due to its illegality, incorrectness, and potential retaliation in connection with this
lawsuit. The Plaintiff also submitted a proposed and proper performance appraisal including
adequate information detailing his performance.

320.     State law afforded the Plaintiff with the right to refuse any order considered to be
reasonably illegal pursuant to Alabama Administrative Code § 670-X-19-.01 ("Employee Work
Rules").

### *Sixth EEOC Charge (Disparate Impact)*

321.     On 10/18/2019, the Plaintiff filed a charge of Disparate Impact with the EEOC.
Such charge was premised upon Booth appointing only Caucasians to the undocumented positions
of Firearm's Instructor, Training Officer, and Investigator without employing any sort of
competitive process.

322.     The Plaintiff was excluded from lawful and appropriate consideration for positions
which he was highly qualified. Booth was aware of a similar unlawful procedure by Anderson. (¶
51).

323.    Booth, upon notification by the Plaintiff of the charge, immediately responded by punishing the Plaintiff to include: 1) sending the Plaintiff to conduct an unreasonable and ill-informed search on ward day areas, 2) making the Plaintiff complete the searches without adequate staffing, 3) denying the Plaintiff's sick leave slip, and 4) disrespecting the Plaintiff in front of subordinate officers through remarks and refusal to be cordial.

### *Jackson's Attempted Establishment of "Mental Health Court"*

324.    On 10/23/2019, Jackson presented a policy limiting employee due process rights to be considered for review. As expressed, Jackson wished to establish an internal method to determine whether patients would be charged for criminal actions occurring within the facility and removed prosecuting authorities from an initial review.

325.    Jackson requested feedback which was promptly provided by the Plaintiff to ensure Jackson was aware of potential Fourteenth Amendment, First Amendment, and criminal violations if such policy was implemented. Plaintiff also informed Jackson that the facility appeared to be attempting to establish its own "Mental Health Court" although a lawful process already existed.

### *General Facts Cont'd*

326.    On 10/30/2019, the Plaintiff was ordered by Booth to leave the facility's Control Room so that he may have a private conversation with the Plaintiff's subordinate. Booth had been previously advised by Jackson to inform the Plaintiff of information, tasks, and duties relayed to the Plaintiff's subordinate officers to ensure that the Plaintiff may effectively conduct his supervisory duties. Booth expressed that the Plaintiff was not purview to the confidential information discussed with the subordinate because it required the confidential use of Control Room equipment. Plaintiff advised he is certified and has purview to any and all equipment within the Control Room just as all other supervisors. Booth advised the Plaintiff wasn't purview to the confidential information. Plaintiff notified Jackson and Long of his concerns.

327.    On 10/31/2019, the Plaintiff was provided a letter from evening shift (2:00 PM – 10:00 PM) detailing discriminatory and bias concerns regarding supervision on evening shift. The Plaintiff was not involved in such concerns.

328.    On 11/1/2019, the Plaintiff was excluded from communications which affected his performance. Booth ended his shift early, thereby placing the Plaintiff next in charge to remedy safety and security concerns. Booth did not advise of his early leave or that the Plaintiff would be required to manage facility visitation. Plaintiff notified Jackson of concerns.

329.    On 11/5/2019, the Plaintiff was provided another letter from evening shift detailing further discriminatory and bias concerns as well as Booth's ill response to such concerns. The Plaintiff was not involved in such matters.

### Booth's Hostile Communications

330.    Additionally, on 11/5/2019, the Plaintiff was harassed by Booth regarding the signing of leave slip presented by Paris. The Plaintiff had not signed such slip because Booth had been the subject to approve the requested leave. Booth was advised that the Plaintiff did not feel comfortable with the circumstances for Paris' leave so the request was presented for him to sign seeing that he verbally approved the leave. As Booth appeared highly upset and unable to control his temper, the Plaintiff immediately left the area. Booth attempted to aggressively follow the Plaintiff. Booth, subsequent the event, was observed to treat other staff members fine and cordially.

331.    On 11/6/2019 at approximately 9:06 AM, Booth requested to speak briefly with the Plaintiff in which the Plaintiff inquired the purpose seeing that such communications would be in private. Plaintiff felt unsafe being in private with Booth following several incidents. Booth advised, "we have to communicate, don't we?!" Booth questioned whether the Plaintiff had heard complaints of discrimination or racial slurs on evening shift. Plaintiff advised he was aware of concerns but had not heard direct statements of concern.

332.    Later, on such date at approximately 9:25 AM, Booth again asked to speak with the Plaintiff in private in which he advised Booth that he may express his concerns in the presence of witnesses. Booth relayed, "If I tell you that I need to see someone… it means then!" Plaintiff had not been given sufficient timing to refer a request to meet to Paris. Paris then was advised to meet with Booth; Booth declined to then leave to the Administration area. Following the filing of this lawsuit, Booth hasn't effectively communicated with the Plaintiff until he wishes to cause emotional distress.

### *Report of Retaliatory Hostile Work Environment*

333.    Further, on 11/6/2019, the Plaintiff disseminated a report of a Retaliatory Hostile Work Environment. The Plaintiff was being subjected to arbitrary, hostile, and inappropriate communications by Booth. On several occasions, Booth raised his voice, harassed the Plaintiff for minute issues not under his control, and continued to disrespect the Plaintiff among his peers and subordinates. Plaintiff, on this date left work due to severe emotional distress caused by such concerns. Plaintiff left work early on several occasions due to these concerns and heightened emotional distress. Plaintiff notified Jackson, Long, and Hubbard.

### *General Facts Cont'd*

334.    Additionally, on this date, the Plaintiff provided a letter to Booth requesting the retraction and expungement of libel as indicated in ¶¶ 196 – 199. Plaintiff notified Jackson, Hubbard, and Defendants' counsel of such dissemination. Booth failed to retract such libel.

335.    On 11/8/2019, the Plaintiff was excluded from participation in an "Active Shooter" drill. Although the Plaintiff had called-in for this date, he was unaware of any prescheduled drills affecting his subordinate staff. Washington, an African American supervisor, was additionally not pre-informed of such drill conducted by Hicks and Booth (Caucasian supervisors). According to staff, Booth failed to notify the facility that such event was, in fact, a drill; such event resulted in minor injuries to staff.

336.    On 11/14/2019, the Plaintiff was informed by James Gray (employee of THSMF) that he was responsible for making the report of the sexual abuse of the THSMF patient alleged within the preceding paragraphs of this Complaint. Gray advised that he would voluntarily testify to the details regarding the incident. Gray advised that he was relocated to an alternate shift following his report of unlawful activity and received reprisal due to his report.

### *Relinquishment of Schedule Management*

337.    On 11/21/2019, Plaintiff informed Jackson, Booth, Long, and Hubbard that he would temporarily relinquish his voluntary management of THSMF Police Services' schedule. Plaintiff had been advised earlier on this date that the facility was not properly investigating a report of theft of government time regarding other employees working within Police Services. Plaintiff advised he did not wish to be responsible for transcribing falsified information. Jackson directed the Plaintiff to keep transcribing information, refused to advise that the complaints were being investigated, and refused to consider state law. Management of the schedule was not the Plaintiff's assignment according to his job description; such task was Booth's responsibility. The Plaintiff had never been directed to do such task as well.

338.    THSMF Police Policy 201 presents that the Director of Police Services responsibilities include: "Supervision of work assignments and work schedules of Police Services personnel". The Plaintiff is not the Director of Police Services; Booth maintains such title. Booth later designated such tasks to Officer Madden who was also anxious about taking on such responsibility.

### *Ill-Will & Deliberate Indifference of Defendants*

339.    The department afforded no protection to prevent retaliation in the filing of internal and external complaints to include complaints with the State of Alabama Attorney General, Alabama Peace Officer Standards & Training Commission, Alabama Law Enforcement Agency, and EEOC, all of which they received preceding notification of concerns.

340.     Jackson retaliated against the Plaintiff through direct and indirect supervisory authority. Jackson presented uncontrolled emotion and unprofessional standards when dealing with the Plaintiff's complaints, grievances, and protected activity. Jackson has presented unlawful, arbitrary, and malicious action adversely affecting the Plaintiff.

341.     Jackson has vigorously, capriciously, and arbitrarily taken a heightened scrutiny in the Plaintiff's employment while disregarding the Plaintiff's presentation of rights, privileges, and the contract established by the department. Jackson has maintained a retaliatory standard and intimidated the Plaintiff on multiple occasions.

342.     Long did not attempt to take action to alleviate concerns but had remained passive and unconcerned. Long additionally oversaw most of the matters presented in this Complaint and was responsible for substantiating as well as reviewing presented disciplinary action prior to administration according to Jackson and his job description.

343.     Hubbard operated insufficiently in managing concerns and unlawful conduct presented to her. Hubbard additionally oversaw many matters presented in this Complaint following the Plaintiff's direct referral of information. Hubbard additionally "rubber stamped" actions taken.

344.     Baugher also operated insufficiently in managing concerns and unlawful conduct presented to her. Baugher oversaw the correction of certification concerns following the direct referral of information by the Plaintiff. Baugher additionally "rubber stamped" actions taken. Baugher additionally presented pretextual discrepancies regarding the Plaintiff's filing of this action. Baugher has presented unlawful, arbitrary, and malicious action adversely affecting the Plaintiff.

345.     Anderson, Booth, Rittner have presented discriminatory apprehensions while exercising discretion outside their scope of authority. Rittner additionally circumvented the appropriate criminal prosecution of Defendants in this action. Rittner furtherly "rubber stamped" behavior and/or actions within his purview to correct. Booth has maintained a hostile and retaliatory work environment subjecting the Plaintiff to emotional distress.

346.    Beshear, as the department's ultimate leadership, avoided concerns and presented an indifference towards the Plaintiff's expressed need for further due process and review of matters while sanctioning decisions imposed. Beshear "rubber stamped" actions taken by all the subordinates in this action. When concerns, discrepancies, and unbecoming conduct is presented to a chief official, there is then a moral obligation for an individual in such position to conduct a thorough review.

347.    Despite abundant internal complaints and external complaints which the Defendants were made aware of, Defendants Beshear, Baugher, Hubbard, and Long failed to take prompt and appropriate remedial action to protect the Plaintiff from discrimination and retaliation. Each presented deliberate indifference to ethical, illegal, and immoral discrepancies.

348.    After the Plaintiff complained about racial and retaliatory discrimination, the Plaintiff was disciplined for *"insubordination"*, *"exceeding scope of authority"*, *"inattention to job duties"*, *etcetera*, and the Plaintiff expressively presented his refutations, legal foundations, and profusely made the Defendants aware of civil rights and statutory violations while no such conduct was presented or documented prior to his complaints.

349.    These adverse employment actions were considered in diminishing the Plaintiff's life, liberty, and property interests and the Plaintiff has suffered emotional distress as a result of ongoing actions by the Defendants. Such disciplinary action, even non-adverse actions presented, would reasonably dissuade an employee from opposing unlawful/illegal actions and have substantially affected the Plaintiff's life, liberty, and property interest in continued and alternate employment.

### *Law & Contractual Violations*

350.    Plaintiff was subjected to disparate treatment, harassment, threats, and intimidation from the Defendants by and through the foregoing discipline and non-promotions referenced in the preceding paragraphs. In addition, the Defendants committed numerous violations pertaining to Federal law, state law, ADMH Policy, and THSMF Policy when disciplining and not promoting the Plaintiff. The following is a non-exhaustive list of those laws, policies, and procedures:

<u>State of Alabama Law</u>

Alabama Code § 22-50-21 ("Police Officers for state mental health facilities…")
Alabama Code § 36-26A-3 ("Discharge for Reporting Violation of Law Prohibited")
Alabama Code § 41-9-623 ("Sub. of Data to Criminal Justice Information Center")
Alabama Code § 41-9-631 ("Sub. by Crim. Justice Agencies of Uniform Crime Reports")
Alabama Code §§ 41-22-1 to 41-22-27 ("Alabama Administrative Procedure Act")

<u>State of Alabama Law – Criminal Code</u>

Alabama Code § 13A-9-12 ("Offering a False Instrument for Recording")
Alabama Code § 13A-9-45 ("Falsifying Business Records")
Alabama Code § 13A-10-2 ("Obstructing Governmental Operations")
Alabama Code § 13A-10-7 ("Compounding")
Alabama Code § 13A-10-4 ("Failing to File Required Report")
Alabama Code § 13A-10-41 ("Resisting Arrest")
Alabama Code § 13A-10-109 ("Unsworn Falsification to Authorities")
Alabama Code § 13A-10-129 ("Tampering with Physical Evidence")
Alabama Code § 13A-11-160 ("Libel Tending to Provoke Breach of Peace")

<u>Alabama Administrative Procedure Act</u>

*State of Alabama Department of Mental Health*
Administrative Code § 580-6-34-.05 ("Performance Appraisals")
Administrative Code § 580-6-34-.12 ("Employee Conduct")
Administrative Code § 580-6-34-.18 ("Drug Free Workplace")
Administrative Code § 580-6-36-.04 ("Affirmative Action Plan")

*State of Alabama Peace Officer Standards & Training Commission*
Administrative Code § 650-X-1-.16 ("Resp. of Each Law Enforcement Agency")
Administrative Code § 650-X-12-.02 ("Continuing Education")
Administrative Code § 650-X-12-.03 ("Firearms Re-Qualification")

*State of Alabama Personnel Department*
Administrative Code § 670-X-4-.01 ("Prohibition of Discrimination")
Administrative Code § 670-X-4-.03 ("Appeal Rights")
Administrative Code § 670-X-9-.04 ("Selection from Within")
Administration Code § 670-X-19-.01 ("General Work Rules")

<u>Alabama Department of Mental Health (Departmental Policy)</u>

ADMH Policy 15-1 ("Legislative Review & Submission")
ADMH Policy 19-12 ("Whistleblower Protection")
ADMH Policy 40-10 ("Computer Usage")
ADMH Policy 60-20 ("Equal Employment Opportunity")
ADMH Policy 60-40 ("Progressive Discipline")
ADMH Policy 60-77 ("On the Job Harassment")
ADMH Policy 60-80 ("Personnel Records")
ADMH Policy 60-102 ("Employee Complaint Procedure")
ADMH Policy 70-5 ("Employee Conduct & Performance")

ADMH Policy 70-6 ("Code of Conduct")
ADMH Policy 70-35 ("Threatening or Intimidating a Witness")
ADMH Policy 80-10 ("BSI: Investigations of Incidents")

Taylor Hardin Secure Medical Facility (Facility Policy)

THSMF Policy 60-40 ("Progressive Discipline" Supplement)
THSMF Policy 115-10(1) ("Code Red")
THSMF Policy 19-20(1) ("Client/Patient Observation")

Taylor Hardin Secure Medical Facility (Facility Police Policy)

THMSF Police Policy 201 ("Director of Police Services Responsibilities")
THSMF Police Policy 203 ("Police Lieutenant Responsibilities")
THSMF Police Policy 204 ("Police Officer Responsibilities")
THSMF Police Policy 206 ("Officer-in-Charge – Absence of Lieutenant")
THSMF Police Policy 207 ("Change in Shift/Off-Days, Request to")
THSMF Police Policy 322.6/.8 ("Sexual Contact Involving Patients")
THSMF Police Policy 323.1 ("Shift Change Request")

Due to such contractual violations, the Plaintiff was damaged/injured and continues to suffer injury in his

life, liberty, and property interest in his continued employment.

## "NOTICE OF SUIT RIGHTS" LETTERS FROM THE EEOC

351.    On 3/1/2019, the Plaintiff was provided a *"Notice of Suit Rights"* letter issued by the

EEOC regarding the charge filed upon 8/28/2018 (Stamped received by the EEOC on 8/30/2018).

Plaintiff had until 5/30/2019 to file a Complaint regarding this charge.

352.    On 3/27/2019, the Plaintiff was provided a *"Notice of Suit Rights"* letter issued by the

EEOC regarding the charge filed upon 9/25/2018 (Stamped received by the EEOC on 9/27/2018).

Plaintiff had until 6/25/2019 to file a Complaint regarding this charge.

353.    On 3/27/2019, the Plaintiff was provided a *"Notice of Suit Rights"* letter issued by the

EEOC regarding the charge filed upon 10/17/2018 (Stamped received by the EEOC on 10/19/2018).

Plaintiff had until 6/25/2019 to file a Complaint regarding this charge.

354.    On 6/5/2019, the Plaintiff requested a *"Notice of Suit Rights"* letter be issued by the

United States Department of Justice (hereinafter referred to as "USDOJ") by and through the EEOC

regarding the charge filed upon 8/17/2018. Plaintiff was provided a letter of a right to sue on 7/2/2019 via certified mail from the United States Department of Justice.

355.    On 10/14/2019, the Plaintiff requested a *"Notice of Suit Rights"* letter be issued by the USDOJ by and through the EEOC regarding the charge filed upon 4/15/2019. Plaintiff has completed administrative remedies regarding this charge.

# FIRST CAUSE OF ACTION [1]

## 42 U.S.C. § 1983 - FIRST AMENDMENT

## SPEECH, ASSOCIATION, ACCESS TO PRESS, REDRESS & PRIVACY

### *Beshear, Baugher, Hubbard, Long, Jackson, Anderson*

### *(Official & Individual Capacity)*

356.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

357.    By reason of the aforementioned restriction imposed by abridging the *freedom of speech, freedom of association*, *access to the press*, and ability to *petition the government for a redress of grievances*, Defendants have deprived the Plaintiff of his right to engage in the listed rights in violation of clauses set forth in the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

358.    Plaintiff spoke upon numerous matters of public concern to include Defendants': violation of their own policy and procedure; violations of state and federal law; improper safety protocols and security measures to protect THSMF patients; unlawful firearms qualifications procedures; ill reporting of Uniform Crime Reporting Statistics; obstruction, intimidations, and hindrances upon law enforcement authority; avenues of increasing government efficiency; and several other concerns within this Complaint.

359.    Defendants deprived the Plaintiff of his right of association through instituting discipline due to his advocacy through the Alabama State Employees Association (ASEA). Plaintiff was an active

member of such association or collective bargaining association at the time of his receipt of the foregoing written reprimand of 5/2/2018. Plaintiff was reprimanded for such association by the Defendants.

360.    By reason of the aforementioned abridging of collective bargaining and utilizing a letter provided in the Plaintiff's "personal capacity" regarding charges of immorality and dishonesty, Defendants deprived the Plaintiff of a right to privacy in his speech and an ability to remain anonymous in expressing, challenging, or reporting violations of law in direct violation of his First Amendment right to privacy.

361.    It is an expressed and inherent right that the Plaintiff be able to remain anonymous in reporting unlawful behavior to established regulatory agencies when acting outside the scope of his official law enforcement position.

362.    By reason of the aforementioned verbal discipline, applicable policies, written reprimand instituted on 5/2/2018, and five-day unpaid suspension effecting the life, liberty, and property interest of the Plaintiff, the Defendants' imposed a prior restraint on his speech. Such prior restraint was accomplished through requiring prior approval to disseminate information and imposing discipline to "chill' the Plaintiff's speech which was blatantly presented by the Plaintiff in regard to unlawful conduct or a protected interest. Furthermore, ADMH Policy 15-1 imposes a prior restraint on protected speech targeted at legislative process. Such speech is of public concern and such "chilling" of speech is ongoing.

363.    Defendants' true purpose for instituting the verbal counseling and written discipline was to silence the Plaintiff, prevent Whistleblower Activity, and impose limitations on external contact regarding unlawful/illegal activity occurring within THSMF, a facility under the department.

364.    Any reasonable public official would and should be aware of these established rights at the time of referenced incidents within this Complaint; as they were clearly established at the time of occurrence.

365.    As a direct and proximate result of Defendants' violation of the First Amendment through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

366.    Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

367.    Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

## SECOND CAUSE OF ACTION [2]

### 42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION

### *Beshear, Baugher, Hubbard, Long, Jackson, Anderson & Booth*

### *(Official & Individual Capacity)*

368.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

369.    Plaintiff engaged in protected speech by speaking with the Defendants regarding unlawful conduct and by speaking on matters of public concern in his drafted bill presented to his collective bargaining organization. Plaintiff engaged in protected speech when he reported violations of law and unlawful procedures, *etcetera*. The Plaintiff additionally engaged in protected speech when he responded professionally and lawfully to charges of immorality, dishonesty, and an ability to ineffectively lead; as a matter of public concern. Foremost, the Plaintiff presented speech in his "personal capacity" regarding defamation to a fellow public official which was additionally protected speech.

370.    Plaintiff engaged in protected speech regarding internal and external complaints/grievances/affidavits forwarded to departmental officials and to external and/or public governing agencies.

371.     By and through changes in terms, conditions, and privileges of employment, administrative investigations, verbal counseling, written warnings, written reprimands, five-day unpaid suspension based upon unfounded charges of dishonesty and immorality provided by fellow coworkers, and denied promotions, Defendants adversely affected the Plaintiff's employment in retaliation for protected speech.

372.     By and through job created supervisory authority, Jackson, Baugher, and Booth retaliated against the Plaintiff for *protected speech* and for the Plaintiff's petition to the government for a *redress of grievances*. Jackson retaliated against the Plaintiff due to her perception of the Plaintiff's *access to the press*. Plaintiff has been isolated due to such retaliation while Defendants are "lying in wait" for opportunities to administer arbitrary, malicious, and capricious disciplinary action.

373.     A person of ordinary firmness would be deterred from engaging in continued protected speech based upon such intimidation, obstructions, isolations, and the related adverse actions.

374.     Statements, documents, and discipline regarding law enforcement authority, violations of federal law and state law, the safety and security of mental health facilities containing criminally insane subjects, and charges of public official immorality and dishonesty are matters of public concern.

375.     The adverse actions taken by the Defendant were motivated by such protected speech; a causal connection exists in that the Plaintiff would have not received a written reprimand or five-day unpaid suspension if he had not engaged in protected speech.

376.     The Plaintiff's interest in commenting on matters of public concern outweighed the government's interest in efficiency and continues to do so. Such protected speech caused no disruption or ill-effect in governmental operation.

377.     Any reasonable public official would and should be aware of these established rights at the time of referenced incidents within this Complaint; as they were clearly established at the time of occurrence.

378.     Defendants retaliated against the Plaintiff for engaging in protected speech in violation of the First Amendment.

379.    As a direct and proximate result of Defendants' violation of the First Amendment through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

380.    Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

381.    Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

## THIRD CAUSE OF ACTION [3]

### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT

### ABRIDGMENT, EQUAL PROTECTION & PROCEDURAL DUE PROCESS

### *Beshear, Baugher, Hubbard, Long, Jackson, Anderson & Graham*

### *(Official & Individual Capacity)*

382.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

383.    Plaintiff is within a discrete and insular minority to include being an African American and a law enforcement officer.

384.    By reason of the aforementioned deprivations, limitations, and discrimination, Defendants have unconstitutionally deprived the Plaintiff of the equal protection of the law and due process guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983; Defendants have prevented the Plaintiff from exerting his rights free of limitation, retaliation, and/or obstruction.

385.    By reason of disparate treatment as well as abridgment of privileges, immunities and rights, Defendants treated the Plaintiff dissimilarly to subjects not within a discrete and insular minority and have deprived him of lawful due process. Instances are attributed to discriminatory discipline and

limitations on law enforcement authority. Defendant Graham deliberately ignored requests for sufficient due process although the Plaintiff was entitled to further "appeal rights" pursuant to Alabama Administrative Code § 670-X-4-.03.

386.    By reason of the aforementioned post-suspension hearing occurring after the deprivation of property (five-day unpaid suspension), Defendants violated the Plaintiff's due process rights as established under the Fourteenth Amendment. All conducted hearings did not afford appropriate due process pursuant actual bias.

387.    By reason of the aforementioned hearings, Defendants deprived the Plaintiff of his essential right to an *unbiased/impartial decision maker*. Per the record herein, Jackson has acted arbitrarily, capriciously, and maliciously presenting erroneous and distorted conceptions to support actions against the Plaintiff. Director of Mental Health Facilities Eric Carpenter (hereinafter referred to as *"Carpenter"*) is an agent of the department of which the Plaintiff alleges is retaliating, conspiring, and discriminating against him. Carpenter expressed a disliking to law enforcement authorities ("Police Officers") operating within the department while operating without sufficient credentials and/or education. As an agent of ADMH, such hearing officers are subject to the interest of the department and are not neutral in regard to the Plaintiff.

388.    Beshear appointed Carpenter for the suspension hearing who in turn presented substantial opinion against the Plaintiff rather than facts while presenting predisposition and *deliberate indifference* to the matters at hand. Carpenter presented actual bias toward the Plaintiff. Carpenter was subsequently terminated/dismissed from his employment with ADMH due to falsification of credentials and/or education; presenting Carpenter's bias toward lawful process.

389.    The Plaintiff was additionally deprived of property interest based upon insufficient or no evidence to support the findings; presenting inappropriate procedural due process.

390.    Defendants' discipline, unsupported by evidence and contrary to their policy, imposed a stigma and disability which foreclosed the Plaintiff's freedom to take advantage of alternate employment

opportunities. Such discipline seriously damaged his standing as well as associations with the community and other employees of ADMH.

391.    By reason of the aforementioned written reprimand instituted on or about 9/19/2018, the Plaintiff was deprived of an opportunity to present written or oral objections prior to the administration of disciplinary action hereinafter causing an erroneous deprivation of the Plaintiff's private interest to external employment.

392.    Any reasonable public official would and should be aware of these established rights at the time of referenced incidents within this Complaint; as they were clearly established at the time of occurrence.

393.    As a direct and proximate result of Defendants' violation of the Fourteenth Amendment through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

394.    Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

395.    Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

## FOURTH CAUSE OF ACTION [4]

### 42 U.S.C. § 1983 - 42 U.S.C. § 1981 – DISCRIMINATION
### MAKE & ENFORCE EMPLOYMENT CONTRACTS
#### *Beshear, Hubbard, Long, Anderson & Booth (Official & Individual Capacity)*

396.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

397.    Defendants, by acting willfully, unlawfully, in bad faith, and under mistaken interpretations of law, instituted a breach and impairment of a binding employment contract established

by department's copious personnel manuals as commenced on November 16, 2016. Such copious

personnel manuals established binding terms and conditions by which the Plaintiff and the Defendants

were required to maintain, acknowledge, and adhere to. Such employment contract established specified

terms in which the Plaintiff may be disciplined, suspended, or terminated as presented in ADMH Policy

60-40 and ADMH Policy 60-112. Such employment contract is maintained and managed, in part, between

the Defendants and the Plaintiff through a *"Position Classification Questionnaire – Form 40"*.

398.    Through intentional discrimination, the Plaintiff, a member of a protected class, was

deprived of his right to *make and enforce contracts* by Defendants, all of which are Caucasian. Defendant

Jackson, although African American, presented *deliberate indifferenc*e and malicious motives through

solely utilizing information presented by staff who were undeniably all Caucasian. Caucasian subjects

who were similarly situated were not deprived of their right to *make and enforce contracts*. Defendants

were assignees under such contract.

399.    Defendants improperly, without sufficient reasoning, instituted disciplinary action not

coinciding with personnel procedures set forth in such contract. Particular reference is given to ADMH

Policy 60-40 setting forth "Progressive Discipline" measures by which the Plaintiff is to be disciplined.

Such policy presents:

> *"The Department of Mental Health shall use Progressive Discipline as a management tool."*
>
> *"Disciplinary Action is action taken with an employee who fails to act in good faith, commits an act of non-compliance, or commits an act not in keeping with DMH standards of conduct or accountability in which a written warning, written reprimand, suspension, or termination process is applied."*

Such policy shows that the Plaintiff may not be disciplined without expressed cause.

400.    Defendants violated this contract through imposing restrictions, limitations, and alterations

to assigned duties and responsibilities as outlined in this contract. Particular reference is given to the

Plaintiff's responsibility to *"maintain safe and secure environment for patients, staff, visitors"*, to

*"conduct investigations"*, and to *"perform duties as Police Officer, make arrest, etc."* according to such

Form 40 and provisions set forth in THSMF Police Policy 203.

401.    Defendants violated this employment contract by maliciously attempting to circumvent state statutory law governing law enforcement authority designated to the Plaintiff in Alabama Code § 22-50-21.

402.    Defendants violated this employment contract through the implication that conducted activities by the Plaintiff were in violation of this employment contract. Actions conducted by the Plaintiff were not in violation of prescribed policy regarding the written reprimand instituted on 5/2/2018 in that ADMH Policy 40-10 sets forth that acceptable uses of electronic mail included *"communicating in a professional manner with parties outside the department for business purposes"*. Booth verbally counseled the Plaintiff for following (not violating) policies and procedure set forth by "Officer-in-Charge" policies. Other disciplinary actions presented similar discrepancies as outlined in the Plaintiff's responses to such adverse actions.

403.    Defendant Jackson violated this contract through threatening the termination of the Plaintiff in the event he expressed or utilized conditions set forth within this contract. Particular reference is given to ADMH Policy 60-40 which defines cause of action for termination includes "*documented involuntary personnel action applied by the appointing authority based on a serious violation(s) or repeated violation(s) of departmental rules or policies, or uncorrected conduct preceded by due process procedure."* Defendants sanctioned this action and failed to discipline Jackson.

404.    The Plaintiff has not violated the employment contract and such threats amount to a violation of provisions set forth in ADMH Policy 70-5 giving rise to improper employee conduct, ADMH Policy 19-12 presenting that the Plaintiff should have been afforded *"reasonable measures to protect"* him from retaliation, and ADMH Policy 70-35 which should have protected the Plaintiff from threats, intimidation, and retaliation.

405.    Defendant Rittner additionally violated such contract by not following ADMH Policy 70-35 advising that *"the appropriate investigating person or entity shall present such facts to the district*

*attorney or other prosecuting authority for consideration of initiation of criminal proceedings"* following

being advised by the Plaintiff.

406.    Defendant Jackson deliberately and maliciously failed to follow ADMH Policy 60-112

*("Pre-Disciplinary Conference")* setting forth herein:

> *"All information presented at the pre-disciplinary conference should be taken into consideration prior to making a decision whether or not to take disciplinary action.*
>
> *In the case of a suspension or termination the burden of proof lies with the appointing authority."*

As Jackson provided insufficient evidence, and in cases, no evidence to support her findings.

407.    Defendants Beshear, Hubbard, Jackson, and Anderson deliberately and capriciously failed

to follow ADMH Policy 70-35 *("Threatening or Intimidating a Witness")*.

Jackson threatened, intimidated, and retaliated against the Plaintiff according these provisions within the

employment contract. It should be noted that this policy specifically references *"Title 36-26A-1, Code of*

*Alabama, 1975 ("The State Employees Protection Act", also known as the "whistleblower" act)"*. In the

event the Plaintiff was afforded adequate protections by Beshear and sufficient investigations were

conducted by the other Defendants, Jackson would have been disciplined.

408.    Defendant Beshear, Hubbard, and Long violated this contract through ill-response and ill-

investigation of the Plaintiff's reports of discrimination, retaliation, hostile work environment, *etcetera*.

Defendants additionally failed to provide whistle-blower protection according to this contract. Particular

reference given to ADMH Policy 19-12 stating *"The Alabama Department of Mental Health shall take*

*reasonable measures to protect employees from retaliation for reporting abuse, neglect, exploitation, or*

*other mistreatment of individuals in the care of DMH or for reporting other illegal acts by employees,*

*when such reports are made by the employee in good faith"* and ADMH Policy 60-77 advising that *"A*

*hostile work environment or on the job harassment will not be tolerated"*.

409.    Defendant Anderson violated this contract through imposing discipline outside the scope

of established policies and procedures, acting beyond his authority. Anderson additionally violated this

contract through imposing limitations on established provisions within such contract. Defendants acted beyond their scope of authority as established by such contract.

410.    Defendants Jackson and Booth violated this contract by intimidation, hindrance, and obstruction regarding the Plaintiff's law enforcement authority and power vested by the State of Alabama.

411.    Defendants violated this employment contract through not completing competency assessments regarding the Plaintiff's duties within his employment.

412.    Employment contract violations presented are not all-inclusive. Additional matters are set forth in the Plaintiff's responses/attachments to adverse employment actions as well as within this complaint's presented facts.

413.    As a direct and proximate result of Defendants' breach and impairment of the employment contract through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

414.    Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

415.    Plaintiff furtherly seeks declaratory and injunctive relief in the official capacity of the Defendants.

## FIFTH CAUSE OF ACTION [5]

### 42 U.S.C. § 1983 - 42 U.S.C. § 1981 – EQUAL RIGHTS

### *Beshear, Baugher, Rittner, Hubbard, Long & Anderson*

### *(Official & Individual Capacity)*

416.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

417.    By reason of the aforementioned deprivation of civil and constitutional rights, Defendants have intentionally deprived the Plaintiff of the full and equal benefit of all laws as enjoyed by white citizens through intentional discrimination; the Plaintiff is an African American, of a protected class.

418.    Punishment in relation to incidents were not comparative to punishment issued to similarly-situated Caucasian counterparts and Defendants were cognizant of this which is *indicia* of discrimination. Race was a motivating factor in decisions made.

419.    Plaintiff was deprived of his *right to sue, be a party to legal action, and to give evidence* by and through a five-day unpaid suspension overseen and managed by Long, Hubbard, Baugher, and Beshear.

420.    Plaintiff, as a citizen and Alabama state employee, was entitled to due process protection of freedom from arbitrary action which jeopardized his property interest in his public employment in that he should have not been subjected to written disciplinary action directly affecting life, liberty, and property interest without due process. Plaintiff additionally should have received appropriate and equal consideration for review of his administrative, civil, and criminal complaints; Defendants deprived the Plaintiff of lawful process afforded to members not of a protected class.

421.    Defendants caused abridgment of sufficiently and well-known rights established by the United States Constitution and were sufficiently informed following actions to offer an opportunity to amend. Defendants refused to amend or revise presenting a *deliberate indifference*.

422.    Plaintiff also was entitled to liberty interest in his reputation as an honest and ethical public employee. The Defendants' actions and refused consideration deprived the Plaintiff of these rights.

423.    Any reasonable public official would and should be aware of these established rights at the time of referenced incidents within this Complaint; as they were clearly established at the time of occurrence.

424.     As a direct and proximate result of Defendants' violation of the equal rights clause of 42 U.S.C. § 1981 through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

425.     Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

426.     Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

# SIXTH CAUSE OF ACTION [6]

## 42 U.S.C. § 1983 - 42 U.S.C. § 1981 – DISCRIMINATION

### *Beshear, Baugher, Rittner, Hubbard, Long & Anderson*

### *(Official & Individual Capacity)*

427.     Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

428.     Plaintiff, as an African American, is a member of a protected class, and thus also has the clearly established statutory right under 42 U.S.C. § 1981 to be free from racially motived actions and decisions in employment. At the time of the presented events within this Complaint, the Plaintiff had a clearly established constitutional right to be free from racial discrimination and the right to enjoy the equal protection of the laws.

429.     Punishment in relation to incidents were not comparative to punishment issued to Caucasian counterparts and Defendants were cognizant of this which is *indicia* of discrimination.

430.     Plaintiff applied for and was most qualified for the applied promotion of Mental Health Special Agent I and the Plaintiff was not selected in lieu of the selection of a less qualified Caucasian. Plaintiff was highly qualified for the applied promotion indicated of Administrator II (Court Liaison) and was not interviewed, selected, or notified.

431.    Anderson engaged in conduct described within this complaint willfully, maliciously, and in bad faith, presenting a reckless disregard for the Plaintiffs rights. Anderson administered an unlawful written reprimand and presented actions limiting the Plaintiff's privileges of employment while not conducting actions comparably to similarly situated Caucasian employees.

432.    Hubbard and Rittner, through subjective selection procedures and the selection of a Caucasian applicant over a more qualified African American applicant, discriminated against the Plaintiff in a promotion selection. Hubbard, through arbitrary and unlawful means, denied the Plaintiff a full and equal consideration for promotion through discrimination and deliberate indifference to the selection of Mental Health Security Officer III (Captain).

433.    Plaintiff's race was a motivating factor in the decisions to conduct the described actions. Defendants' conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law and equal privileges and immunities under the law in violation of 42 U.S.C. § 1981.

434.    Any reasonable public official would and should be aware of these established rights at the time of referenced incidents within this Complaint; as they were clearly established at the time of occurrence.

435.    As a direct and proximate result of Defendants' discrimination through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

436.    Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

437.    Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

# SEVENTH CAUSE OF ACTION [7]

## 42 U.S.C. § 1983 - 42 U.S.C. § 1981 – RETALIATION

## *Beshear, Baugher, Rittner, Hubbard, Jackson, Long, Anderson & Booth*

## *(Official & Individual Capacity)*

438.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

439.    Plaintiff engaged in protected activity when he complained about discrimination based upon race as well as disparate treatment on 12/6/2017, 5/2/2018, and via written internal complaints.

440.    Plaintiff engaged in protected activity when he filed Equal Employment Opportunity Charges (EEOC) on 8/17/2018, 8/28/2018, 9/25/2018, 10/19/2018, 4/15/2019, and 10/18/2019 alleging discrimination, disparate impact upon African Americans, and retaliation.

441.    Plaintiff was subjected to arbitrary and unlawful disciplinary action, prevented from relocating to an alternate shift where he would gain a superior role as lead supervisor, declined privileges of employment, suspended without pay for five days, and denied promotions in which scrutiny ensued within his employment. Plaintiff was denied a promotion to Mental Health Special Agent despite being most qualified. Plaintiff was denied a promotion to Mental Health Security Officer III (Captain) despite being most qualified. Plaintiff was deliberately avoided from consideration for promotion to Administrator II (Court Liaison) despite being highly qualified in retaliation of events described herein. Plaintiff also endured having to complete arbitrary ward searches, being made to decide upon and being placed in lose-lose situations to affect his performance, being initially denied sick leave, being disrespected among subordinate staff by supervisors, being excluded from work related communications/meetings, having privileges revoked, and other discrete acts of retaliation. All such actions occurred following protected activity.

442.    Defendants retaliated with such actions due to the Plaintiff's membership in the specified protected class.

443.    There was a causal connection between the Plaintiff's complaints and the materially adverse actions taken against the Plaintiff. A special focus exists in relation to *temporal proximity* based upon when adverse actions were conducted by the Defendants and heightened pretextual comportment.

444.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination, disparate treatment, as well as filing EEOC charges.

445.    Race was a motivating factor in actions imposed. Similarly situated employees who are Caucasian had been allowed to violate policy and procedure without recourse or disciplinary action under the Defendant's supervision and received sufficient considerations and/or promotions.

446.    Defendants retaliated against the Plaintiff for engaging in protected activity in violation of 42 U.S.C. § 1981.

447.    As a direct and proximate result of Defendants' retaliation through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

448.    Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

449.    Plaintiff is furtherly entitled to declaratory and injunctive relief in the official capacity of the Defendants.

## EIGHTH CAUSE OF ACTION [8]

### 42 U.S.C. § 1985(2) CLAUSE TWO – CONSPIRACY

### *Beshear, Baugher, Hubbard, Rittner, Long, Anderson & Booth*

### *(Individual Capacity)*

450.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

451.    By reason of the aforementioned underlying wrong as expressed in this complaint, Defendants, along with McShan, the personnel department, and ASEA, separate entities, agreed to accomplish an unlawful end and conspired against the Plaintiff due to his membership and/or birth into the specified classes of individuals. Such conspiracy is ongoing.

452.    Plaintiff asserts that Rittner (BSI) should be considered as a separate entity for the purpose of a conspiracy in this action in that he operated as a representative of the State of Alabama in use of his authority as a law enforcement officer.

453.    Defendants deprived the Plaintiff of the equal protection and privileges of the laws through discrimination, retaliation, civil rights violations, class-based animus, and *deliberate indifference* to civil and constitutional rights while exceeding their scope of authority.

454.    Plaintiff was additionally treated differently than similarly situated Caucasian employees with the same authority and/or position as the Plaintiff. Plaintiff was furtherly treated differently than Caucasian employees within THSMF.

455.    Defendant Jackson presented animus, defiance, and anxieties directed at law enforcement officers and the male gender; both classes for the purposes of this cause of action.

456.    Defendants Beshear, Baugher, Hubbard, Long, Rittner, and Anderson presented discriminatory animus directed at the Plaintiff. Defendants additionally presented defiance and anxieties directed at law enforcement officers (including the Plaintiff who is a member of such class) operating within the department who receive their power from state statutory law and the United States Constitution.

457.    Minorities, genders, and law enforcement officers are discernable classes for the purpose of this cause of action.

458.    Plaintiff received numerous instances of arbitrary, unlawful, and malicious disciplinary action (including verbal counseling) jointly reviewed and approved by the Defendants in violation of the

Plaintiff's civil and constitutional rights. Several of such matters were directed at the Plaintiff's law enforcement authority.

459.    Plaintiff received a written reprimand on 5/2/2019 directly limiting fundamental rights through a prior restraint in order to obstruct the due course of justice in the State of Alabama. Such reprimand was instituted and sanctioned through joint communications among the Defendants. Such overt acts were also a crime pursuant to *Alabama Code 13A-10-2 ("Obstructing Governmental Operations")* and *Alabama Code 13A-10-42 ("Hindering Prosecution or Apprehension")*.

460.    The Plaintiff referred the written reprimand of 5/2/2019 to ASEA who refused to assist based upon arbitrary cause following their communication with the department.

461.    The Plaintiff also filed complaints with the personnel department who willingly declined to respond to concerns of unlawful conduct.

462.    Jackson intimidated the Plaintiff in efforts to prevent his current and future involvement in state district court proceedings with the subsequent approval of her overseers and Rittner through deliberate indifference (overlooking the passage of a criminal act); such overt act was in violation of *Alabama Code 13A-10-123 ("Intimidating a Witness")*.

463.    Jackson sought avenues of disciplining and hindering the Plaintiff for bringing subjects who were wanted for criminal acts to due course of justice within the State of Alabama. Defendants, knowing such avenues were unlawful, presented *deliberate indifference* and permitted such overt acts to proceed.

464.    Booth attempted to discipline the Plaintiff for exerting his law enforcement authority as per state law by unlawful modifications on jurisdiction, arbitrarily stating departmental facilities were separate jurisdictions under a mistaken interpretation of law, and by presenting the Plaintiff lied without any evidence concluding such.

465.    The Plaintiff received an arbitrary and capricious performance appraisal in the Month of October 2018 including false statements which were disseminated from the Defendants to the personnel

department. Such performance appraisal referenced imposed restrictions of the Plaintiff's law enforcement authority. Defendants jointly approved and reviewed such overt act; a crime pursuant to *Alabama Code 13A-9-12 ("Offering a False Instrument for Recording")*.

466.     Defendants conducted overt acts, as listed within the facts, and presented deliberate indifference through "rubber stamping"; furthering conspiracy regarding the Plaintiff's lawful authority and employment.

467.     Defendants conspired and are conspiring for the purpose of impeding, hindering, and obstructing the Plaintiff in regard to a due course of justice in any state or territory through such overt acts.

468.     Defendants' goal was/is to secure the abrupt end of the Plaintiff's employment due to his involvement, association, and/or birth within the specified classes of individuals.

469.     Defendants conspired for the purpose of injuring the Plaintiff in lawfully enforcing, or attempting to enforce, the right of employees (persons) to the equal protection of the laws through hindrances on law enforcement authority and access to state courts.

470.     Plaintiff had a right to engage in the duties of a law enforcement officer in order to secure the rights of fellow employees operating within the department. Additionally, Defendants, along with co-conspirators, instituted directives, hindrances, and limitations on the Plaintiff's and other employee's law enforcement authority to prevent the due course of justice in the State of Alabama.

471.     Such due course of justice included: *1) receipt of complaints of violations, 2) investigation of such violations, 3) referral via deposition/affidavit to state courts and/or arrests, and 4) potential prosecution*. Administrative process in lieu of criminal prosecution was/is not within such due course of justice.

472.     Plaintiff had pending state court proceedings regarding a current patient housed within the facility, had filed charges against Gosa (former employee) initiating state court proceedings, had initiated state court proceedings against other staff, and had arrested subjects on warrants for arrest.

473.     Defendants' counsel, an employee of the department, presented that Jackson possessed the authority to circumvent arrests in circumstances she deemed appropriate.

474.     Defendants jointly communicated in furtherance of violations of this Clause in efforts to affect arbitrary and capricious discipline although placed on prompt and sufficient notice. Although not achieved, Defendants sought the "unlawful end" of the Plaintiff's termination.

475.     Therefore, Defendants conspired in violation of 42 U.S.C. § 1985(2) Clause Two.

476.     As a direct and proximate result of Defendants' conspiracy through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

477.     Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

# NINTH CAUSE OF ACTION [9]

## 42 U.S.C. § 1985(3) – CONSPIRACY

### *Beshear, Baugher, Hubbard, Rittner, Jackson, Long, Anderson & Booth*

### *(Individual Capacity)*

478.     Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

479.     By reason of the aforementioned underlying wrong as expressed in this complaint, Defendants, along with the personnel department and ASEA, separate entities, agreed to accomplish an unlawful end and conspired against the Plaintiff due to his membership and/or birth into the specified classes of individuals.

480.     Defendants deprived the Plaintiff of the equal protection and privileges of the laws through discrimination, retaliation, civil rights violations, class-based animus, and *deliberate indifference* to civil and constitutional rights while exceeding their scope of authority. Plaintiff was additionally treated

differently than similarly situated Caucasian employees with the same authority and/or position as the Plaintiff. Plaintiff was furtherly treated differently than Caucasian employees within THSMF.

481.    Defendant Jackson presented animus, defiance, and anxieties directed at law enforcement officers and the male gender; both classes for the purposes of this cause of action.

482.    Defendants Beshear, Baugher, Hubbard, Long, Rittner, and Anderson presented discriminatory animus directed at the Plaintiff; the Plaintiff is African American. Defendants additionally presented defiance and anxieties directed at law enforcement officers (including the Plaintiff who is a member of such class) operating within the department who receive their power from state statutory law and the United States Constitution.

483.    Minorities, genders, and law enforcement officers are discernable classes for the purpose of this cause of action.

484.    Plaintiff received numerous instances of arbitrary, unlawful, and malicious disciplinary action jointly reviewed and approved by the Defendants in violation of the Plaintiff's civil and constitutional rights. ASEA declined to assist after communications with the department.

485.    Plaintiff received a written reprimand on 5/2/2019 directly limiting fundamental rights through a prior restraint in violation of the First Amendment in order to obstruct the due course of justice in the State of Alabama. Such reprimand was instituted and sanctioned through joint communications among the Defendants.

486.    The Plaintiff received an arbitrary and capricious performance appraisal in the Month of October 2018 including false statements which were disseminated from the Defendants to the personnel department.

487.    The Plaintiff also filed complaints with the personnel department, overseen by Graham, who willingly declined to respond to concerns of unlawful conduct.

488.    Beshear, Baugher, Hubbard, Long, Jackson, and Booth instituted and permitted a five-day un-paid suspension in direct violation of 42 U.S.C. § 1981 and the First and Fourteenth Amendments of

the United States Constitution which authorization was disseminated to the personnel department who enacted such suspension.

489.    Defendants jointly communicated in furtherance of violations of the Plaintiff's rights established by the United States Constitution. Defendants Baugher and Jackson maliciously communicated in efforts to further violate the Plaintiff's rights subsequent the foregoing adversities; an ongoing violation.

490.    As a direct and proximate result of Defendants' conspiracy through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

491.    Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

## TENTH CAUSE OF ACTION [10]

### 42 U.S.C. § 1986 – ACTION FOR NEGLECT TO PREVENT

### *Beshear, Baugher, Hubbard, Long, Rittner & Graham*

### *(Individual Capacity)*

492.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

493.    By reason of the aforementioned violation of 42 U.S.C. § 1985(2) and 42 U.S.C. § 1985(3), Defendants are hereby liable under 42 U.S.C. § 1986 for failing to prevent or aid in the prevention of such wrongful act(s) in lieu of their participation.

494.    Defendants had power to prevent the alleged wrongs as presented within this complaint. Beshear is the supervisory oversight for the entire department, Baugher is the supervisory oversight for all of the department's mental health facilities, Hubbard is the supervisory oversight for human resources for the entire department, Long is the supervisory oversight for human resources within THSMF, Rittner is

the law enforcement official responsible for the investigations of unlawful conduct of Facility Directors, and Graham is the Director of the State Personnel Department.

495.    Defendants had prompt and sufficient notification in order to aid in the prevention of such acts, violations, and willful obstructions.

496.    As a direct and proximate result of Defendants' neglect and callous indifference through willful, malicious, and arbitrary means, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

497.    Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

# ELEVENTH CAUSE OF ACTION [11]

## TITLE VII, 42 U.S.C. §§ 2000E TO 2000E-17 - DISCRIMINATION

### *Alabama Department of Mental Health & Mental Retardation (ADMH)*

498.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 355 as fully set forth herein.

499.    Plaintiff, as an African American, is a member of a protected class, and thus also has the clearly established statutory right under Title VII, 42 U.S.C. § 2000E-2 to be free from discrimination in employment.

500.    Particularly, Plaintiff was issued an illegitimate written reprimand on 5/2/2018 which directly violated his rights because of his race. Similarly situated employees, not of a protected class, did not receive discipline for the same behavior as the Plaintiff.

501.    Plaintiff applied for and was most qualified for the applied promotion of Mental Health Special Agent I and the Plaintiff was not selected in lieu of the selection of a less qualified Caucasian.

502.    Defendant disregarded improprieties in Caucasian employees in contrast to arbitrarily and unlawfully disciplining and avoiding the promotion of the Plaintiff who is an African American.

503.    Defendant provided higher raises and wages to Caucasian subjects rather than the Plaintiff and other African American employees due to such discrimination. Defendant also provided reduced/negative performance appraisals to African American employees as opposed to enhanced/positive performance appraisals to Caucasians who had not earned such performance ratings due to discrimination.

504.    Defendant's conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law and equal privileges and immunities under the law through discrimination in violation of Title VII, 42 U.S.C. § 2000e-2.

505.    ADMH, as a state governmental entity, is not subject to immunity pursuant to 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment to abrogate such immunities.

506.    Defendant discriminated against the Plaintiff in violation of Title VII, 42 U.S.C. § 2000e-2.

507.    As a direct and proximate result of Defendant's discrimination through willful, malicious, callous, and arbitrary actions, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

508.    Plaintiff seeks recovery of compensatory damages as provided by law and any so other relief determined to be appropriate.

509.    Plaintiff is furtherly entitled to declaratory and injunctive relief.

## TWELFTH CAUSE OF ACTION [12]

### TITLE VII, 42 U.S.C. §§ 2000E TO 2000E-17

### RETALIATION & RETALIATORY HOSTILE WORK ENVIRONMENT

#### *Alabama Department of Mental Health & Mental Retardation (ADMH)*

510.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 355 as fully set forth herein.

511.    Plaintiff engaged in protected activity when he complained of discrimination based upon race as well as disparate treatment on 12/6/2017, 5/2/2018, and through any other complaint of discrimination referenced within internal complaints disseminated to the Defendants.

512.    Plaintiff engaged in protected activity when he filed, completed, and/or disseminated Equal Employment Opportunity Charges (EEOC) on 8/17/2018, 8/28/2018, 9/25/2018, 10/19/2018, 4/15/2019, pursuant to Title VII of the Civil Rights of 1964 § 2000e-3. *[Section 704]*.

513.    Defendant was aware of the Plaintiff's activities under Title VII of the Civil Rights Act.

514.    There was a causal connection between the Plaintiff's complaints and the numerous materially adverse actions taken against the Plaintiff by ADMH. A special focus exists in relation to temporal proximity based upon when adverse actions were conducted by the Defendants and heightened pretextual comportment.

515.    Defendant's institution of abundant adverse actions, negative effects on the Plaintiff's terms, conditions, and privileges of employment, and numerous denied promotions have subjected the Plaintiff to a retaliatory hostile work environment and harassment for his engagement in protected activity.

516.    The retaliation endured by the Plaintiff would/has dissuade(d) a reasonable employee from making complaints of discrimination, disparate treatment, as well as filing EEOC charges. Such retaliation has additionally fostered an open forum of retaliation directed at employees who engage in protected activity in pursuit of relief under Title VII.

517.    Such retaliatory actions have created an intolerable hostile work environment.

518.    ADMH has intentionally maintained these retaliatory and unlawful practices to the detriment of the Plaintiff and its other employees.

519.    ADMH failed to take necessary action to prevent or correct the retaliatory actions and, in fact, ratified and permitted such conduct through deliberate indifference.

520.    Defendant, through the supervision of the Plaintiff in his employment, has engaged in, directed, and/or ratified retaliatory conduct and have sought avenues to defeat the Plaintiff's efforts to obtain relief under Title VII.

521.    ADMH, as a state governmental entity, is not subject to immunity pursuant to 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment to abrogate such immunities.

522.    ADMH retaliated against the Plaintiff for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

523.    As a direct and proximate result of Defendant's retaliation for protected activity through willful, malicious, callous, and arbitrary actions, the Plaintiff has suffered and continues to suffer injuries and damages alleged in ¶ 634 and adverse employment actions alleged herein. Plaintiff continues to be denied his right to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

524.    Plaintiff seeks recovery of compensatory damages as provided by law and any so other relief determined to be appropriate.

525.    Plaintiff is furtherly entitled to declaratory and injunctive relief.

## THIRTEENTH CAUSE OF ACTION [13]

### ALABAMA CODE § 36-26A-3 – STATE EMPLOYEES PROTECTION ACT (ASEPA)
### WHISTLEBLOWING – STATE LAW CLAIM

#### *Beshear, Baugher, Hubbard, Long, Jackson & Booth (Individual Capacity)*

526.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

527.    Plaintiff engaged in protected activity by reporting violations of law pursuant to Alabama Code § 36-26A-3 via affidavits under affirmation, witnessed and signed before a notary public. Plaintiff,

primarily, reported violations of firearms training regulations, law enforcement certification

discrepancies, personnel practices, and Uniform Crime Reporting delinquencies.

528.    Plaintiff engaged in protected activity when he filed Equal Employment Opportunity

Charges (EEOC) on 8/17/2018, 8/28/2018, 9/25/2018, 10/19/2018, 4/15/2019, and 10/28/2019 via

affidavits under affirmation and the penalty of perjury.

529.    Plaintiff engaged in protected activity when he filed criminal charges by and through

affidavits transmitted to state courts pursuant to his lawful authority as a law enforcement officer of the

State of Alabama.

530.    Defendants violated the foregoing federal laws and failed to follow state laws including,

but not limited to, law enforcement officer certifications, firearms qualifications, uniform crime reporting

statistics, and ethics law.

531.    Plaintiff, in such transmitted affidavits under affirmation, reported violations of such laws

and rules promulgated pursuant to the laws of the State of Alabama.

532.    Plaintiff's terms, conditions, and privileges of employment were directly affected by and

through discrimination for filing such affidavits.

533.    There was a causal connection between the Plaintiff's affidavits and the materially adverse

action/changes taken against the Plaintiff by the Defendants. A special focus exists in relation to temporal

proximity based upon when the adverse action (discrimination) was conducted by the Defendants, via

transmitted communications, and heightened pretextual comportment.

534.    The discrimination would dissuade a reasonable employee from reporting violations of law

and rules promulgated by the State of Alabama.

535.    Defendants discriminated against the Plaintiff for engaging in protected activity through

willful, capricious, malicious, and arbitrary actions beyond their scope of authority in direct violation of

Alabama Code § 36-26A-3.

536.     As a direct and proximate result of Defendants' discrimination through willful, malicious, and callous actions, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

537.     Plaintiff seeks recovery of back-wages, front-wages, and/or compensatory damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

## FOURTEENTH CAUSE OF ACTION [14]

### BREACH OF CONTRACT – STATE LAW CLAIM

### *Beshear, Hubbard, Rittner, Jackson, Long & Booth (Official Capacity)*

538.     Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

539.     Defendants, as assignees, by acting willfully, unlawfully, in bad faith, and under mistaken interpretations of law, instituted a breach and impairment of a binding employment contract established by department's copious personnel manuals as commenced on November 16, 2016. Such copious personnel manuals established binding terms and conditions by which the Plaintiff and the Defendants were required to maintain, acknowledge, and adhere to. Such employment contract established specified terms in which the Plaintiff may be disciplined, suspended, or terminated as presented in ADMH Policy 60-40 and ADMH Policy 60-112. Such employment contract is maintained and managed, in part, between the Defendants and the Plaintiff through a *"Position Classification Questionnaire – Form 40"*.

540.     Defendants improperly, without sufficient reasoning, instituted disciplinary action not coinciding with personnel procedures set forth in such contract. Particular reference is given to ADMH Policy 60-40 setting forth "Progressive Discipline" measures by which the Plaintiff is to be disciplined. Such policy presents:

> *"The Department of Mental Health shall use Progressive Discipline as a management tool."*

> *"Disciplinary Action is action taken with an employee who fails to act in good faith, commits an act of non-compliance, or commits an act not in keeping with DMH standards of conduct or accountability in which a written warning, written reprimand, suspension, or termination process is applied."*

Such policy shows that the Plaintiff may not be disciplined without expressed cause.

541.    Defendants violated this employment contract through imposing restrictions, limitations, and alterations to assigned duties and responsibilities as outlined in this contract. Particular reference is given to the Plaintiff's responsibility to "maintain safe and secure environment for patients, staff, visitors", to "conduct investigations", and to "perform duties as Police Officer, make arrest, etc." according to such Form 40 and provisions set forth in THSMF Police Policy 203.

542.    Defendants violated this employment contract by maliciously attempting to circumvent state statutory law governing law enforcement authority designated to the Plaintiff in Alabama Code § 22-50-21.

543.    Defendants violated this employment contract through the implication that conducted activities by the Plaintiff were in violation of this employment contract. Actions conducted by the Plaintiff were not in violation of prescribed policy regarding the written reprimand instituted on 5/2/2018 in that ADMH Policy 40-10 sets forth that acceptable uses of electronic mail included *"communicating in a professional manner with parties outside the department for business purposes"*. Booth verbally counseled the Plaintiff for following (not violating) policies and procedure set forth by "Officer-in-Charge" policies. Other disciplinary actions presented similar discrepancies as outlined in the Plaintiff's responses to such adverse actions.

544.    Actions conducted by the Plaintiff were not in violation of prescribed policy regarding the written reprimand instituted on 5/2/2018 in that ADMH Policy 40-10 sets forth that acceptable uses of electronic mail included *"communicating in a professional manner with parties outside the department for business purposes"*. Other discipline presented similar discrepancies.

545.    Defendant Jackson violated this employment contract through threatening the termination of the Plaintiff in the event he expressed or utilized conditions set forth within this contract. Particular reference is given to ADMH Policy 60-40 which defines cause of action for termination includes *"documented involuntary personnel action applied by the appointing authority based on a serious*

*violation(s) or repeated violation(s) of departmental rules or policies, or uncorrected conduct preceded by due process procedure."*

546.    The plaintiff has not violated the employment contract and such threats amount to a violation of provisions set forth in ADMH Policy 70-5 giving rise to improper employee conduct, ADMH Policy 19-12 presenting that the Plaintiff should have been afforded *"reasonable measures to protect"* him from retaliation, and ADMH Policy 70-35 which should have protected the Plaintiff from threats, intimidation, and retaliation.

547.    Defendant Rittner additionally violated such contract by not following ADMH Policy 70-35 advising that *"the appropriate investigating person or entity shall present such facts to the district attorney or other prosecuting authority for consideration of initiation of criminal proceedings"* following being advised by the Plaintiff.

548.    Defendant Jackson deliberately and maliciously failed to follow ADMH Policy 60-112 *("Pre-Disciplinary Conference")* setting forth herein:

> *"All information presented at the pre-disciplinary conference should be taken into consideration prior to making a decision whether or not to take disciplinary action.*
>
> *In the case of a suspension or termination the burden of proof lies with the appointing authority."*

As Jackson provided insufficient evidence, and in cases, no evidence to support her findings.

549.    Defendants Beshear, Hubbard, Jackson, and Anderson deliberately and capriciously failed to follow ADMH Policy 70-35 *("Threatening or Intimidating a Witness")*. Jackson threatened, intimidated, and retaliated against the Plaintiff according these provisions within the employment contract. It should be noted that this policy specifically references *"Title 36-26A-1, Code of Alabama, 1975 ("The State Employees Protection Act", also known as the "whistleblower" act)"*. In the event the Plaintiff was afforded adequate protections by Beshear and sufficient investigations were conducted by the other Defendants, Jackson should have been disciplined.

550.     Defendant Beshear, Hubbard, and Long violated this employment contract through ill-response and ill-investigation of the Plaintiff's reports of discrimination, retaliation, hostile work environment, *etcetera*.

551.     Defendants additionally failed to provide whistle-blower protection according to this contract. Particular reference given to ADMH Policy 19-12 stating *"The Alabama Department of Mental Health shall take reasonable measures to protect employees from retaliation for reporting abuse, neglect, exploitation, or other mistreatment of individuals in the care of DMH or for reporting other illegal acts by employees, when such reports are made by the employee in good faith"* and ADMH Policy 60-77 advising that *"A hostile work environment or on the job harassment will not be tolerated"*.

552.     Defendant Anderson violated this contract through imposing discipline outside the scope of established policies and procedures. Anderson additionally violated this contract through imposing limitations on established provisions within such contract. Defendants acted beyond their scope of authority as established by such contract.

553.     Defendant Jackson and Booth violated this contract by intimidation, hindrance, and obstruction on the Plaintiff's law enforcement authority and power vested by the State.

554.     Defendants violated this contract through not completing competency assessments regarding the Plaintiff's duties within his employment pursuant to THSMF Policy 50-5.

555.     Contract violations presented are not all-inclusive. Additional matters are set forth in the Plaintiff's responses/attachments to adverse employment actions as well as within this complaint's presented facts.

556.     Defendants' liability is established, in part, by their assignments pursuant to ¶¶ 29 – 30, 45, 46, 102, 130, and 232.

557.     As a direct and proximate result of Defendants' breach of the employment contract through willful, malicious, callous, and arbitrary actions beyond their scope of authority, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

558.   Plaintiff seeks injunctive relief in the official capacity of the Defendants.

# FIFTEENTH CAUSE OF ACTION [15]

## DEFAMATION – STATE LAW CLAIM

### *Jackson (Official & Individual Capacity)*

559.   Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

560.   Jackson published by means of written discipline (libel) false statements of fact pertaining to and directly relating to the Plaintiff's character, conduct in official duties, and behavior.

561.   Jackson was aware that several statements therein were false and operated with a reckless disregard of whether other statements were false through botched, malicious, and capricious administrative investigations.

562.   Jackson acted to entice adverse and derogatory feelings or opinions, and to diminish the Plaintiff's esteem, respect, and confidence in the normal course of his employment.

563.   Jackson disseminated such statements to a third party.

564.   Jackson operated with actual malice to defame the Plaintiff and exhibited rage in the furtherance of her supervision of the Plaintiff.

565.   Jackson committed the act of defamation by and through published libel naming and referencing the Plaintiff in false respects and pretenses.

566.   As a direct and proximate result of the Defendant's defamation of the Plaintiff through willful, malicious, callous, and arbitrary actions, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

567.   Plaintiff seeks recovery of all legal damages, including compensatory and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendant.

568.     Plaintiff furtherly seeks injunctive relief in the official and individual capacity of the Defendant.

### *Booth (Official & Individual Capacity)*

569.     Plaintiff hereby re-asserts by reference paragraphs 196 – 199 as fully set forth herein regarding the following paragraphs 570 – 579.

570.     Booth published by means of proposed disciplinary action (libel); false statements of fact pertaining to and directly relating to the Plaintiff's character, conduct in official duties, and behavior.

571.     Booth was aware that statements therein were false and operated with a reckless disregard and malicious motive through botched, capricious, and arbitrary administrative investigations.

572.     Booth acted to maliciously secure the promotion of Mental Health Security Officer III (Captain) and to diminish a third parties view, respect, and interpretation of the Plaintiff's employment. Plaintiff did not receive such promotion, completely or in-part, due to such libel. Such act was a crime pursuant to Alabama Code § 13A-9-12 (*"Offering a False Instrument for Recording"*).

573.     Booth disseminated such libel to a third party. Parties identified include: Long (Human Resources oversight for such promotion) and Jackson (Final decision-maker for such promotion).

574.     Booth acted with actual malice to defame the Plaintiff and presented unsupported statements of fact.

575.     Booth committed the act of defamation by and through published libel naming and referencing the Plaintiff in false respects and pretenses.

576.     Booth was served with a retraction letter, for this singular incident, on 11/6/2019.

577.     As a direct and proximate result of the Defendant's defamation through willful, malicious, callous, and arbitrary action(s), the Plaintiff has suffered injuries and damages alleged in ¶ 634.

578.     Plaintiff seeks recovery of all legal damages, including compensatory damages, vindictive and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendant.

579.     Plaintiff furtherly seeks injunctive relief in the official and individual capacity of the Defendant.

## SIXTEENTH CAUSE OF ACTION [16]

### NEGLIGENCE & WANTONNESS – STATE LAW CLAIM(S)

### NEGLIGENT RETENTION, SUPERVISION & HIRING – STATE LAW CLAIM

#### *Beshear, Baugher & Jackson (Official & Individual Capacity)*

580.     Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

581.     At all times material, Jackson and Anderson were employed by ADMH and/or were under the respective Defendant's direct supervision and control when they committed the wrongful, unlawful, malicious, and retaliatory acts alleged herein.

582.     At all times material, Defendants' should reasonably have known of Jackson's, Anderson's, and Booth's retaliatory/discriminatory propensities and unfitness for duty, and despite such knowledge, Defendants failed to provide reasonable supervision and failed to remove Jackson, Anderson, and Booth from positions of trust and authority over the Plaintiff.

583.     At all times material, Defendants Beshear and Baugher should have known or were aware of Jackson's inability to maintain appropriate staffing levels, appropriate safety, and inability to hire competent staff within THSMF which directly affected the safety of the Plaintiff, other staff, visitors, and patients.

584.     At all times material, Defendants should have been aware of Booth's prior employment history presenting his unfitness to maintain or operate in his current position of authority. Negligence in the conducting of a security clearance is a reason of prominence.

585.     At all times material, Beshear should have been aware of Carpenter's being unqualified to operate as Director of Mental Health Facilities as well as Hearing Officer for the Plaintiff's suspension;

Carpenter operated within such role of authority unlawfully and illegally. Negligence in the conducting of a security clearance is a reason of prominence.

586.    Jackson and Anderson engaged in the wrongful conduct while acting in the course and scope of his/her employment with ADMH and accomplished the retaliatory/discriminatory acts by virtue of job-created authority assigned by Beshear and Baugher. Anderson's authority was supervised by Jackson.

587.    Booth engaged in the wrongful conduct while acting in the course and scope of his employment with ADMH and accomplished the retaliatory/discriminatory acts by virtue of job-created authority assigned by Jackson.

588.    Beshear and Baugher failed to exercise appropriate and ordinary care in the supervision of Jackson and Anderson in their assignment and failed to prevent the foreseeable misconduct of Jackson and Anderson leading to the harm of the Plaintiff. Jackson was futile in the presented and apparent misconduct of Booth.

589.    Beshear and Baugher failed to exercise appropriate and ordinary care in the decision to retain Jackson although Jackson violated ADMH Policy 70-35 and state statutory law by intimidating the Plaintiff.

590.    Beshear and Baugher were sufficiently notified of the conduct on several occasions to include May 2018, October 2018, May 2019, and via receipt of EEOC charges.

591.    Defendants were additionally unaware of Anderson's ill-law enforcement certification oversight and his unlawful firearms procedures instituted for the department until notification by the Plaintiff.

592.    Booth defamed the Plaintiff and conducted an arbitrary investigation to conclude the Plaintiff was untruthful in order to secure a promotion the Plaintiff was in consideration for. Jackson was aware of Booth's defaming of the Plaintiff by written statement and failed to correct this conduct.

593.     Defendants manifested and engaged in conduct with a reckless and conscious disregard of the rights of the Plaintiff through breaching the employment contract, overlooking criminal matters, and presenting deliberate indifference to the foregoing contentions regarding Anderson's, Jackson's, and Booth's employment.

594.     Defendants allowed Jackson to intimidate the Plaintiff, allowed Jackson to commit criminal acts without reprisal, and sanctioned the violation of the Plaintiff's rights established by law.

595.     Defendants were aware of their duty to provide adequate supervision and to allow for appropriate due process regarding the investigation, review, and corrective action regarding the Plaintiff's complaints and/or grievances but acted with reckless disregard and wanton conduct.

596.     As a direct and proximate result of Defendants' negligence through willful, malicious, callous, arbitrary actions, and relative mistaken interpretations of law, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

597.     Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

598.     Plaintiff furtherly seeks injunctive relief in the official capacity of the Defendants.

## NEGLIGENCE & WANTONNESS – STATE LAW CLAIM(S)

### *Graham (Official & Individual Capacity)*

599.     Plaintiff hereby re-asserts by reference paragraphs 181, 204 – 206, and 233 as fully set forth herein regarding the following paragraphs 600 – 606.

600.     At all times material, Graham was employed by and/or appointed to the Alabama Personnel Department (set forth as *"APD"*), a department of the State of Alabama, and responsible for the personnel oversight of specified matters regarding ADMH.

601.     At all times material, Graham's responsibilities included: 1) conducting "investigations concerning the administration and effect" of the *State of Alabama Merit System Act of 1939*, 2) to "devise

and administer employee service ratings", and 3) to acknowledge as well as oversee employee "appeal rights" pursuant to *Alabama Code § 36-26-8* and *Alabama Administrative Code § 670-X-4-.03*.

602.     In efforts to alleviate concerns, Plaintiff disseminated disciplinary documents, files, and a foregoing performance appraisal within this Complaint for appropriate review to Graham premised upon discrimination. Graham, despite notifications and appeal rights requests forwarded by the Plaintiff, deliberately and willfully ignored, avoided, and/or disregarded the Plaintiff's request for lawful due process and failed to conduct a review pursuant to such law and rules promulgated by the State of Alabama.

603.     Graham, according to prior cases concerning the applicable statutes, was sufficiently and appropriately aware of such responsibility.

604.     As a direct and proximate result of Graham's negligence through superseding and ignoring state law requirements as well as willful, callous, and arbitrary indifference, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

605.     Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendant.

606.     Plaintiff furtherly seeks injunctive relief in the official capacity of the Defendant.

## SEVENTEENTH CAUSE OF ACTION [17]

### TORTIOUS INTERFERENCE (CONTRACTUAL & BUSINESS RELATIONS)
### STATE LAW CLAIM

#### *Beshear, Hubbard, Jackson & Booth (Official & Individual Capacity)*

607.     Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

608.     At all times material, the Plaintiff had a contractual and business relationship within his employment with the State of Alabama pursuant to an oath of office commencing on 4/21/2016 and an appointment pursuant to Alabama Code § 22-50-21 commencing on 11/16/2016.

609.     Although appointed pursuant to such statute, Defendants had no authority to circumvent Alabama Code § 22-50-21 or the oath sworn to the State of Alabama which authorized, provided, and rendered discretionary authority to the Plaintiff, not the Defendants, and "charged" him with the responsibility to protect, serve, and enforce law irrespective interference, bribery, or compounding.

610.     Defendants had knowledge of this contractual and business relationship prior to their action(s).

611.     Defendants were not privileged to the management, severing, or mitigation of such relationship with State of Alabama at large. Defendants were not involved in the establishment of the Plaintiff's law enforcement certification via the Alabama Peace Officer Standards & Training Commission; although such certification was required for appointment.

612.     Defendants intentionally interfered with the Plaintiff's relationship with the State of Alabama by imposing restrictions, hindrances, and obstructions on his authority when the Plaintiff was "charged with all the duties and invested with all the powers of police officers". Such interferences targeted the Plaintiff's authority to: investigate, report, arrest, as well as render subjects to the due course of justice in the State of Alabama. Defendants additionally committed criminal acts in the furtherance of their interference. Jackson offered the pecuniary benefit of continued employment to impede the Plaintiff's authority to seek prosecution.

613.     Defendants Beshear, Hubbard, and Jackson were not trained, certified, empowered, or educated as law enforcement officers of the State of Alabama. Booth was trained, empowered, and certified as a law enforcement officer of the State of Alabama. Defendants were/are not members of the legislative branch or law makers who have rendered sufficient process to change or revise Alabama Code § 22-50-21 or powers vested to police officers.

614.    There was no justification for the Defendants' interference with the Plaintiff's business relationship, contractual relationship, and discretion under Alabama Code § 22-50-21 or his oath of office.

615.    Such interference is an ongoing violation and continuous interference.

616.    As a direct and proximate result of Defendants' willful, callous, malicious interference, and mistaken interpretations of law, the Plaintiff has suffered injuries and damages alleged in ¶ 634.

617.    Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

618.    Plaintiff further seeks injunctive relief in the official and individual capacity of the Defendants.

## EIGHTEENTH CAUSE OF ACTION [18]

### MISREPRESENTATION & DECEIT – STATE LAW CLAIM

*Beshear (Official & Individual Capacity)*

*Hubbard & Jackson (Individual Capacity)*

619.    Plaintiff hereby incorporates and re-asserts by reference paragraphs 1 – 350 as fully set forth herein.

620.    At all times material, Plaintiff had an established relationship with the Defendants to conduct specified law enforcement duties/tasks.

621.    Defendants had the authority to establish contractual relationship(s), appoint/hire employees, and to draft/revise/administer job descriptions pursuant to Alabama Code § 22-50-11.

622.    Beshear's authority was established to "appoint all officers and employees of the department or [she] may authorize any superintendent, division or bureau head, or other administrator to select with [her] approval all staff members and employees" pursuant to Alabama Code § 22-50-16. Such authority was utilized regarding this action.

623.    Jackson's authority established a responsibility to hire the Plaintiff and other staff by utilization of job descriptions (presented and reviewed) and employment announcements. Such authority was utilized regarding this action.

624.    Hubbard's authority established a responsibility to "manage job analysis and classification work, establish new classifications and revisions of current classification specifications, provide training, technical assistance, and write, monitor, and amend HR contracts as needed". Such authority was utilized regarding this action.

625.    Defendants misrepresented the material fact that the Plaintiff was employed to operate as a law enforcement officer purview to his discretion; Plaintiff conducted acts in order to maintain the "safety and security of a state mental health facility". Defendants, through an employment announcement and presented duties/tasks pursuant to a "Form 40" (employment terms), presented that the Plaintiff was authorized to operate within the role of a "Police Officer" pursuant to Alabama Code § 22-50-21, inherent police powers of the Tenth Amendment of the United States Constitution, and his oath of office. Beshear is ultimately responsible for such appointment pursuant to Alabama Code § 22-50-21, Hubbard was responsible for the presentation, drafting, and management of the job announcement and duties presented to the Plaintiff, and Jackson offered the Plaintiff such position through her authority as assignee.

626.    Each Defendant presented reprisal for the Plaintiff's conducting of law enforcement and police officer related tasks as set forth through such misrepresentations and deceit.

627.    Defendants presented that the Plaintiff, along with other police officers, were "Mental Health Security Officers" while utilizing the acting title of "Police Officers" in all other respects.

628.    Such misrepresented material fact(s) were made willfully, recklessly, and without seeking diminutive knowledge, although the Plaintiff made notification on numerous occasions that such legal contentions should be resolved and/or addressed.

629.    Plaintiff justifiably relied upon such material fact in the performance of his duties, tasks, and employment while ensuring the prompt safety and security of THSMF.

630.    As a result of such reliance, Plaintiff was primarily damaged through the foregoing discipline (verbal counseling, written warning, and written reprimand) which presented that he exceeded his scope authority and did not have such authority although such authority had been designated pursuant to Alabama Code § 22-50-21, the employment terms, his contractual job duties, the department's prescribed policy and procedure, and his oath of office.

631.    As a direct and proximate result of Defendants' willful, callous, and malicious misrepresentation, the Plaintiff has additionally suffered injuries and damages alleged in ¶ 634.

632.    Plaintiff seeks recovery of all legal damages, including compensatory damages and/or punitive damages provided by law, in addition to costs and expenses within the individual capacity of the Defendants.

633.    Plaintiff further seeks injunctive relief in the official capacity of the Defendants Beshear and Hubbard to revise the written title of "Mental Health Security Officer" to "Mental Health Police Officer" to end a continuing violation premised upon fraudulent and willful misrepresentation and deceit.

## DAMAGES & INJURIES

634.    Plaintiff's damages and injuries include, but are not limited to, the following: non-economic and economic damages, suspension from employment, anxiety, panic attacks, physical injury, loss of enjoyment of life, prohibited free and protected speech, severe emotional distress, lost wages, loss of office space, loss of career privileges, loss of ability to attend meetings of prestige, lost opportunities for internal promotions and external employment consideration, diminishment of reputation, degradation, and declined life, liberty, and property interest following the Defendant's discrimination, deprivation of rights, conspiracy, breach of contract, retaliation, and continuing violations. Plaintiff additionally has suffered embarrassment among his peers who previously looked highly upon him. Several of such injuries are ongoing due to the Plaintiff's continued employment as well as the Defendants' continuing violations.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court grant the following Prayer for Relief:

### *Alabama Department of Mental Health and Mental Retardation (ADMH)*

A.     Enjoin Defendant ADMH from:

      a.   subjecting employees to discrimination and disparate treatment based upon race, color, and/or national origin;

      b.   retaliating against employees who engage in activity protected under Title VII;

      c.   Subjecting employees to retaliatory hostile work environments premised upon engagement in protected activity under Title VII;

B.     Enjoin Defendant from utilizing final decision makers in every step of the selection process. (Final decision makers shall not participate on the panel and shall not create questions for panelists to deliver);

C.     Compel Defendant ADMH to develop and implement appropriate and effective measures designed to prevent discrimination and retaliation, including but not limited to policies, mandatory training for employees and managers, and a grievance procedure encompassing all forms of written discipline which effect performance appraisals (life, liberty, and property interest);

D.     Compel Defendant ADMH to develop appropriate and effective measures to receive complaints of discrimination, harassment, and retaliation as well as a sufficient process for investigating such complaints through an established departmental division to be present within THSMF (supplemental to Director of Human Resources);

E.     Compel uncompetitive promotion of the Plaintiff to a position comparable to the positions he was denied promotion. Such promotion should be of Pay Grade 76 ($44,640.00 - $67,660.80) pursuant to Alabama Personnel Department salary scales. Comparable positions known include Mental Health Special Agent I and Mental Health Security Officer IV (Major). Such relief may be omitted if satisfied under other provisions herein;

F.      Compel the establishment of a competitive process for the promotions and/or appointments of employees to positions of higher prestige which is overseen completely by the State of Alabama Personnel Department rather than internal staff of ADMH. (Subjects receiving the highest score from panelists is to be absolutely selected unless partiality or bias is raised as a concern or if federal law violations are alleged);

G.      Compel the removal of subjective criteria from interview processes which may present no method for subsequent subjects to ascertain reasoning for presented panel scores. (IE: scores based upon questions which present no explanations as to why a panelist provided the given score);

H.      Compel Defendant ADMH to cancel and expunge unwarranted personnel action and any adverse materials relating to the discriminatory employment practices and/or retaliation from the department's records to restore the Plaintiff to the status he occupied prior to discrimination and/or retaliation;

I.      Compel Defendant ADMH to provide a letter of exoneration premised upon adverse actions taken against the Plaintiff pursuant to discrimination and/or retaliation;

J.      Declaratory judgment ascertaining Defendant violated Title VII of the Civil Rights Act by and through adverse actions taken against the Plaintiff;

K.      Award compensatory damages to the Plaintiff to fully compensate him for injuries caused by Defendant ADMH's discriminatory and retaliatory conduct, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991. ADMH has employees in excess of 500;

L.      Award Plaintiff back-wages/back-pay and/or front wages pursuant to Title VII. (Such relief may be omitted if satisfied under other provisions herein);

M.      Award such additional relief as justice may require in relation to the Plaintiff's Title VII actions together with the Plaintiff's court costs and expenses;

### *All Defendants Excluding ADMH*

N.      Enjoin respective Defendants from:

a.   subjecting employees to discrimination and disparate treatment based upon race, color, and/or national origin;

b.   retaliating against employees who engage in activity protected under the First Amendment, 42 U.S.C. § 1981, Title VII of the Civil Rights Act, Alabama Code § 36-26A-3, and other statutes applicable to this Complaint;

c.   discriminating in the administration, enforcement, and management of implied employment contracts, policies, and procedures pursuant to 42 U.S.C. § 1981;

d.   acting fraudulently, willfully, in bad faith, and under mistaken interpretations of law regarding the presented state statutes, laws, administrative code, policies, and procedures referenced herein; and

d.   speech, privacy, and due process restrictions, obstructions, retaliation, and their application to Plaintiff's rights set forth within this Complaint;

O.   Enjoin Defendants, their successors in office, and subordinates with supervision over the Plaintiff, in the verbal and physical dissemination of record of discipline/adverse action/negative connotations in relation to this Complaint to parties seeking reference or recommendation to seize the Plaintiff's current foreclosure of employment opportunities; respective constitutionally impermissible motives, acting in bad faith, fraudulently, beyond their authority, and under mistaken interpretations of law;

P.   Enjoin Defendants, and their successors in office, in the continuing conspiracy to impede, hinder, and obstruct the law enforcement authority and powers of arrest of the class of law enforcement officers (police officers) working for/within the department; premised upon constitutionally impermissible motives, acting in bad faith, fraudulently, beyond their authority, and under mistaken interpretations of law;

Q.   Declaration setting forth Defendants Beshear, Hubbard, Jackson, Long, and Anderson are violating the Plaintiff's First Amendment rights by and through ongoing prior restraint(s);

R.      Compel Beshear, Hubbard, Jackson, Long, and Graham, in their official capacities, to remove, purge, and/or remand record (written, recorded, and/or physical) of disciplinary and/or adverse matters from the Plaintiff's personnel files or other files which are premised upon constitutionally impermissible motives, ill-performance of legal duties, acts in bad faith, acts beyond their authority, mistaken interpretations of law, and arbitrary discipline contrary their policy and procedure. Particular focus on the written reprimand issued upon 5/2/2018 representing an ongoing prior restraint upon the Plaintiff's speech;

S.      Compel revisions to ADMH Policy 15-1 to include appropriate exceptions pursuant the First Amendment of the United States Constitution; such exceptions shall clarify an employee's right to supersede such policy when engaging in protected speech;

T.      Compel Defendant Beshear to render void the Plaintiff's suspension hearing, appoint an impartial hearing officer external to the department, and re-conduct said hearing regarding the instituted suspension as a ministerial act and/or legal duty (Such relief may be omitted if satisfied under other provisions herein);

U.      Compel Defendant Beshear, Hubbard, Jackson, and Long, and their successors in office, to render appropriate and sufficient measures to rectify ill-staffing levels and safety concerns present within THSMF, including but not limited to, increasing Human Resources staffing within the facility, increasing police officer staffing within the facility, and seeking external avenues to secure additional staff. The safety of staff, patients, and visitors, as well as appropriate staffing levels, are their legal duties;

V.      Compel Defendants Jackson and Booth to retract libelous statements in connection with actions set forth in the facts herein, in their individual capacity, in such event that such charges cannot be proven pursuant to Alabama Code § 6-5-187;

W.      Compel Defendants Jackson and Booth to remove and/or remand libelous statements from the Plaintiff's personnel/supervisory file(s), in their official capacity, in such event that such charges cannot be proven pursuant to Alabama Code § 6-5-187;

X.      Compel Defendant Graham initiate a hearing or sufficient process pursuant to Alabama Administrative Code § 670-X-4-.03 entitling the Plaintiff to a hearing before the State Personnel Board or a Special Hearing Agent regarding his claims of discrimination in personnel actions presented herein;

Y.      Back-wages/back-pay and/or front wages pursuant to Alabama Code § 36-26A-5. (Such relief may be omitted if satisfied under other provisions herein);

Z.      Compensatory, punitive, vindictive, liquidated, economic, non-economic, mental anguish, emotional distress, and/or other monetary damages against all individual Defendants, severally, and in their individual capacity, in an amount established at trial, and whatsoever other damages the Court deems just and equitable;

AA.    Prejudgment and post-judgment interest as appropriate and allowed by law and/or special damages under common law;

BB.    Reasonable costs and expenses in lieu of self-representation; and

CC.    Grant such other and/or further relief as this Court should find just and proper.

# JURY DEMAND

The Plaintiff hereby demands a trial struck by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Seventh Amendment of the United States Constitution, and herein such other statutes which allow such demand.

# VERIFICATION

I, Derrick James Williamson, Jr., am the Plaintiff in the present case, a citizen of the United States, and a resident of the State of Alabama living in Tuscaloosa County. I have personal knowledge of my interactions, activities, and intentions, including those set out in the foregoing *Second Amended & Verified Complaint*, and if called on to testify, I would competently testify as to the matters stated herein.

I have personal knowledge of all the Defendants named and events presented in such *Second Amended & Verified Complaint*, along with relevant evidence to support my claims. I have read and reviewed the foregoing complaint presented in pages 1 – 115, referencing myself as "Plaintiff" throughout, regarding the facts related to my claims. I further assert that I have solely and personally drafted, edited, and reviewed such Complaint.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

DERRICK J. WILLIAMSON, JR., *PRO SE*
8816 Old Greensboro Road, APT 20104
Tuscaloosa, Alabama, 35405
**Cellphone:** (205) 422-9664
**Email:** aeonpctech@live.com

12/1/2019   2200
*Executed On*