**FILED**

2021 Mar-08 AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

2021 MAR -8  A 8:58

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| DERRICK JAMES WILLIAMSON, JR. PRO SE **_PLAINTIFF_** V. ALABAMA DEPARTMENT OF MENTAL HEALTH & MENTAL RETARDATION ET AL **_DEFENDANTS_** | CASE NO.: **7:19-CV-00669-LSC** SUR-REPLY |

---

## SUR-REPLY IN OPPOSITION TO ADMH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**COMES NOW**, the Plaintiff, **DERRICK JAMES WILLIAMSON, JR.**,

pursuant to leave of Court granted upon November 20, 2020 (Doc. 227), and files

the following **SUR-REPLY IN OPPOSITION** to the ADMH Defendants' Motion

for Summary Judgment.[1] (Doc. 254)

---

[1] The Plaintiff sought a telephone conference by disseminating a request to the Court's chambers on January 5, 2021 to determine specific stipulations on this sur-reply. The Plaintiff did not receive communication from the Court. Accordingly, the Plaintiff maintains the following sur-reply within a 50-page limitation in comparison with the Defendants' reply. (Doc. 254) Furthermore, the Plaintiff submits any additional evidentiary material as needed to respond to newly raised legal argument(s).

## REPLY TO DEFENDANTS' RESPONSE TO
## ADDITIONAL UNDISPUTED FACTS

65.     It is a personnel management plan for any incidents which may affect

patient care and governs employee discipline.[2] (Doc. 247-21, pp. 139, 149 – 150,

163 – 172) There were disciplinary measures within the scope of this plan. (Doc.

247, pp. 142 – 143; Pl. Dec. ¶¶ 23, 38 – 39, 46; Doc. 248-17, p. 6, ¶ 13)

69.     Jackson initially testified: "he called agencies to come into our facility

with dogs without notifying myself, as the director, or notifying the captain in

advance that this was occurring." (Doc. 230-1, p. 199, ll. 15 – 23) Jackson

thereafter testified she received prior notification from the Plaintiff and Booth.

(Doc. 230-1, p. 215, ll. 19 – 23, pp. 216 – 217, ll. 1 – 23)

## I.    DEFENDANTS AREN'T ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII & 42 U.S.C. § 1981 DISCRIMINATION CLAIMS

### A. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Discriminatory Discipline Claims

As an initial matter, the Plaintiff is *Pro Se*, in which Defendants are

thoroughly aware. (Doc. 254, n.6) The Plaintiff's Third Amended & Verified

Complaint must be construed liberally. *Edwards v. Pruitt*, 7:20-CV-01400-LSC at

*3 ("The Court must liberally construe Plaintiffs' Complaint because Plaintiffs

---

[2] "This plan describes the responsibilities of the ADMH, its facilities [] in management incidents by identification, analysis, and reduction of risks which occur *in the course of* providing mental health and support services." (emphasis added); ALA. CODE §§ 22-56-6, 22-56-7.

were proceeding *pro se*"). Accordingly, the Court may construe the Plaintiff's

pleading as one of disparate impact if appropriate. (*Id.*) The Plaintiff clearly

identified the convincing mosaic standard despite Defendants' assertations. (Doc.

254, p. 11; Doc. 247, pp. 16, 18 – 19) The Plaintiff rehashes in turn.

### *i. Plaintiff Can Prove his Prima Facie Case Because Comparators aren't Required*

As re-iterated, Defendants have no legitimate reason for the Plaintiff's May

2, 2018 written reprimand. (Doc. 219-2) The Plaintiff did not violate the indicated

rule.[3] (Doc. 219-2, p. 19, ¶¶ 69 – 72) This in combination with Defendants'

falsities in their EEOC position statement. *Burton v. Freescale Semiconductor,*

*Inc.*, 798 F. 3d 222, 239 – 240 (5th Cir. 2015) (holding that a jury may view

"erroneous statements in [an] EEOC position statement" as "circumstantial

evidence of discrimination."); *Miller v. Raytheon Co.*, 716 F. 3d 138 (5th Cir.

2013). (Doc. 219-2, ¶¶ 69 – 75)

Even if Defendants had a legitimate reason and the Plaintiff failed at a

proper comparator for any of the discipline in question, the Plaintiff has presented

a convincing mosaic of discrimination. *Chapman v. Alabama Department of*

*Transportation*, 7:17-CV-01631-LSC at *18 (N.D. Ala., October 17, 2019) ("'(1)

---

[3] The Defendants exclaim that "showing he did not violate rule" may not establish a *prima facie* case and the rule was abandoned. (Doc. 254, p. 9) However, they are incorrect. *Lewis v. City of Union City*, 934 F. 3d 1169, 1187 – 1188 (11th Cir. 2019) ("'[Defendant] did not comply with its own policies' — to the benefit of white men and to the detriment of black [men].").

suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual.'") (citations omitted). This is partially premised upon a lack of discipline to Caucasians: (1) the similarly situated comparator, McDaniel, on *six* occasions with at least one major occasion and three instances including the same basic conduct (Doc. 219-2, pp. 23 – 26, ¶¶ 84 – 96); (2) the similarly situated comparator, Booth, on *two* prolonged occasions where Booth as well as the Plaintiff lacked former disciplinary records and both worked under Anderson (Def. RFP, pp. 3659 – 3686, 6695; Doc. 247, p. 21; Pl. Dec. ¶¶ 55 – 56; Pl. Dec. 2, ¶ 3); (3) Porter on *two* major and prolonged occasions regarding unlawful impersonation as well as ethical violations (Doc. 219-2, pp. 20 – 21, ¶¶ 76 – 78; Doc. 248-4, p. 5, ¶ 11; Doc. 245-14, Def. Ex. 61); (4) Pike on *one* occasion regarding unauthorized revisions of state property (Doc. 219-2, p. 21, ¶ 79); and (5) a non-police services staff member harassing a patient on *one* occasion (Doc. 219-2, p. 22, ¶ 81). This represents that Defendants failed to discipline Caucasians within the same Police Services Division in *eleven* circumstances during Anderson's supervision of the Plaintiff; one year and four months.[4] (Doc. 145, ¶ 38; Def. RFP, p. 6695)

More so, the Court should not ignore the differing circumstances in

---

[4] This excludes the instance regarding the employee not under Anderson's supervision.

combination with the Plaintiff having not violated ADMH Policy 15-1. *Stalter v. Wal-Mart Stores, Inc.*, 195 F. 3d 285, 290 – 291 (7th Cir. 1999) ("the company's code could not be reasonably read to support that interpretation."). These offenses were more egregious premised upon any reasonable jury's judgment. *Id.* ("This strikes us as swatting a fly with a sledge hammer. That [Defendant] felt compelled to [discipline the Plaintiff] for this offense does not pass the straight-face test... [Defendant] did not [discipline] a Caucasian employee who also committed gross misconduct..."). *Lewis* supports finding a mosaic in the avoidance of disciplining Caucasians.[5] *Lewis*, 934 F. 3d at 1187 – 1188 ("regardless of the applicable personnel policy... 'a reasonable jury could find that the [ADMH] did not consistently exercise its authority [] and that the [ADMH] did not comply with its own policies' — to the *benefit of white men* and to the *detriment of black* [men].") (emphasis added).

Not a single Caucasian was disciplined by Anderson while the Plaintiff was under his supervision. (Doc. 248-19, p. 5, ¶ 6; Def. RFP, p. 6695) When the Plaintiff sought to discipline Porter, a Caucasian, for his disrespect founded upon the Plaintiff's report of his misconduct, Anderson and Long modified the

---

[5] It may be of interest that Baugher, Hubbard and Long, Caucasians, were extensively intertwined in the administration of this written reprimand. (Doc. 219-2; Pl. Dec. 2, ¶ 2) The cat's paw theory may be relevant. *Lewis*, 934 F. 3d at 1189. Defendants' policy required appropriate discipline in *all* circumstances. (Doc. 219-2, p. 46) (emphasis added).

Plaintiff's disciplinary record to be issued to Porter. (Doc. 145, ¶ 164; Doc. 249-

13, ¶ 9; Def. RFP, p. 2128; Pl. Ex. 183) This event occurred while Anderson was

permitting Porter's prolonged misconduct. (Doc. 219-2, ¶¶ 76 – 78) Upon the May

2, 2018 reprimand, of which the Plaintiff advised violated Title VII (Def. In. Disc.,

p. 0236), summary judgment should be denied.

More so, Defendants have conceded that the Plaintiff's performance

appraisals, in comparison to McDaniel's and Booth's under Anderson's

supervision (Def. RFP, pp. 3647 – 3658, 3659 – 3686), are contingent upon

underlying discipline.[6] (Doc. 245, p. 19) Here, "discrimination was the real

reason." *Hornsby-Culpepper v. Ware*, 906 F. 3d 1302, 1312 (11th Cir. 2018). The

Plaintiff's performance appraisals were unaffected absent this disparate treatment

according to Defendants' argument. (*Id.*) The performance appraisals and any

connected progressive disciplinary actions are disparately tainted. (Doc. 220)

Although Defendants' burden may be "light", they must come forward with

admissible evidence that they relied upon their assertations at the time. *Turnes v.*

*AmSouth Bank*, 36 F. 3d 1057, 1060 – 1061 (11th Cir. 1994) They have only

asserted conflicting testimony which doesn't evidence that they specifically relied

upon the contentions mentioned. (Docs. 251 – 252) They fail to "*articulate* a

---

[6] The Defendants assert that the Plaintiff has abandoned Hicks as a comparator. (Doc. 254, p. 10)
However, Defendants were on notice the Plaintiff would assert Keeler. (Doc. 145, ¶ 356; Doc.
248-11, ¶ 9) The Plaintiff did not conduct discovery focused upon Hicks.

legitimate, non-discriminatory explanation". *Id.* (emphasis added). Conclusory arguments, absent *admissible* evidence they reasonably believed the policy violations occurred, are due no consideration. (Doc. 254, p. 14)

### B. ADMH isn't Entitled to Summary Judgment on Plaintiff's Discriminatory Promotion Claims

#### i. Mental Health Special Agent I [7]

In looking to the true reason of a *discriminatory* nature regarding the MHSA I promotion, although the Plaintiff is entitled to judgment as a matter of law with Defendants' failure of the *Burdine* standard:

(1) The questions asked of the interview panel, drafted by Rittner (Doc. 247, ¶ 38), omitted an assessment of education as expressed to be of consideration (Doc. 247, ¶ 14); this only disadvantaged minorities and caused an advantage for the *only* Caucasian in consideration, Kevin McDaniel (Doc. 145, ¶ 105; ADMH's Answer, ¶ 105; Doc. 247, ¶ 37);

(2) Without a consideration for discriminatory intent, there was a 20% chance that McDaniel would be selected. (Def. Ex. 12, p. 3) These chances greatly increased by omitting consideration of documented education and training (Def. Ex. 12, p. 2; Doc. 247, ¶ 37; Doc. 248-2, ¶ 9);

---

[7] Pursuant to Rule 56(f)(1) of the Federal Rules of Civil Procedure, if Defendants have not met their burden, the Plaintiff moves the Court to enter judgment in his favor regarding the MHSA I promotion. *Trotter v. Board of Trustees of Univ. of Alabama*, 91 F. 3d 1449, 1455 (11th Cir. 1996). Defendants have not pleaded a same decision defense. (Docs. 138, 200)

(3)   Rittner and Randolph, Caucasians, scored the Plaintiff the lowest (Def. Ex.
      12, p. 3; Doc. 247, ¶ 25); however, Fenderson, an African American, did not
      score the Plaintiff the lowest (*Id.*);

(4)   Apparently, Rittner only consulted with Fenderson after the interview, the
      African American panelist (Doc. 247, ¶ 25), regarding his disappointment
      with the Plaintiff's interview (Doc. 248-22, ¶ 3; Doc. 248-23, ¶ 3); [8]

(5)   Defendants have ignored McDaniel's, a Caucasian's, misconduct in office as
      opposed to unlawfully disciplining the Plaintiff (Doc. 219-2, ¶¶ 84 – 97);

(6)   Defendants' own testimony conflicts as if testimony has been manufactured
      and perjured to conceal discrimination (Doc. 245, ¶¶ 72, 74; Doc. 251);

Thus, there is sufficient circumstantial evidence for a jury to find discrimination by

assessing: (1) why the Defendants chose to omit education as a consideration

which disadvantaged minorities (*Id.*); (2) differed from its method of selection

benefiting a Caucasian in violation of § 2000E-2(l) (*Id.*); (3) engaged in archaic

selection procedures by permitting a Caucasian final decisionmaker (Rittner) to

operate at every level of the process (Doc. 145, ¶ 121; ADMH's Answer, ¶ 121);

(4) falsely testified/presented to this Court as well as the EEOC that the Plaintiff's

---

[8] Rittner did not testify that he consulted with anyone else other than the African American
panelist following the interview. (*Id.*) Apparently, Rittner even asked the Plaintiff how he
perceived he did. (Doc. 247, p. 6, ¶ 26; Pl. Dec. ¶ 29) A jury could conclude that Rittner
consulted with both the Plaintiff and Fenderson, African Americans, for an ulterior purpose;
attempting to sway subjective views of present African Americans regarding the Plaintiff's
interview.

potential discipline was not in Rittner's knowledge (Doc. 247, ¶ 72; Def. In. Disc., pp. 0004, 0028 – 0029; Doc. 248-23, ¶ 5; Doc. 251); (5) changed their reasons for selection from (a) solely McDaniel's scoring to (b) his scoring as well as ADMH experience to (c) his scoring, length of criminal justice experience, and doing well on a panel interview (Def. In. Disc., p. 0004; Doc. 248-22, ¶ 10; Def. Ex. 13, p. 3); (6) proffered ADMH experience for not selecting the highest ranking subject, an African American, as a reason when the position was initially internal (Doc. 247, ¶¶ 14, 42); (7) Defendants did not mention this internal opening (*Id.*); and (8) have proffered Rittner's testimony of the panelists' motives (Doc. 252; Def. Ex. 13) when he testified "there were no discussions after the Plaintiff's interview" and failed to testify, that he either did, or didn't, consult with the entire panel when answering interrogatories (Doc. 248-22, ¶ 3). Hence, ample circumstantial evidence of a *discriminatory* motive, in lieu of general inconsistencies, exists to regarding the MHSA I promotion.[9] This is in *combination* with the absence of the panel's completed assessment forms and notes. (Doc. 252; Doc. 254, p. 16)

---

[9] Defendants have changed reasons from the federal administrative proceedings to this very motion for summary judgment. *Perfetti v. First Nat'l Bank of Chicago,* 950 F. 2d 449, 456 (7th Cir. 1991), *cert. denied,* 505 U.S. 1205, 112 S. Ct. 2995, 120 L. Ed. 2d 871 (1992) (when employer gives one reason at the time of the adverse employment decision, and at trial gives another reason unsupported by the documentary evidence, the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification). The Plaintiff anticipates further changes if their motion for summary judgment is denied. More so, Defendants' false statements to the EEOC are evidence of pretext regarding this promotion. *Burton,* 798 F. at 239 – 240; *Miller,* 716 F. 3d 138. (Doc. 219-2, ¶¶ 69 – 75)

### ii.    *Mental Health Security Officer III*

In looking to the true reason of a *discriminatory* nature regarding the MHSO

III promotion, the following should be considered:

(1)  Booth and Long, Caucasians (Def. RFP, p. 6695; Pl. Dec. 2, ¶ 2), evidently

interfered with the application process to Booth's benefit (p. 44);

(2)  The Plaintiff scored highest, as an African American, however, the position

was given to Booth who ranked/scored lower (Def. In. Disc., p. 1437; Doc.

247, p. 32);

(3)  As evidenced, the Plaintiff was significantly more qualified by Defendants'

own written standards and their prior recommendation, however, Booth,

copiously less qualified, was selected (Def. In. Disc., pp. 0380, 1437, 1439;

Doc. 247, ¶¶ 45 – 52; Doc. 247, pp. 33 – 35); [10]

(4)  Defendants testify that two African Americans were being considered for the

position, the Plaintiff and Phillips, however neither minority was selected

(Def. Ex. 13, p. 4; Def. In. Disc., p. 1437; Pl. Dec. ¶ 31);

---

[10] It should be noted that an African American reported a concern for discrimination which
resulted in this external selection process of the Plaintiff. (Def. RFP, pp. 2146 – 2148; ADMH
Int., Set One, ¶ 5) Apparently, Defendants affixed additional reasons following the Plaintiff's
allegations that seniority, *i.e.*, years of experience with the ADMH, isn't a competitive trait; as
the Plaintiff couldn't compete with time. (Doc. 145, ¶ 294; Admin. Code § 580-6-36-.05)
Logically, if seniority would be the only determining factor, there would be no need for an open
or competitive process following reception of applications. (*Id.*) This proffers evidence of a
convincing mosaic. *Lewis*, 934 F. 3d at 1186 ("… establishing that the employer has failed to
clearly articulate and follow its formal policies."). In correction, the Plaintiff presented a
portfolio regarding his internal accomplishments dating from November 16, 2016 until the date
of interview; 268 pages. (Doc. 247, p. 33)

(5)  Defendants have admitted that the Plaintiff's education was not assessed, contrary to their announcement, which purposefully benefitted Booth (Doc. 247, ¶¶ 50 – 51; Def. In. Disc., pp. 0368, 0389, 1439); [11]

(6)  Defendants' testimony of a consideration of whether the Plaintiff would "cause problems" could reasonably encompass the Plaintiff's complaints of discrimination and disparate impact upon African Americans (Doc. 145, ¶¶ 52, 89, 97, 103, 153; Doc. 249-2, ¶ 9; Doc. 247, ¶ 57);

(7)  Defendants' consideration of whether the Plaintiff would "cause problems" signifies a potential consideration of discipline which was falsely disparately instituted (pp. 1 – 5; Doc. 247, ¶ 57; Pl. Dec. ¶¶ 1 – 88);

(8)  Defendants' own testimony conflicts regarding other aspects in this case, and this promotion, as if testimony has been manufactured; mendacity is all the more apparent (Doc. 247, ¶¶ 57, 68 – 70, 72 – 74; Doc. 251).

Accordingly, ample circumstantial evidence of a *discriminatory* motive, in lieu of general inconsistencies, exists regarding the MHSO III promotion.[12]

### iii.  *Legally Insufficient Reasons & Pretext*

---

[11] More so, reasons for non-selection shifted on numerous occasions (Doc. 247, ¶¶ 52 – 57; Doc. 247, pp. 31 – 32) and now, upon a summary judgment motion, includes a slew of factors not previously relied upon or testified to. (Doc. 245-4, Def. Ex. 16, p. 5) No jury would believe these reasons after five instances of changes.

[12] Defendants may claim they relied upon Booth's illegitimate supervision at the time, however, their affidavits evidence these asserted reasons are a sham. (Doc. 254, pp. 18 – 20; Doc. 251) More so, the Defendants worked with Booth and had access to his personnel file. (Doc. 247, ¶¶ 49, 73) This is not a reasonable belief of which a jury would find in their favor.

As a matter of law, as for the Defendants' consistent disregard for their own method of selection of rating education, training, and experience, "[e]xaminations like those administered by the [ADMH] create legitimate expectations on the part of those who took the tests." *Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2676 (2009). The very purpose for "[e]mployment tests can be an important part of a *neutral* selection system that *safeguards* against the very racial animosities Title VII was intended to prevent... Restricting an employer's ability to discard test results (and thereby discriminate against qualified candidates on the basis of their race) also is in keeping with Title VII's express protection of *bona fide* promotional examinations." *Id.* (emphasis added). In this Plaintiff's case, the Defendants have avoided the selections of minorities on two occasions by disregarding an African American's highest rating (Luther Davis and the Plaintiff) as set forth as the method of selection.[13] *Bass v. Board of County Com'rs, Orange County, Fl.*, 256 F. 3d 1095, 1107 (11th Cir. 2001) ("Hiring a less qualified person can support an inference of discriminatory motivation."). This practice is pretextual when those announcements, with a clear "method of selection", were unambiguous. (Def. In. Disc., pp. 1299, 1439)

---

[13] Defendants argue that Davis' non-promotion doesn't proffer evidence, however, they are incorrect. *Furcron v. Mail Centers Plus, LLC*, 843 F. 3d 1295, 1309 (11th Cir. 2016) ("Rule 404(b) permits the admissibility of so-called 'me too' evidence to prove intent to discriminate and retaliation."). Interestingly, highest ranking African Americans were not selected regarding *both* promotions and in each circumstance the *only* Caucasian applicants were selected.

Importantly, regarding one position, they *rely* on the scores to their potential

benefit, and with the other, they *abandon* the scores.[14] Viewed in light most

favorable to the Plaintiff, these reasons are incredible and ever shifting to disguise

the underlying intentional non-selection of minorities. (Doc. 245, pp. 19 – 21) This

includes disadvantaging educated minorities by abandoning a consideration of

education as mentioned within the method of selection following reception of

applications.[15] (Def. In. Disc., pp. 1299, 1439; Doc. 247, ¶¶ 23, 34, 37, 48, 50 – 51)

These reasons are pretextual. *Bass,* 256 F. 3d at 1108 ("An employer's violation of

its own normal hiring procedure may be evidence of pretext… We believe that this

is especially true where, as here, an employer disregards *all but one of the factors*

*and qualifications* generally taken into consideration and relies solely on a factor

which was designed to create 'leeway' for the promotion of people of a certain

race.") (emphasis added). Regarding the MHSA I promotion, Defendants have

disregarded the Plaintiff's education, and potentially his documented training,

---

[14] This method of making a mockery of the Court is blatantly obvious: (1) they <u>do</u> rely on the scores for the MHSA I promotion because they've omitted the panel's completed assessment forms and notes in bad faith (Doc. 252) and (2) they <u>do not</u> rely on the scores for the MHSO III promotion because the Plaintiff scored highest, accordingly, they didn't even submit the rankings upon their motion (Doc. 247, ¶ 47). Although *Pro Se*, the Plaintiff recognizes mendacity in these tactics and the Court should as well. These are intentionally disparate practices; utilized before this suit and periodically attempted in this action.

[15] Anderson even expresses animus toward his subjective ideas of the Plaintiff's proper consideration of his education; Anderson was only employed when the Plaintiff applied for the MHSA I promotion. (Doc. 248-5, ¶ 4; Def. RFP, p. 6695) He testifies he made an undisclosed negative statement regarding the Plaintiff's hiring to Rittner. (Doc. 248-4, p. 6, ¶ 13) He offers no evidence to prove his negative assertions.

while disregarding McDaniel's misconduct and taking consideration of the

Plaintiff's alleged misconduct as expressed *supra*.[16] In regard to the MHSO III

position, the same occurred regarding the Plaintiff's training alongside his

education. (*Id.*) As the Plaintiff scored the highest for the MHSO III position, it is

logical to conclude that his score would have been significantly higher if his

education and training had been properly considered; the same is for the MHSA I

promotion. (*Id.*) Affirmatively, a close score with Booth is irrelevant. (Def. In.

Disc., p. 1437; Def. Ex. 13, p. 5; Doc. 254, p. 19) More so, Defendants' Human

Resources Department sought this information for a *purpose*. (Doc. 247, ¶ 52)

Disregarding "the factors and qualifications generally taken into consideration"

resulted in the selection of Caucasians as opposed to minorities. *Id.* at 1108.[17]

More so, Defendants have failed to proffer the completed assessment forms

and notes for the MHSA I position and the Eleventh Circuit has more recently

determined, corresponding with *Blackledge*, that this practice does not meet the

*Burdine* standard. *Voudy v. Sheriff of Broward County*, No. 16-12059 (11th Cir.

2017) (citations omitted) ("In the absence of any statement from [] its decision

---

[16] The Plaintiff recognizes that Rittner has testified that he did not consider complaints or grievances and had no knowledge thereof regarding the Plaintiff, however, his credibility is tarnished because he testified that he was aware of the Plaintiff's pending disciplinary action and filed grievances as well. (Doc. 247, ¶ 72; Doc. 251, ¶¶ 1 – 6) Accordingly, this sham testimony is due to be stricken. (*Id.*)

[17] Defendants attempt to steer the Court from the Plaintiff's showing he was the obvious candidate and have failed to proffer admissible evidence that Defendant relied upon Booth's false qualifications. (Doc. 254, pp. 19 – 20; Doc. 251, ¶¶ 1 – 10)

makers explaining the reasons for its decision, we cannot hypothesize the employer's reasons and then use that speculation to find that the employer carried its burden of *articulating* a 'clear and reasonably specific non-discriminatory basis for its actions.'") (emphasis added).[18] Accordingly, without the testimony of the panelists regarding the MHSA I position, and being unable to determine why Rittner seemingly scored the Plaintiff lower with a single-digit score of six (Def. Ex. 12, p. 3), Defendants "may not satisfy its burden by presenting a hypothetical reason for the employment decision in question" when omitting the most important evidence to consider. *Id.* (Doc. 252) Rittner testified that there were "no discussions after the Plaintiff's interview" so his testimony regarding the panelists' motives and reasoning is implausible. (Doc. 248-22, ¶ 3). The Plaintiff wasn't given the opportunity to assess these scores, likewise, nor has the Court. *Burdine,* 450 U.S. at 258, 101 S. Ct. at 1096 ("[T]he defendant's explanation of its legitimate reasons *must be* clear and reasonably specific" so that "the plaintiff be afforded a 'full and fair opportunity' to demonstrate pretext.") (emphasis added).

Such pretext, absence of required evidence, and even a convincing mosaic, is all the more plausible. *Chapman*, 7:17-CV-01631-LSC at *18. (Doc. 219-2, ¶¶

---

[18] It should be noted that the Plaintiff has moved to strike Rittner's and Jackson's affidavits and to exclude information submitted in support of summary judgment. (Def. Ex. 13, 16; Docs. 251 – 252) Accordingly, absolutely no explanation would exist for why the Plaintiff wasn't selected for the MHSA I promotion. Interestingly, Defendants have only asserted biased testimony to support these arguments. *Kilgore v. Trussville Development, LLC.*, No. 15-11850 (11th Cir. 2016) (jury isn't required to believe testimony unless from "a disinterested witness" at the pretext stage).

76 – 97; Doc. 247, pp. 20 – 21) Having failed to proffer legitimate reasons, relying

on conflicting and manufactured testimony, and ample circumstantial evidence of a

discriminatory intent as reviewed *supra*, summary judgment would be improper.

Hence, there is substantial evidence of racial animus for any claims in this case.

*Chavis v. Clayton County School Dist.*, 300 F. 3d 1288, 1293 (11th Cir. 2002).

## II.    ADMH ISN'T ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII RETALIATION CLAIM

In opening, Defendants have already asserted a summary judgment motion

on all of the Plaintiff's counts. (Doc. 254, p. 21) They are due no additional

briefing when they encompassed the Bryce Hospital MHSO III promotion in their

motion. The Plaintiff's pleading isn't a shotgun complaint. *Sommerville v. Warrior

Met Mining, LLC.*, 7:19-CV-00079-LSC at *9 (N.D. Ala., December 22, 2020)

("[Plaintiff's *Pro Se*] complaint is not a shotgun pleading for one reason: it gave

[Defendants] notice"). The Plaintiff isn't responsible for Defendants' ill reading of

the pleading; their motions to dismiss rendered the pleading detailed when they

never moved for a more definite statement in opposition to a *Pro Se* Plaintiff.

(Docs. 23, 28, 80, 94, 110, 141) Defendants have waived this relief. FED. R. CIV.

P. 12(e).

### A. *Plaintiff Can Make a Prima Facie Case of Title VII Retaliation*

Defendants attempt to touch upon the Plaintiff's alleged meritless

complaints. (Doc. 254, pp. 21 – 22) As already stated, this cannot be a "legitimate

basis" without evidence meeting the *Burdine* standard that this reason was relied upon. *Rollins v. State of Fla. Dept. of Law*, 868 F. 2d 397, 401 (11th Cir. 1989).[19] As previously advised, several of the Plaintiff's complaints were not meritless although Defendants falsely present the contrary. *Rollins*, 868 F. 2 at 399, 401 ("The district court held, however, that the [Defendant] had successfully *rebutted* Rollins' claim by *articulating a legitimate, non-discriminatory reason* for denying her promotion — that the denial of promotion was based on the manner in which Rollins complained of discrimination, not on the fact that she complained... the employee's conduct then may be deemed an *independent, legitimate basis* for the denial of her promotion") (emphasis added). (Doc. 248-14, ¶ 4) Defendants' argument that the reasonableness standard occurs at the pretext stage is clearly erroneous. (*Id.*) This reason was not mentioned regarding any action until *this* summary judgment motion. *Perfetti,* 950 F. 2d at 456. (Doc. 39-1)

As set forth herein, several of Defendants' discrete actions may be considered adverse and combined actions may also amount to an adverse employment action. *Hamner v. Tuscaloosa Co. School System*, 7:18-CV-01838-LSC at *22 (N.D. Ala., Feb. 17, 2021). As seen in *Bass*, "[w]hile the other actions might not have individually risen to the level of adverse employment action under

---

[19] It should be noted that the Plaintiff attempted to transfer from THSMF, however, Defendants denied those uncompetitive transfer requests. (Doc. 145, ¶ 207)

Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action." 256 F. 3d at 1118.

## B. ADMH Did Not Have Legitimate, Non-Discriminatory Reasons for Plaintiff's Discipline, Declined Promotions & Performance Reviews

The Plaintiff has already set forth his arguments that the Defendants' disciplinary actions were not legitimate within his response. (Doc. 247; Pl. Dec. ¶¶ 1 – 88) Plaintiff's responses to disciplinary actions place these alleged legitimate reasons in dispute.[20] (Def. In. Disc., pp. 0204 – 0207, 0210 – 0214, 0222 – 0230, 0232 – 0236; Doc. 209-4, pp. 60 – 67) There was obvious "pending disciplinary action" against Jackson. (Doc. 254, p. 22; Doc. 247, ¶¶ 60 – 62, 68, 70) The review isn't whether Jackson resigned after the Plaintiff's termination; a reasonable jury could conclude Jackson commonly falsified documentation. (Id.)

Regarding the May 2, 2018 reprimand, the Plaintiff has already argued its falsity in the adjacent motion. (Doc. 219-2, 47 – 48; Def. In Disc., p. 0232 – 0236) Defendants argument that the May 2, 2018 reprimand precedes the complaint is irrelevant; the Plaintiff's first discrimination complaint was verbal and before the reprimand. (Doc. 145, ¶ 52; Doc. 249-1, p. 3, ¶ 3, p. 12, ¶ 4)

More so, the Plaintiff's access to review employee discipline regarding the

---

[20] The Plaintiff has clearly made an argument regarding his September 19, 2018 reprimand. (Doc. 254, p. 23, n.10) He has produced his response and testified that it was falsely implemented. (Pl. Dec. ¶¶ 39, 46) Defendants made no argument regarding this discipline.

February 2019 suspension isn't a personal purpose. (Doc. 249-2, p. 5, ¶ 15; Doc.

249-12, p. 4, ¶ 9) The evidence, submitted by the Defendants, clearly presents the

Plaintiff was responsible for enforcing policy. (Def. Ex. 110, p. 1; Def. Ex. 105, p.

4) More so, evidence presents the Plaintiff perceived the letter was fraudulent and

he wasn't given proper guidance. (Doc. 209-2; Doc. 209-3, p. 15; Doc. 209-4, p.

25) The Plaintiff was also permitted to discipline Porter for his disruptive

comments to the Plaintiff. (Doc. 209-2; Def. RFP, p. 2129; Pl. Ex. 183) Clearly,

Jackson was aware of the Plaintiff's concerns. (*Id.*) Defendant Hubbard perceived

Jackson was seeking to bolster this disciplinary action and provided guidance to

make it appear legitimate. (Doc. 209-4, p. 21) It is evident the Plaintiff was misled

by Anderson's former behavior and Booth's assertations. (Doc. 248-11, p. 5, ¶ 5;

Def. RFP, p. 4099) Evidently, the Plaintiff was moving to day-shift to *supervise*

the officers in question; this led to the defamatory letter. (Doc. 209-4, pp. 1, 10)

The Plaintiff was set up for failure when Defendants recognized an opportunity

due to subordinate officers' concerns.[21] *Hamilton v. G.E. Co.*, 556 F. 3d 428, 436

(6th Cir. 2009) ("when an 'employer waits for a legal, legitimate reason to

fortuitously materialize, and then uses it to cover up his true, longstanding

---

[21] Evidence even shows the Defendants only provided a verbal warning to Keeler, a probationary employee (Ala. Admin. Code § 580-6-36-.06), who indisputably accessed the camera system to monitor his significant other. (Def. RFP, p. 6695; Doc. 145, ¶ 314; Doc. 248-11, p. 6, ¶ 9) The Plaintiff accessed the system for reviewing conduct to produce a disciplinary draft. (Doc. 209-4, pp. 66 – 67) The Plaintiff's former discipline is already tainted. Additionally, Hubbard alluded that the Booth instigated the creation of the defamatory letter. (Doc. 209-4, p. 26)

motivations for [disciplining] the employee,' the employer's actions constitute 'the very definition of pretext.'"). Summary judgment should be denied.

## C. Plaintiff Can Establish a Causal Connection Between Defendants' Discipline & His Protected Activity, Additionally, He Can Prove Pretext

The Plaintiff incorporates the causal connection expressed *infra* and *supra*. There is ample evidence of causation. The bulk of the Plaintiff's arguments lie within a review of the Plaintiff's retaliatory hostile work environment claim expressed subsequently. *Bass*, 256 F. 3d at 1119 ("[Plaintiff] filed his EEOC charge on December 19, 1995. Soon after [Plaintiff] filed his EEOC complaint, he began to suffer adverse employment actions... [Plaintiff] established a *prima facie* case of discrimination."). Temporal proximity only need be close to the cumulative weight of the adverse actions in consideration whereas here the Plaintiff's first report of discrimination was in December of 2017. (Doc. 145, ¶ 52) Several charges and adverse actions fill the temporal gaps.

More so, Defendants presented that the Plaintiff's work performance was admirable until *after* his protected activity. (Doc. 145, ¶ 62; Answers, ¶ 62; Doc. 247-18, p. 131; Doc. 248-5, ¶ 4(a); Doc. 249-1, ¶ 3; Doc. 249-2, ¶ 16) These changes in position, after the Plaintiff reported discrimination and filed an "EEO suit", are evidence of pretext. *Menefee v. Sanders Lead Company, Inc.*, No. 19-10433 (11th Cir. 2019) ("he must demonstrate that the employer did not believe that his performance was lacking, and merely used that claim as a cover for

discriminating against him"). Defendants changed their position when the Plaintiff

opposed their unconstitutional conduct. *Damon v. Fleming Supermarkets of

Florida, Inc.*, 196 F. 3d 1354, 1361 (11th Cir. 1999).

Evidently, "[a] plaintiff engages in 'statutorily protected activity' when he or

she protests an employer's conduct so long as she demonstrates 'a good faith,

reasonable belief' that the employer was engaged in unlawful employment

practices." *Harper v. Blockbuster Entertainment Corp.*, 139 F. 3d 1385, 1388 (11th

Cir. 1998), *cert. denied*, 525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998)

(citations omitted). It is evident the Plaintiff had a good faith belief to place

Defendants on notice that he would seek appropriate action. (Def. In. Disc., p.

0236; Doc. 219-2) The Plaintiff's notice of an EEO suit is sufficient to engage in

protected activity; presenting "but for" causation. (Doc. 254, p. 28) "Filing suit [is

a] 'protected activity' listed in Plaintiff's Third Amended Complaint for which he

claims he was retaliated. (Doc. 145, ¶ 678) The Plaintiff's "EEO suit" is clearly

mentioned in the internal written and verbal complaints. (*Id.*)

The Plaintiff need not recast evidence of pretext regarding promotions and

disparate discipline reviewed *supra*.[22] Those concerns for pretext should be

---

[22] Defendants have not properly moved for summary judgment regarding the Bryce Hospital
MHSO III promotion upon Title VII retaliation in which Clarence Owens was selected.
However, the same pretextual concerns expressed within the following section applies in
combination with: (1) Plaintiff scored significantly higher (Doc. 249-1, ¶ 13(e)); (2) was
significantly more qualified (Def. In. Disc., pp. 0367 – 0387, 0481 – 0487); (3) similar concerns

considered in combination with the following section. Although evidencing racial discrimination, those arguments for disparate adverse actions also evidence scrutinization of the Plaintiff's employment.

## III.   ADMH ISN'T ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII HOSTILE WORK ENVIRONMENT CLAIM

In efforts to address arguments not previously raised regarding the Plaintiff's *retaliatory* hostile work environment claim, formerly unsuitably identified by the Defendants as a race-based hostile work environment claim (Doc. 245, p. 30; Doc. 254, p. 29), the Eleventh Circuit has recently addressed this framework. *Monaghan v. Worldpay U.S., Inc.*, 955 F. 3d 855, 857, 860 (11th Cir. 2020). Apparently, the Court reaffirmed "that the standard applicable to all Title VII retaliation claims is the *Burlington Northern* 'well might have dissuaded' standard". *Id.* at 862. Defendants argument that the Plaintiff "puts forth no substantive argument" is prejudicial because they are ones who identified an improper standard. (Doc. 245, p. 30) It is their initial burden to argue these principles when moving for summary judgment; the pleading was properly labelled. (Doc. 254, p. 29; Doc. 145, p. 131)

Accordingly, "statements from a supervisor... which threatened []

_____

for the interview process may be connected because interviews were combined (Doc. 248-17, ¶ 17); and (4) a lack of leadership experience, in which Booth's was false, was discussed with the panel even though the Plaintiff ranked highest (Doc. 249-13, ¶ 13; Doc. 247, ¶ 49). Accordingly, biased Defendants, particularly Long, potentially led the panelists astray regarding the Bryce Hospital promotion as well. (p. 9) Nonetheless, Defendants have not the met the *Burdine* standard to present a legitimate reason for this promotion and no further briefing is due.

termination" would dissuade a "reasonable worker from making or supporting a charge of discrimination." *Id.* at 863 (citations omitted). The same goes for other events which Defendants argue are not considerable. *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 69 (2006) ("excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement"); *Cross*, 49 F. 3d at 1507 ("When the work place is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."); *Crawford v. Carroll,* 529 F. 3d 961, 974 (11th Cir. 2008) (unfavorable performance review, which rendered an employee ineligible for a merit pay increase that was due five months later, was a material adverse employment action); *Graham v. State Farm Mut. Ins. Co.*, 193 F. 3d 1274, 1283 (11th Cir. 1999) ("negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment").

The Plaintiff testified that his initial report of discrimination was upon December 6, 2017. (Doc. 145, ¶ 52; Doc. 249-2, ¶ 9) The Plaintiff's initial reports of discrimination were discussed among the primary supervisors instituting discipline. (*Id.*) Accordingly, all of the Plaintiff's disciplinary actions with ADMH followed this report. (Doc. 145, ¶ 7; Answers, ¶ 7; Def. Ex. 5 – 9; Doc. 249-1, ¶ 3; Pl. Dec. ¶¶ 81 – 82) Furthermore, his performance appraisals declined thereafter.

(Doc. 249-1, ¶ 11) This evidences a convincing mosaic. *Lewis*, 934 F. 3d at 1186 ("From all this evidence, a jury could conclude that the [Defendant] was searching for a policy to fit its desire to terminate [the Plaintiff] rather than neutrally enforcing an existing policy."). Jackson even advised it was "fucking fine" if the Plaintiff sued following communicating with the Plaintiff about his rights and the rights of fellow African American employees. (Doc. 145, ¶ 147; Jackson's Answer, ¶ 147; Doc. 247, ¶ 61; Doc. 249-1, ¶ 13(o))

Jackson made several admissions that she had a temper toward the Plaintiff. (Doc. 247, ¶ 62) This was sanctioned by Baugher and Hubbard where Jackson was issued absolutely no disciplinary action. (Doc. 248-14, ¶ 5; Doc. 248-6, ¶ 12; Def. Ex. 52, 114) Defendants had guidance regarding these principles. (Pl. Ex. 82A, pp. 28 – 33) More so, Monaghan was also disregarded when she complained of hostile behavior in relation to her complaints. *Id.* at 858 ("Ms. Monaghan contends that she told some of the executives about Ms. Daniel's behavior at this meeting, but they again refused to consider her complaints."). The Plaintiff's complaints in this case were disregarded in several occasions because they did not subjectively require a response. (Doc. 249-8, ¶ 15; Doc. 246-10, ¶¶ 1 – 2; Doc. 248-3, ¶ 8; Doc. 248-12, ¶ 7) When a Caucasian officer complained, Defendants lodged an elaborate investigation. (Doc. 145, ¶¶ 427 – 428; Answers, ¶¶ 427 – 428; Pl. Ex. 410; Def. RFP, p. 6695)

Of importance, Jackson even communicated her prior notice that the

Plaintiff wouldn't have a job long term or receive a promotion, following the

Plaintiff's notification of a potential "EEO suit", to Baugher and Hubbard. (Doc.

247, ¶ 60; Def. In. Disc., pp. 0705 – 0706) Following this communication on May

2, 2018, Hubbard and Baugher were extensively intertwined in the Plaintiff's

following discipline. (Def. In. Disc., pp. 0734 – 0737, 0867 – 0870; Doc. 219-2, ¶¶

34, 39 – 40, 42, 108, 110, 119) Baugher could not "recall any discipline of [an]

African-American employee other than of [the Plaintiff] in which [she]

participated or that [she] recommended or assisted". (Doc. 248-8, ¶ 4)

Accordingly, there is ample evidence to show that Defendants lodged a campaign

of disparate harassment against the Plaintiff to terminate his employment. Even

Baugher and Jackson communicated regarding further efforts to discipline the

Plaintiff in connection with their notification of this EEO suit's filing. (Doc. 247, ¶

63) Booth additionally sought to have the Plaintiff transferred because of concerns

he perceived related to this EEO suit and after direct reports of discrimination to

him. (Doc. 145, ¶¶ 318, 350; Doc. 247, ¶ 67) All of these concerns are in addition

to issues regarding disparate discipline and promotions expressed *supra*.

Furthermore, evidence even sustains that Jackson attempted to steer the

evidence in possession of the Plaintiff regarding his initial EEOC charge by dating

his discipline before his charge. (Doc. 247, ¶ 70) A jury could conclude that

Defendants wished to thank the Plaintiff regarding his reports of Anderson's disparate disregard of Porter's misconduct so they could dissuade the Plaintiff (Doc. 248-14, ¶ 4); calming his efforts to file suit while they sought avenues to terminate his employment.[23] (Def. In. Disc., p. 0871)

Accordingly, even Hubbard was working in advance of the Plaintiff's filing a suit which included ensuring he was disciplined. (Doc. 248-14, ¶ 4) Some of these decisions even included not reviewing defenses or contradictory evidence of the Plaintiff, nevertheless, Hubbard criticizes the Plaintiff's decision making simultaneously. (Doc. 248-14, ¶¶ 3, 7; Doc. 248-15, ¶¶ 2, 7) Furthermore, Hubbard, Jackson, Baugher, and Beshear declined to rescind the stipulations on the Plaintiff's contact with external agencies including the EEOC. (Doc. 219-2, ¶¶ 33 – 42; Def. Ex. 5).

Moreover, Defendant Jackson commonly deviated from established procedure governing proper internal investigations of the Plaintiff's misconduct; Jackson admits to several of these shoddy investigations. (Doc. 209-2; Pl. Dec. ¶¶ 39, 46 – 47; Doc. 248-18, ¶ 5; Doc. 249-11, ¶¶ 3, 5 – 6) Formerly, "[s]tanding *alone*, deviation from a company policy does not demonstrate discriminatory

---

[23] Additionally, there is evidence that Jackson and Booth even avoided allowing the Plaintiff to be in charge when Booth was absent in a foreign country, violating the Defendants' policies. (Pl. Ex. K; Def. Ex. 115) Also, Jackson and Booth attempted to set the Plaintiff up for failure. (Doc. 145, ¶ 389 – 393) Defendants have conceded that Booth falsified testimony upon this motion and in his personnel files. (Doc. 247, ¶¶ 49; Doc. 247, p. 30; Doc. 254, p. 18) He isn't an incident bystander in this case but is a party Defendant.

animus." *Mitchell v. USBI Co.*, 186 F. 3d 1352, 1356 (11th Cir. 1999) (emphasis added). However, Defendants have "failed to clearly articulate and follow its formal policies." *Lewis*, 934 F. 3d at 1186. The Plaintiff has evidenced a multitude of pretextual concerns for the Court's determination as expressed *supra* and *infra*. Additionally, Jackson falsely testified that such regulations didn't establish a checklist for her position as Facility Director. (Doc. 251, p. 6, ¶ 11; Pl. Ex. 278)

Defendants have even sought to extinguish the Plaintiff's discrete Title VII retaliation claims because of his *characterized* extensive complaints; amounting approximately to one complaint a month according to their erroneous calculations. (Doc. 245, p. 24) Defendants' outdated policy doesn't even mention a legitimate claim of a *retaliatory* hostile work environment but they argue the Plaintiff's complaints are meritless; a convenience in their benefit. (Doc. 145, ¶¶ 98 – 99, 153, 158, 220, 229, 321, 421, 428; Def. Ex. 102) This circuit has made known that this basis is actionable regardless of the Defendants' subjective view that the complaints were "unreasonable". *Monaghan*, 955 F. 3d at 863 ("… that she was being discharged for *complaining and complaining* to the executives, that they were tired of her complaining… First, when [Plaintiff] was terminated, [Defendant] told her that she was being fired for *complaining and complaining*. As noted earlier, a jury could draw the inference that the reference to [Plaintiff's] complaining was to the complaints about [Defendants]… We reverse…")

(quotations omitted) (emphasis added). Apparently, Defendants have conceded that the Plaintiff's retaliatory hostile work environment claim isn't due summary judgment via asserting their *novel* argument that the amount of the Plaintiff's complaints were unreasonable which was never presented during discovery or their EEOC position statements. (Doc. 245, p. 24; Doc. 39-1)

Even more so, Jackson's replacement, Defendant McAlpine, reported to Jackson that the Plaintiff intended to file an "EEO suit". (Def. In. Disc., p. 0705; Doc. 230-1, p. 264, ll. 14 – 22) McAlpine, as well as a former subordinate officer, have a completely different outlook than the Defendants who the Plaintiff named, or referenced, in EEOC charges. (Doc. 230-1, p. 266, ll. 11 – 12, p. 270, ll. 1 – 23, p. 271, ll. 1 – 23, p. 1 – 7, p. 284, ll. 7 – 23, p. 285, ll. 1 – 6) McAlpine's and Madden's testimony brings into question Defendants' motives transpiring during the Plaintiff's employment and whether Defendants' biased actions were motivated by animus, whether discriminatory or retaliatory.[24] The same goes for testimony

_____

[24] Interestingly, evidence even presents that Anderson and Booth, uncertified in the NCIC system as opposed to the Plaintiff, ordered Madden to eliminate the Plaintiff's access. (Doc. 230-1, p. 296, ll. 5 – 23, p. 297, ll. 1 – 10, p. 309, ll. 14 – 22; Doc. 248-5, ¶ 11; Doc. 249-2, ¶ 6; Pl. Dec. ¶ 55) However, evidence presents the Plaintiff was operating lawfully. (Def. In. Disc., pp. 0726 – 0733; Pl. Dec. ¶ 70) Accordingly, Anderson even revises his position expressed within the recommendation he signed for the Plaintiff. (Doc. 248-5, ¶ 4; Def. In. Disc., p. 0380; Doc. 145, ¶¶ 123 – 124) He also offered a recommendation to another African American potentially to induce his resignation. (Doc. 145, pp. 123 – 124) Defendants were scrutinizing every avenue of the Plaintiff's employment even if they were improperly trained or uncertified to exercise this authority. The same goes for Jackson's consistent disregard of the Incident Management Plan. (Doc. 251; Pl. Dec. ¶ 39; Doc. 249-11, ¶¶ 3, 5, 6; Doc. 248-17, ¶ 13; Doc. 248-18, ¶ 5) Furthermore, the Defendants' novel argument regarding the number of complaints, first raised during summary judgment, presents evidence of causation. (Doc. 245, p. 24; Doc. 39-1)

from Leavelle, Peoples, and Keeler. (Pl. Ex. 229, 410 – 411) More so, but-for

causation is evident and the same-decision defense does not apply. *Gowski*, 682 F.

3d at 1313. Defendant isn't entitled to summary judgment.

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S § 1985 FEDERAL CONSPIRACY CLAIMS

The Plaintiff has shown ample evidence of racial animus *supra*. Defendants

arguments suggest the Plaintiff may not prove § 1985(3) liability with

circumstantial evidence. (Doc. 254, pp. 31 – 33) They are wholly mistaken. *Burrell*

*v. Bd. of Trustees of Ga. Military College*, 970 F. 2d 785, 789 (11th Cir. 1992)

("whether a *prima facie* case of conspiracy under 42 U.S.C. §§ 1983 and 1985(3)

may rely on circumstantial evidence. We fully agree with the district court that this

question must be answered in the *affirmative*.") (emphasis added).

Accordingly, "Section 1985 provides a vehicle to redress conspiracies to

interfere with civil rights." *Farese v. Scherer*, 342 F. 3d 1223, 1230 (11th Cir.

2003) (emphasis added). Defendants' cited case of *Aulson v. Blanchard*, 83 F. 3d 1

(1st Cir. 1996) offers no support for their arguments. *Id.* at 5 ("to state a claim

under Section(s) 1985(3) in respect to conspiracies involving *public officials*,

private actors, or both…"). The violation must "must aim at a deprivation of the

equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge*, 403

U.S. 88, 102 (1971). More so, this is "including a long list of enumerated rights

such as free speech, assembly, association" which are protected under the First

Amendment. *Id.* at 103. Defendants' argument suggests that a private person

cannot assert a First Amendment, § 1981, or Title VII claim. This is clearly

erroneous and due no consideration because *both* private individuals *and* state

employees can assert these rights. (Doc. 254, p. 34)

The Plaintiff has evidenced a "racially discriminatory private action aimed at

depriving [him] of the basic rights that the law secures to all free men." *Id.* at 105.

(Doc. 219-2) If the Plaintiff has evidenced a deprivation of his First Amendment

rights, with underlying racial animus, he has stated a claim. (*Id.*) As stated in *Bray*,

"the alleged violation of the First Amendment was insufficient because there was

no claim that the State was involved in the conspiracy…" 506 U.S. 263 at n.14.

(Doc. 145, ¶¶ 17 – 26) Defendants misinterpret this statute. Upon conceded

citations,

> "[t]he rights, privileges, and immunities that § 1985(3) vindicates must
> be found elsewhere, and here the right claimed to have been infringed
> has its source in the First Amendment. Because that Amendment
> restrains only official conduct, to make out their § 1985(3) case, it was
> necessary for respondents to prove that the *State was somehow involved
> in* or affected by the conspiracy."

*Carpenters v. Scott*, 463 U.S. 825, 833 (1983) (emphasis added). The statute

applies to rights involving state action and *limits* its application when a *private*

conspiracy *without* state action is alleged. (*Id.*) Defendants are incorrect regarding

the Plaintiff's underlying Title VII and Fourteenth Amendment assertations:

"In the present case, although Dickerson's Title VII and § 1985(3) claims arise out of the same underlying facts, the rights which are the basis of the § 1985(3) claim are rights created by the Constitution, not by Title VII. Indeed, Dickerson's § 1985(3) claim is based on the Fourteenth Amendment rights to equal protection of the laws and due process. Because this case involves the assertion of constitutional rights, the holding of *Novotny* simply does not apply here. Thus, consistent with our prior decision in *Johnson,* we hold that Dickerson's § 1985(3) claim is not preempted by Title VII."

*Dickerson v. Alachua County Com'n*, 200 F. 3d 761, 767 (11th Cir. 2000)

(emphasis added). Defendants are misplaced and not due summary judgment.

In closing, the intracorporate conspiracy doctrine does not bar the Plaintiff's conspiracy claims here. (Doc. 254, p. 34) The Plaintiff isn't required to rehash a slew of arguments, presenting Defendants' violations of the Plaintiff's First Amendment, Title VII and § 1981 underlying rights. (Doc. 219-2) These concerns are already briefed. (Docs. 219-2, 229 – 230, 242, 245 – 247) "[E]ven courts that generally apply the intracorporate conspiracy doctrine to § 1985 claims have recognized that an exception should exist when the conspiracy alleged is criminal in nature." *McAndrew v. Lockheed Martin Corp.*, 206 F. 3d 1031, 1041 (11th Cir. 2000). (Doc. 145, ¶¶ 615, 623, 626, 629, 644, 651 – 652) Even if the Plaintiff's declaration was the only supporting evidence, it weighs more to the preponderance of the evidence than Defendants' legal conclusions. *Perry v. Thompson*, 786 F. 2d 1093, 1095 (11th Cir. 1986).

## V.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFF'S 42 U.S.C. § 1983 & 42 U.S.C. § 1985 CLAIMS

process violation); *Johnson v. City of Fort Lauderdale, Fla.*, 126 F. 3d 1372 (11th

Cir. 1997) ("We have squarely held that qualified immunity is not available as a

defense to a § 1985(3) claim"); *Shahawy v. Lee*, No. 95-269-CIV-T-21-B, 1996

U.S. Dist. LEXIS 22854, at *70 (M.D. Fla., Dec. 13, 1996) (qualified immunity

not available for § 1985(2)); *Cross*, 49 F. 3d 1490 (rejecting qualified immunity

when doing nothing in face of Title VII harassment and discrimination); *Ratliff v.

DeKalb County, Ga.*, 62 F. 3d 338, 340 (11th Cir. 1995) ("The right to be free from

retaliation is clearly established as a first amendment right and as a statutory right

under Title VII"); *Brown v. Georgia Dept. of Revenue*, 881 F. 2d 1018 (11th Cir.

1989) (merit system employee must be noticed of due process). It also follows, that

if Title VII and § 1981 cases are analogous, the Plaintiff's cited Title VII authority

also abrogates the Defendants' qualified immunity defense. *Quigg v. Thomas Cnty.

Sch. Dist.*, 814 F. 3d 1227, 1235 (11th Cir. 2016).

## *A. Defendants Are Not Entitled to Summary Judgment on Plaintiff's First Amendment Claims* [25]

---

[25] Defendants manifestly fail to understand that association claims are not viewed in an official duty context. The public concern analysis encompasses the review of "content, form, and context", however, association claims do not apply the public concern analysis. *Ex parte Hugine*, 256 So. 3d 30, 48 (Ala. 2017); *Cook v. Gwinnett County School Dist*, 414 F. 3d 1313, 1321 (11th Cir. 2005); *Allred v. Carbon Hill*, 6:13-CV-00930-LSC at *18 (N.D. Ala., October 24, 2014). Once the associative activity is identified, the Court skips to the government efficiency test and causation principles. (Doc. 254, n.13) Defendants assert they have "uncovered no valid First Amendment 'Access to Press & Privacy' claim". It is not whether the Defendants uncover such a claim, it is whether they've briefed the claims to move for summary judgment. Defendants again attempt to abrogate the Plaintiff's liberal pleading standard. More so, the Supreme Court has for over fifty years recognized that the First Amendment protects the right to speak anonymously.

Defendants seek summary judgment following the Plaintiff's arguments because they perceive them to be "bareboned" when they initiated only "bareboned" arguments. (Doc. 254, p. 37, n.14) The Plaintiff addressed their baseless arguments within the applicable constraints of the briefing. Additionally, the Plaintiff has already testified to the circumstances of his complaints and protected activity. (Doc. 145, ¶¶ 52 – 53, 73, 75 – 76, 78 – 81, 97 – 101, 103, 141, 153, 164 – 172, 220, 229, 240 – 241, 302 – 316, 318, 321)

### i.  *Specified Complaints*

First, in sum, it is evident the May 3, 2018 complaint reports Jackson's "unethical management of the facility". (Doc. 254, p. 37) Defendants continue to attempt to mislead the Court from rendering the Plaintiff's complaints protected. More so, the Plaintiff's partial reference to his "duty" references a "duty" to public at large; not the Defendants. (Def. Ex. 113) When there is a "legitimate matter of inherent concern to the electorate" the Court may "eschew[] further inquiry into the [Plaintiff's] motives". *Baron v. Suffolk County Sheriff's Dept*, 402 F. 3d 225, 235 (1ˢᵗ Cir. 2005).

---

*Talley v. California*, 362 U.S. 60 (1960); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). Anonymity "protect[s] unpopular individuals from retaliation — and their ideas from suppression — at the hand of an intolerant society." *Id.* at 357; *Shelton v. Tucker*, 364 U.S. 479, 490 (1960) (striking down as overbroad a statute requiring teachers to list the organizations to which they had belonged as a condition of employment, reasoning that "[t]he statute's comprehensive interference with associational freedom goes far beyond what might be justified"). The Plaintiff couldn't maintain privacy in his speech when compelled to reveal all his concerns regarding the ADMH and THSMF. (Def. Ex. 5)

Based upon the Defendants' arguments, which are exactly the arguments addressed in *King v. Board of County Commissioner*, 916 F. 3d 1339 (11th Cir. 2019), the Eleventh Circuit has already clarified why this Plaintiff's speech is protected. The court opined that "Carollo had important ingredients that King is missing: evidence that the Plaintiff spoke on something beyond his job duties…" *Id.* at 1350 (emphasis added). The Plaintiff isn't required to strictly maintain his speech to matters of 100% public concern and internal speech may be protected. More so, none of these complaints were rendered as an official requirement of the Plaintiff's job duties; several *partially* concerned his job duties. *See, e.g., Carter v. City of Melbourne, Fla.*, 731 F. 3d 1161, 1168 – 1169 (11th Cir. 2013) ("we do not think that [Plaintiff's] status as an employee of the police department meant that his speech did not address a matter of public concern… [Plaintiff's] speech activities, which essentially consisted of *criticizing the leadership* of the police department… supports our conclusion.") (emphasis added).

Second, the Plaintiff introduced the June 19, 2018 complaint to induce an official investigation into a hostile work environment. (Doc. 145, ¶ 153) Defendants speak to the Plaintiff's motives but have cited to no evidence regarding this complaint. (Doc. 254, p. 39)

Regarding the Plaintiff's report of corruption regarding Anderson's permitting Porter to engage in unethical conduct (Def. Ex. 55); this complaint was

submitted to the Alabama Peace Officer Standards & Training Commission

(hereinafter "APOSTC") to report corruption (Doc. 145, ¶¶ 164 – 172; Pl. Ex. 182

– 183). *King*, 916 F. 3d at 1350. The Plaintiff quoted his response to Anderson's

assertation that the Plaintiff's concerns had nothing to do with him. Nonetheless,

the Plaintiff's complaint evidences direct concerns affecting the public. (Def. Ex.

55, p. 3) More so, the Plaintiff's identical complaint to the APOSTC is sworn.

*Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) ("Truthful testimony under oath by a

public employee outside the scope of his ordinary job duties is speech as a citizen

for First Amendment purposes."). (Pl. Ex. 182 – 183) Evidence even presents that

APOSTC responded with a state-wide mandate regarding the Plaintiff's complaint.

(Doc. 145, ¶¶ 240 – 241) It was not his duty to transmit these complaints reporting

misconduct. (Doc. 145, ¶ 164) There is also an evident causal connection to

Plaintiff's discipline. (Doc. 145, ¶¶ 166, 178 – 184) This complaint falls squarely

within *Bailey*. 843 F. 3d 473 at n.8 ("Bailey alleged sufficient facts to show that he

engaged in protected speech when he complained to his chief, and again in his

termination appeal, that Douglas County law-enforcement officers were involved

in racial profiling and other inappropriate and unconstitutional conduct.").

Finally, the Plaintiff's *external* complaints, of which Defendants received,

could not be pursuant to the Plaintiff's official duties. *King*, 916 F. 3d at 1350. The

Plaintiff wasn't commissioned to produce them. *Garcetti v. Ceballos*, 547 U.S.

410, 422 (2006). Nor are internal complaints a bar. *Lane*, 134 S. Ct. at 2379.

### ii. *Issues of Private Concern*

Defendants quote concerns with Plaintiff's "own self-interest in improving

the conditions of his employment". (Doc. 254, p. 40) The Defendants' cited case

law isn't persuasive nor binding. *Carter*, 731 F. 3d at 1168 – 1169 ("Carter did not

*simply* address 'matter of interest only to [him],' but rather sought to bring about

changes that would lead, *at least in his eyes*, to the more effective operation of the

Melbourne police force") (emphasis added). The consistent references to *Morgan*,

*Ezekwo*, *Boyce*, and *Anderson* are non-persuasive case law, non-binding, and are

clearly outdated regarding First Amendment principles.

### iii. *Libel Retraction Letter*

The context of *Rosenblatt* doesn't matter when establishing *subject matter* of

public concern. (Doc. 254, p. 42) Defendants didn't even address the context of

off-duty conduct. (Doc. 247, pp. 65 – 66) Regarding the Plaintiff's libel retraction

letter, there is a distinct difference between seeking to repair reputation and simply

accessing the Courts for private interest. *NAACP v. Button*, 371 U.S. 415, 443

(1963) ("[r]esort to the courts to seek vindication of constitutional rights is a

different matter from the oppressive, malicious, or avaricious use of the legal

process for purely private gain."). As set forth *supra*, the Plaintiff has a liberty

interest in his reputation as a law enforcement officer. (Doc. 247, pp. 78 – 79)

Just as in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), "[t]his case ultimately comes down to the importance the Court attaches to society's 'pervasive and strong interest in preventing and redressing attacks upon reputation.'" *Id.* at 401 (*citing Rosenblatt,* 383 U.S. at 86). According to the Defendants' reply, "the [Defendants have] miscalculated and denigrates [this] interest at a time when escalating assaults on individuality and personal dignity counsel otherwise. At the very least, the issue is highly debatable, and the [Defendants have] not carried [their] heavy burden of proof to justify tampering with state libel laws." *Id.* at 401. The Plaintiff, having sought to repair his reputation while being aware that Defendants were scrutinizing his employment (Pl. Dec. ¶ 47), as a "private citizen does not bargain for defamatory falsehoods. Nor is *society* powerless to vindicate unfair injury to his reputation." *Id.* at 402 (emphasis added). These principles aren't destroyed because of the Plaintiff's public employment. *Georgia Ass'n of Educators v. Gwinnett County Sch. Dist.,* 856 F. 2d 142, 145 (11th Cir. 1988). It is the judicial system's authority to determine whether the Plaintiff may vindicate his reputation, not the Defendants' authority. *Id.* at 403. (Def. Ex. 9)

In *Little v. City of North Miami*, 805 F. 2d 962 (11th Cir. 1986), Little was charged with utilizing his official position for personal gain. *Id.* at 964. (Def. Ex. 9) Even more similar to Defendant Jackson in this case having not conducted an investigation regarding the Plaintiff's alleged use of the camera system for

personal gain (Doc. 209-2, p. 3, ¶ 13), Little was charged "without verification that the assertions were truthful." *Id.* at 965 – 965. (Doc. 247, pp. 78 – 79) Little even brought a claim of defamation. *Little*, 624 F. Supp. 768, 770 (S.D. Fla. 1985). The Plaintiff intended to do the same regarding the officers' defamatory letter. (Doc. 145, ¶ 309; Doc. 209-2, p. 3, ¶¶ 11 – 12) The Court opined that "[b]y representing [] himself [] in state litigation... [Little] was engaging in a 'form of political expression' entitled to First [] Amendment protection." *Id.* at 968. The Defendants "may not retaliate against an individual because of that person's legitimate use of the courts." *Id.* at 968. (Doc. 219-2, pp. 39 – 41; Doc. 247, p. 3, ¶ 6) These principles were clearly established.

Defendants did not move for summary judgment on causation. (Doc. 254, p. 44) Evidence revealed in Plaintiff's Title VII reviews obviously link these same disciplinary actions to First Amendment activity. *Ratliff*, 62 F. 3d at 340. More so, Plaintiff has already briefed concerns with direct evidence.[26] (Doc. 219-2)

## B. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fourteenth Amendment Claim

The Plaintiff is a merit system employee, nonetheless, this doesn't foreclose Plaintiff's property interest. *Owens et al. v. Alabama Department of Mental*

---

[26] The Plaintiff has adequately briefed the prior restraint claim. The Defendants' arguments are baseless and do not address Anderson's directive or the Plaintiff's cited authority. The Plaintiff clearly identified the prior restraint's chilling of his filing a lawsuit. (Doc. 145, ¶¶ 309, 453)

*Health*, 2:07-CV-00650-WHA-TFM at *24 – 26 (M.D. Ala., August 29, 2008)

("The existence of a property right in an aspect of public employment generally 'is

made by reference to laws, regulations, or personnel policies.'") (*citing Nolin v.*

*Douglas County*, 903 F.2d 1546, 1553 (11th Cir. 1990)); *Galbreath v. Hale County*,

Alabama, No. 17-13762 at * 8 – 9 (11th Cir. 2018). These are identified on multiple

accounts. (Pl. Ex. 81 – 82, 82A, 83, 86 – 87, 278, 280 ALA. ADMIN. CODE §§

580-6-36-.05, 580-6-34-.10; Def. Ex. 96 – 109) Defendants' arguments are

improper. Additionally, *Cannon* did not foreclose the "more" to only a discharge.

Plaintiff "has presented [] evidence that he [is] unable to secure a similar position

with any other employer." *Liu*, 330 F. App'x at 781.

Furthermore, the Plaintiff has alleged a facially neutral statute that has been

improperly applied to him and other law enforcement officers. (Doc. 145, ¶¶ 6, 15

– 16, 31, 492) The Plaintiff is testifying that § 22-50-21 in correspondence with the

State Merit System Act of 1939 has been misapplied as a class designation.

## VI.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRACT CLAIMS

### A. Department Policies & Form 40s Do Create a Binding Employment Contract

To recover for a breach of contract upon policies and procedures of

employment, "[1] the language contained in the handbook must be examined to see

if it is specific enough to constitute an offer, [2] the offer must have been

communicated to the [Plaintiff] by issuance of the handbook, or otherwise, [and 3] the [Plaintiff] must have accepted the offer by retaining employment after he has become generally aware of the offer." *Hoffman-La Roche v. Campbell*, 512 So. 2d 725, 735 (Ala. 1987). *Clements* does not address this standard. (Doc. 254, p. 48)

In response to the Plaintiff's argument that a binding contract has been implemented via the ADMH's policies, the Court should "see no reason why a policy contained in an employee manual issued to an employee cannot become a binding promise once it is accepted by the employee through his continuing to work when he is not required to do so." *Id.* at 733. As the Plaintiff has clearly performed according to unbiased testimony (Doc. 230-1, p. 266, ll. 11 – 12, p. 270, ll. 1 – 23, p. 271, ll. 1 – 23, p. 1 – 7, p. 284, ll. 7 – 23, p. 285, ll. 1 – 6; Pl. Ex. 229, 410 – 411), "[s]uch a performance clearly provides any consideration necessary to the contract. The fact that the promise is communicated to the [Plaintiff] through the medium of a [Form 40 and conjoining policies], rather than by some other means, is simply of no consequence." *Id.* at 733. "[W]hether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs." *Id.* at 734. (Doc. 254, p. 50) Apparently, in continuously expressing the parties "must" follow policy (Def. Ex. 13, p. 9; Def. Ex. 16, p. 9; Def. Ex. 33, p. 7; Def. Ex. 34, p. 3; Def. Ex. 81, p. 3; Def. Ex. 83, p. 7; Def. Ex. 92 – 93; Doc. 248-15, ¶ 4; Doc. 248-19, ¶ 20; Doc.

249-9, ¶ 11), as well as threatening the Plaintiff's employment if such policies were not followed (Doc. 247, ¶ 60), they indeed became binding between Defendants and the Plaintiff. The Plaintiff received these policies requiring his signing of their reception with joint signatures between Defendants. (Def. Ex. 92 – 93) Furthermore, Form 40s are completed yearly in order to ensure an employee's knowledge of the requirement that they must follow the policies and procedures of the ADMH. (Pl. Ex. T, p. 2)

Additionally, "the rules set out [] regarding the enforcement of a unilateral contract do not require that any definite time period for performance have been set or agreed to." *Id.* at 734. Furthermore, Defendants' argument that the word "guidelines" expels the binding nature of the contracts is also meritless. *Id.* at 737 ("The language used in this handbook is clear enough that an employee reading it could reasonably believe that, as long as he worked within the guidelines set out in the handbook, he would not be terminated until all procedures set out in the handbook had been followed...") (emphasis added). (Doc. 254, pp. 48 – 50)

The Eleventh Circuit has provided guidance for this Court. *Galbreath*, No. 17-13762 at \*8 – 9 ("Under Alabama law, 'language contained in a handbook can be sufficient to constitute an offer to create a binding unilateral contract.'") (*citing Hoffman-La Roche*, 512 So. 2d at 735). Accordingly, a "subjective understanding of whether the policy applied to [the Plaintiff] is not relevant." *Id.* (Doc. 254, p.

50) More so, the same has occurred in a binding opinion. *Hill v. Cundiff*, 797 F. 3d 948, 983 (11th Cir. 2015) ("the terms of the Policy Manual are sufficiently detailed under Alabama law to create a genuine issue of material fact as to whether [Defendants] acted beyond [their] authority" and denying state-agent immunity where policy advised Defendants "shall investigate the complaint and take appropriate action."). (Doc. 247, ¶ 65)

Defendants' conduct "falls within any one of the exceptions to State-agent immunity". *Id.* at 134. The Plaintiff has presented ample evidence to support that Defendants acted: (1) willfully by disregarding the Plaintiff's responses to disciplinary action (Def. In. Disc., pp. 0210 – 0214, 0204 – 0207, 0232 – 0236, 0222 – 0230; Doc. 209-4, pp. 60 – 67); (2) fraudulently in their documentation (Pl. Dec. ¶¶ 1 – 88), maliciously in their behavior (Doc. 247, ¶¶ 58 – 74); (3) in bad faith upon the policies which set forth ample guidelines to ensure their appropriate behavior (Doc. 247, ¶ 65; Pl. Dec. ¶¶ 1 – 88); and (4) acted upon mistaken interpretations of law regarding the Plaintiff's law enforcement authority and his appropriate state merit system classification which would have provided due process to review these contentions (*Id.*).[27]

---

[27] Jackson's persistent disregard of the Incident Management Plan in regard to the Plaintiff's disciplinary actions most definitely results in a breach of contract under these theories. (Pl. Dec. ¶¶ 38 – 39, 46; Pl. Ex. 278) It is hard to imagine an argument that this plan's 50 pages, which demands what the Defendants "shall" do, are not binding. They accepted these policies.

More so, Alabama law is clear that the Plaintiff may recover (1) from Defendants' manifestations to the Plaintiff and (2) their own contracts with the state because the Plaintiff is a third-party beneficiary. *Fitzpatrick v. Hoehn*, 262 So. 3d 613, 623 (Ala. 2018) (citations omitted). Defendants' motion for summary judgment should be denied as the § 1981 and state law breach of contract(s).

## VII.   SUMMARY JUDGMENT ISN'T DUE TO GRANTED ON ALL PLAINTIFF'S STATE LAW CLAIMS

### A. Defendants Are Not Entitled to Sovereign Immunity

"Under the *Ex parte Young* doctrine — which can be understood as an exception to Eleventh Amendment sovereign immunity — federal courts may 'entertain suits against state officers seeking prospective equitable relief to end continuing violations of federal law.'" *Lambert v. Board of Trustees*, No. 19-10621 (11th Cir. 2019) (citations omitted). The Plaintiff may proceed upon any claims of prospective equitable relief in Defendants' official capacity. Defendants are not afforded sovereign immunity in their individual capacities. *Ex parte Cranman*.

### B. Defendants Are Not Entitled to State-agent Immunity

For reasons set forth in the Plaintiff's response (Doc. 247), and herein as expressed *supra* and *infra*, Defendants are not due state-agent immunity. *Williams v. Aguirre*, 965 F. 3d 1147, 1170 (11th Cir. 2020) (finding that evidence of bad faith and malicious conduct negates state-agent immunity along with acts done "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or

under a mistaken interpretation of the law.") (citations omitted). The evidence is

sufficient for a proper denial of state-agent immunity. (Pl. Dec. ¶¶ 1 – 88) More so,

Defendants' legal conclusions are due no consideration. (Def. Ex. 3, 13, 16, 25, 33,

59, 83 – 84) The same goes for non-illustrative facts. (*Id.*)

## *C. Summary Judgment isn't Due to be Granted on Plaintiff's Claim Against Booth*

Booth attempts to broaden the review of his personal conduct. (Doc. 254, pp.

52 – 53) These arguments are still without merit. *Hoover* affirmatively coincides

with Booth's operating for his own personal purposes. 611 So. 2d at 293. He hasn't

even addressed the slew of arguments presenting he maliciously acted or authority

presenting he defamed the Plaintiff.

More so, Booth is evidenced to have falsified his application, and evidence

upon this motion, regarding the very supervisory position in question sustaining his

personal objective. (Doc. 247, ¶¶ 49, 72; Doc. 254, p. 18) This wasn't Booth's only

instance of attempting to block the Plaintiff's advancement. (Doc. 145, ¶ 303) This

is the Plaintiff's supplementary, and *tenth*, reason Booth acted for his own personal

objective to obtain the MHSO III promotion. (Doc. 247, p. 91) He even fabricated

testimony upon conceding his application was false. (Def. Ex. 25, p. 1) "Because

there appears to be a fact question as to whether [Booth], either individually or in

concert, acted outside [the] scope of [his] duties to the [ADMH] by making false

statements concerning [the Plaintiff's police] service record, the summary

judgment for [Booth cannot be] based on a lack of publication" nor an applicable privilege.[28] *Id.* at 293. The Plaintiff's October 19, 2018 complaints do not address whether the "Interim" role was truly a *legitimate* role. (Doc. 254, p. 52)

It is apparent that Booth's aspiring to the Plaintiff's "moral fortitude" was to assert that the Plaintiff wasn't qualified for the MHSO III promotion which required "high personal and moral standards". (Def. In. Disc., p. 1438; Def. Ex. 58, p. 2) By preponderance of the evidence, Booth's and Long's motive was to prevent the Plaintiff from being Booth's immediate supervisor; a personal objective. *Hoover*, 611 So. 2d at 293. Reasonably, Defendant Booth wanted the MHSO III promotion, was disparate toward the Plaintiff and the idea of him being his immediate supervisor, and enlisted the efforts of anyone to assist in obtaining the role because he was significantly less qualified. (Doc. 247, p. 33) Evidence even presents the Plaintiff completed his application first and both applications were received on the same day. (Def. In. Disc., pp. 0367, 0371, 0388, 0392) These arguments are analogous to concerns the Plaintiff blew the whistle regarding in his complaint to the Defendant Graham regarding Long. (Doc. 244-3, p. 3)

---

[28] The evidence sustains that concerted action occurred: (1) Defendants were in possession of the personnel file (Doc. 247, ¶ 49); (2) Long controlled the application and personnel file (Def. Ex. 83, pp. 1 – 2); (3) Long notified human resources that Booth was more qualified (Doc. 247, ¶ 52); and (4) Long was extensively engaged in Plaintiff's discipline and promotion consideration (Doc. 247, ¶¶ 50, 57; Doc. 248-20, ¶ 6; Doc. 249-13). Evidence presents that Long, a Caucasian (Pl. Dec. 2, ¶ 2), disparately operated to ensure the Plaintiff wasn't promoted so that Booth, also a Caucasian, would receive the promotion. This evidence presents pretext regarding Title VII.

Finally, upon receiving a request from the Plaintiff to retract his statements under Alabama Code § 6-5-186 and 13A-9-12(e), Booth declined to respond. (Doc. 145, ¶ 791; Pl. Ex. S) Such a refusal to retract further signifies that actual malice is evident as well as personal objectives. *Tanner v. Ebbole*, 88 So. 3d 856, 869 (Ala. 2011) (determining that malice can be shown by a refusal to retract libelous statements). Summary judgment, as well as state-agent immunity, regarding this malicious, willful, fraudulent, and illegal defaming of the Plaintiff should be denied. (Doc. 145, ¶ 783; Booth's Answer, ¶ 783)

### D. Summary Judgment isn't Due to be Granted on Plaintiff's False Light Claim

Defendants have made a poor attempt to abrogate the Plaintiff's false light claim unsupported by citations. (Doc. 254, pp. 53 – 54) After observing they have no viable argument, they completely abandon the initially cited case of *Butler*:

> "Furthermore, the parties have given this Court no framework or authority on which to evaluate Jennings' actions. It is not clear exactly when Ayres's materials became a part of the public record and whether Jennings's actions even contributed to the materials' becoming a part of the public record... Butler, in focusing on the public aspect of the record of the actions of the city council, fails to provide us with any legal basis from which one could conclude that the mere administrative act of receiving materials — submitted by someone else — which later become the official minutes of a city council meeting constitutes an intentional communication of information to the public by the person receiving the documents."

*Butler*, 871 So. 2d at 15 (2003) (emphasis added). Defendants have already conceded they made the records public; intentionally. (Doc. 145, ¶¶ 226 – 228,

330; Answers, ¶¶ 226 – 228, 330; Doc. 245, p. 91; Doc. 244-2, pp. 13 – 14, 20 –

26, 29 – 38) ("the undisputed evidence demonstrates that, even though Plaintiff's

disciplinary documents were placed in his personnel file…"). *Regions Bank v.*

*Plott* has absolutely no application to this distinct wrong or to an intentional public

record. (Doc. 254, p. 54) Summary judgment should be denied.

### E. Summary Judgment isn't Due to be Granted on Plaintiff's Tortious Interference Claim

In *Hickman v. Winston County Hosp. Bd.*, 508 So. 2d 237 (Ala. 1987), the

Court determined that "corporate officers or employees may individually commit

the tort of intentional interference with *business or contractual* relations to which

their corporation or employer is a party." *Id.* at 238 (emphasis added).

Blatantly, "[i]n view of the fact that the [ADMH], as do other [state

agencies] of Alabama, derives its creation and continued existence from the

legislature, and the office of [Police Officer] exists by legislative authority, the

occupant(s) of which [are] charged by legislative direction with the duty and

responsibility of enforcing state laws [], all to the protection of the general public,

and to promote its general welfare", the Plaintiff maintains a responsibility to the

public at large; not the Defendants. *Alexander v. State*, 150 So. 2d 204, 208 (Ala.

1963); *State v. Stone,* 240 Ala. 677, 680, 200 So. 756, 758 (1941) ("[i]t seems to be

well settled that one who performs a public function, and his authority is derived

directly from the state by legislative enactment, and the law prescribes his duties,

powers, and authority, such an one is a public officer of the state."). The Plaintiff is charged by legislative direction to engage in the duties rendered by Alabama Code § 22-50-21. (Doc. 145, ¶¶ 15, 28; Answers, ¶¶ 15, 28) In his appointment via this statute, he may not falter. (Doc. 145, ¶ 21; Answers, ¶ 21; Doc. 207-7, p. 62).

The State of Alabama's Constitution renders that Beshear, and any of her appointed officials, may not circumvent Alabama Code § 22-50-21. ALA. CONS. § 43 ("the executive shall never exercise the legislative and judicial powers, or either of them"); ALA. CODE § 22-50-16 (presenting that the Commissioner of the ADMH is a discretionary member of the executive branch) (Doc. 145, ¶ 844; Answers, ¶ 844). Alabama Code § 22-50-21, along with Alabama Code § 22-50-16, renders no authority to any of the Defendants to interfere with the Plaintiff's business relations in these circumstances unless he "fail[s] to perform *faithfully* any of the duties which are *lawfully* prescribed for him". *See Also McMillian v. Monroe County,* 520 U.S. 781, 790 – 791 (1997) (statutory law enforcement officers "are given complete authority to enforce the state criminal law in their [jurisdiction]… thus the governing body… cannot instruct the [officer] how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime. And when the [officer] does secure such evidence, he has an obligation to share this information not with the [ADMH], but with the district attorney"). Defendants interfered with several aspects of the criminal process unlawfully. (Doc. 145, ¶¶ 68, 71, 74, 122,

146, 409; Def. Ex. 33, pp. 2 – 3; Def. Ex. 114; Doc. 249-2, p. 10, ¶¶ 11 – 12; Doc.

249-7, ¶ 3; Doc. 249-11, ¶¶ 5 – 6; Docs. 207-5, 207-7) Policy forbid these actions.

(Def. Ex. 106) Rittner even testifies to exceeding his authority. (Pl. Dec. ¶ 23)

No supervisory discretion exists to unlawfully control or interfere with a

police officer conducting investigations of which Defendants testify to. (Def. Ex.

13, p. 5; Def. Ex. 16, p. 2; Def. Ex. 33, pp. 2 – 3; Def. Ex. 59, p. 3) Apparently, in

appointing Police Officers, Defendants must "trust officers to rely on their

experience and expertise in order to make spur-of-the-moment determinations

about amorphous legal standards such as 'probable cause' and 'reasonable

suspicion'". *Id*. at 109 – 110. Evidently, regarding this "tortious interference with a

business relationship",

> "it was decidedly outside the scope of [Defendants'] executive
> authority as superintendent[s] [] to prevent Plaintiff, a [] law
> enforcement officer, from contacting witnesses, to direct witnesses not
> to cooperate with a police investigation, to interfere with the collection
> of evidence, to arguably withhold evidence, to actively facilitate the
> filing of third-party complaints against Plaintiff [] and to attempt to
> influence a law enforcement officer to refrain from investigating or
> reporting possible criminal behavior. We acknowledge that it is within
> the scope of Defendant[s'] authority to oversee the discipline and safety
> of [patients in their] district; however, [it is] significant that in
> exercising that authority, Defendant[s] agreed to a partnership with the
> [police] to allow law enforcement personnel onto [facility] grounds
> with the express duty of '[i]nvestigat[ing] criminal complaints on
> [ADMH] property.' While investigation of misconduct on [ADMH]
> grounds is foremost within the province of the [ADMH] administration,
> once the administration opens the [facility] doors to assistance from law
> enforcement personnel, it concedes some of its authority to that
> autonomous agency. That is, while the administration would be

expected to remain involved to the extent it was necessary to advocate for its [patients'] best interests, the administration loses its authority to direct or interfere with law enforcement personnel's function of investigating conduct violative of the laws of this state. We reiterate and stress that, to the extent Defendant[s] [were] dissatisfied with or critical of Plaintiff's investigative methods, it would be within the province of Defendant[s'] authority to express those concerns to the appropriate parties. But, notably, we see no indication in the record that Plaintiff was engaged in any misconduct in his pursuit to investigate criminal activity."

*Baker v. Couchman*, 721 NW 2d 251, 254 – 257 (Mich. Ct. App. 2006).[29]

Summary judgment should be unequivocally **DENIED**.

## CONCLUSION

**WHEREFORE**, Plaintiff maintains his original position in response (Doc. 247), and the Defendants' motion should be denied on these principles.

**DERRICK JAMES WILLIAMSON, JR.**, *Pro Se*
8816 Old Greensboro Road, APT 20104
Tuscaloosa, Alabama, 35405-8854
**Cellular Phone:** (205) 422-9664
**Email:** aeonpctech@live.com
**Secondary Email:** CEO@aeonpctech.com
**E-Fax:** aeonpcinno@hpeprint.com

---

[29] *Ex Parte ADMH*, 840 So. 2d 863, 867 (Ala. 2002) ("§ 22-50-21, Ala. Code 1975, authorizes DMHMR to employ police officers to *investigate criminal activity* on the property of state mental health facilities or hospitals") (emphasis added). *See, e.g.,* ALA. CODE §§ 13A-6-25 (Criminal Coercion); 13A-9-18 (Criminal Impersonation); 13A-10-2 (Obstructing Governmental Operations); 13A-10-5 (Refusing to Aid Peace Officer); 13A-10-11 (Impersonating Peace Officer); 13A-10-41 (Resisting Arrest); 13A-10-44 (Hindering Prosecution); 13A-10-123 (Intimidating a Witness), 13A-11-122 (Conspiracy to Interfere with or Hinder Business); and 13A-11-261 (Interference with Police Animals).

## CERTIFICATE OF SERVICE

I, Derrick James Williamson, Jr., hereby certify that on Monday, March 8, 2021, I mailed or presented the foregoing to be conventionally filed by the Clerk of the Court which will send notification of such filing to the following via the CM/ECF system:

**EDWARD CARY HIXON**
**THOMAS BAILEY KLINNER**

Attorneys for State Defendant
ALABAMA DEPARTMENT OF
MENTAL HEALTH
100 North Union Street, Suite 536
P. O. Box 301410
Montgomery, Alabama, 36130-1410
Eddie.Hixon@mh.alabama.gov
Tommy.Klinner@mh.alabama.gov
Fax: (334) 242-0924

**TERRI OLIVE TOMPKINS**

Attorney for ADMH Defendants
ROSEN HARWOOD, P.A.
2200 Jack Warner Parkway, Suite 200
Tuscaloosa, Alabama, 35401-1014
TTompkins@rosenharwood.com
Telephone: (205) 344-5000
Fax: (205) 758-8358

**ALICE ANN BYRNE**
**LAURY BASWELL MORGAN**
**TARA SMELLEY HETZEL**

Attorneys for Defendant Jacqueline Graham
STATE OF ALABAMA PERSONNEL DEPARTMENT
64 North Union Street, Suite 316
Montgomery, Alabama, 36130-4100
AliceAnn.Byrne@personnel.alabama.gov
Laury.Morgan@personnel.alabama.gov
Tara.Hetzel@personnel.alabama.gov
Fax: (334) 242-1110

**DERRICK JAMES WILLIAMSON, JR.**, *Pro Se*
8816 Old Greensboro Road, APT 20104
Tuscaloosa, Alabama, 35405-8854
**Cellular Phone:** (205) 422-9664
**Email:** aeonpctech@live.com
**E-Fax:** aeonpcinno@hpeprint.com