FILED
2021 Aug-13  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| Derrick James Williamson, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:19-cv-00669-LSC |
| | ) | |
| Alabama Department of Mental | ) | |
| Health and Mental Retardation, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OF OPINION</u>

Derrick James Williamson, proceeding *pro se*, sued thirteen defendants under both federal and state law. Several motions are before the Court, including cross-motions for summary judgment. The Court will address each motion below.

## I.   Background[1]

Derrick James Williamson is an African American male. He worked as a Mental Health Security Officer II at the Taylor Hardin Secure Medical Facility in Tuscaloosa, Alabama, a facility managed and staffed by the Alabama Department of

---

[1]   The Court gleans these facts from the parties' submissions of facts claimed to be undisputed, the parties' responses to those submissions, and the Court's independent examination of the record. These are the "facts" for summary judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). Their inclusion in this memorandum of opinion does not signal their veracity.

Mental Health and Mental Retardation ("ADMH"). As a Mental Health Security Officer II, Williamson supervised a shift of other Mental Health Security Officers, officers tasked with securing and protecting ADMH facilities, employees, and patients.

Williamson had many disagreements with ADMH and ADMH officials. He disagreed with how supervisors applied (or failed to apply) ADMH policy, he disagreed with how supervisors restricted his independence as a law enforcement officer, he disagreed with how colleagues behaved at work, and he disagreed with how colleagues responded to situations that arose within the Taylor Hardin facility. He regularly voiced those concerns, both formally and informally, through internal and external grievance channels. In his two and one-half years at ADMH, Williamson filed dozens of complaints—sometimes multiple complaints a month—about work conditions and policy violations and perceived inconsistencies within the workplace. Many of those complaints form the basis of the instant lawsuit, which is a nineteen-count, eight-hundred-and-ninety-one paragraph action against thirteen defendants: ADMH, ADMH Commissioner Lynn Beshear, Taylor Hardin Facility Director Annie Delois Jackson, Kimberly Boswell, Dr. Tammie McCurry, Lynn Hubbard, Kimberly McAlpine, Joe Long, Robert Anderson, Joseph Rittner, Jeremy Lain Booth, Jacqueline Graham, and Zelda Diane Baugher.

Most of Williamson's grievances fall within one of five categories: (1) grievances about disciplinary action taken against him, (2) grievances about his non-selection for promotion, (3) grievances about directives issued by supervisors, (4) grievances about annual performance evaluations, and (4) grievances about inconsistent application of ADMH policies. The Court will summarize each category.

Disciplinary Action: ADMH disciplined Williamson on at least three occasions. On March 13, 2018, Captain Bobby Anderson issued Williamson a written reprimand for allegedly violating ADMH Policy 15-1, which governs ADMH's internal advocacy program. (Doc. 245-2 at 12.) On September 19, 2018, Facility Director Annie Jackson issued Williamson a written reprimand for allegedly violating Taylor Hardin Policy 115-10 (1), which is the policy governing how employees respond to emergency situations within the facility. Three weeks earlier a Taylor Hardin employee called a "Code Red" when one patient attacked another, and the reprimand accused Williamson of calling a "Code Green"—of ending emergency protocols—before medical staff finished treating the attacked patient. On February 13, 2019, Facility Director Jackson suspended Williamson for five days without pay because he allegedly used the department's surveillance equipment for personal reasons. (Doc. 245-3.) Williamson believes these disciplinary incidents

violated the First Amendment, the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, federal anti-conspiracy laws, multiple sections of the Alabama Code, and several theories of Alabama tort law.

Non-Promotion: In 2018 Williamson unsuccessfully applied for two promotions. First, he applied for a vacant Mental Health Security Agent I position. ADMH interviewed Williamson but ultimately selected a Caucasian applicant, Kevin McDaniel, to fill the vacancy. Second, he applied for a vacant Mental Health Security Officer III position; ADMH again interviewed Williamson and again selected a Caucasian applicant, Defendant Jeremy Booth, for the position. Williamson believes both non-promotions violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

Directives: On several occasions ADMH supervisors admonished Williamson to "follow the chain of command," to not seek arrest warrants without supervisory approval, to not send internal information to external state agencies without approval from the director of Taylor Hardin's police services division, and to consult superior officers before taking certain actions. Williamson believes these directives infringed on his authority as a law-enforcement officer, violated federal anti-conspiracy statutes, and trampled on his First Amendment rights to free speech, free association, and freedom to petition.

<u>Performance Reviews</u>: Many of Williamson's claims rely on his 2017 and 2018 annual performance reviews, both of which rated his performance as "partially meets standards." He believes these reviews violated Title VII's prohibitions against race-based discrimination and discriminatory retaliation.

<u>Policy Violations</u>: Finally, Williamson accuses ADMH of inconsistently applying ADMH policy. He contends, in other words, that ADMH supervisors disciplined and treated him more harshly than similarly situated non-African American employees.

Williamson brought the following causes of action: (1) First Amendment claims for deprivations of the freedoms of speech, petition/redress, and association, (2) Fourteenth Amendment claims for deprivations of his equal protection, substantive due process, and procedural due process rights, (3) race-discrimination and retaliation claims under §§ 1981 and 1983, (4) race-discrimination and retaliation claims under Title VII of the Civil Rights  of 1964, (5) federal conspiracy claims under 42 U.S.C. §§ 1985(2), 1985(3), and 1986, (6) a claim under the Alabama State Employees' Protection Act, (7) a breach-of-contract claim, (8) a promissory-estoppel claim, (9) a defamation claim, (10) an invasion-of-privacy claim, (11) a negligence claim, (12) a wantonness claim, (13) a tortious-interference claim, (14) a fraudulent-misrepresentation claim, and (15) a state-law conspiracy claim. Each

claim names multiple defendants, sometimes in their individual capacities, sometimes in their official capacities, sometimes in both capacities.

## II.   Defendants' Motion for Summary Judgment (Doc. 245) (Doc. 242)

The defendants have moved for summary judgment on each of Williamson's claims. A successful summary judgment motion shows there is no genuine dispute as to any material fact and that the plaintiff deserves judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists, and summary judgment is not appropriate, if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). At summary judgment, district courts view all evidence and draw all justifiable inferences in the nonmoving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then the court determines "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be . . . resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250–51 (1986).

### A.   First Amendment Retaliation: Speech

The defendants moved for summary judgment on Williamson's First Amendment speech-retaliation claims, brought against Beshear, Baugher, Hubbard,

Long, Jackson, Anderson, and Booth. These claims rest on four subsets (or types) of speech. First are internal complaints, or complaints Williamson made within ADMH's formal grievance channels. In his relatively short tenure at ADMH, Williamson filed dozens of written complaints about his colleagues, his supervisors, and how his supervisors implemented (or failed to implement) ADMH policies. In total he filed more than thirty internal complaints in his two-and-one-half years as an ADMH employee. He believes four of those complaints—those submitted on May 3, 2018, June 8, 2018, June 19, 2018, and August 1, 2018—deserve First Amendment protection. (Doc. 247 at 59.) The Court will briefly summarize each of the four.

1) On May 3, 2018, Williamson complained about Facility Director Annie Jackson's leadership style. He accused her of managing Taylor Hardin like a "dictator" and of inserting herself into decisions best left to ADMH's law enforcement officers. By exerting "improper control over law enforcement matters," and by inserting herself into Williamson's department, she, according to Williamson, had "halted the progress of the police services division" and fostered a "hostile work environment" at Taylor Hardin. (Doc. 245-12 at 1.)

2) On June 8, 2018, Williamson complained about Major Robert Anderson and Lieutenant Jeremy Booth, both of whom were officers within Williamson's department. He questioned a conversation between Anderson and one of Williamson's subordinates, he accused Anderson of inadequately investigating an incident of harassment, he complained about Booth removing a television from Taylor Hardin's control room, and he complained about a sick-leave policy implemented by Major Anderson. Williamson said these incidents were indicative of racial discrimination. (Doc. 245-9 at 8–9.)

3) On June 19, 2018, Williamson complained about an early-arrival policy implemented by Major Anderson. This policy prevented Mental Health Security Officers from "enter[ing] the secure area or control room [at Taylor Hardin] prior to starting their shift." Because Williamson was the only ADMH employee who had "been observed entering the secure area prior to his shift beginning," Williamson believed the new policy was motivated by racial discrimination and an animus towards African Americans. (Doc. 249-9 at 13–15.)

4) On August 1, 2018, Williamson complained that one of his colleagues, Officer Tony Porter, had not fulfilled his continuing education requirements. He also accused Porter of falsely claiming be a certified firearms instructor, capable of teaching firearms courses and credentialing other law enforcement officers. (Doc. 245-12 at 29–32.) Because Porter wasn't a certified firearms instructor, any classes he taught were nullities, and the officers he supposedly credentialed were never certified to bear firearms. Williamson feared that Officer Porter's behavior—his untruthfulness about his credentials—posed a safety risk to prisoners and patients and placed the "lives and employment" of ADMH's Mental Health Security Officers in jeopardy. (*Id.* at 31.)

Next are external complaints, or the two complaints Williamson sent to outside government agencies. The first was a letter to the Alabama Peace Officer Standards & Training Commission (APOSTC), voicing concerns about Officer Tony Porter. The letter relayed the same concerns Williamson raised in his internal complaints: (1) that Porter hadn't completed his continuing education requirements, and (2) that Porter had falsely claimed to be an NRA-certified firearms instructor. (Doc. 245-14 at 1–8.) The second external complaint was an online grievance

Williamson submitted to the Occupational Safety and Health Administration (OSHA). The grievance reported "severe staff shortages" at Taylor Hardin Secure Medical Facility and warned that understaffing was undermining the capacity of Mental Health Security Officers to respond to dangerous situations.[2] (Doc. 245-14 at 22.)

Third is a libel-retraction letter Williamson drafted while at work and delivered while at work. In December 2018, ADMH had a vacant first-shift Mental Health Security Officer position, and supervisors were considering filling the vacancy by moving Williamson from the second shift to the first shift. But first-shift employees didn't want to work with Williamson. So five of those employees submitted a letter to Taylor Hardin's Facility Director, Annie Jackson.

> In Regards to the Dayshift Lt. Position, we as a first shift have no confidence in leadership (sic) of Lt. Williamson. He does not exhibit qualities of a leader and does not work well with other Officers. Williamson has shown poor judgement [sic] in several areas. He has been vindictive towards Officers and not always truthful. We know he has been written up and received numerous complaints from staff and administrators. We feel him coming to our shift would be a detrimental mistake and interfere with our mission in serving the facility.

---

[2]     Based off the parties' briefing, it appears these are the only two external complaints on which his First Amendment claims rely. (Doc. 247 at 63) ("Likewise, Plaintiff spoke as a citizen in his complaints to OSHA and APOSTC.")

(Doc. 245-22 at 4.) Later that same day, and while on Taylor Hardin property, Doc. 245-1 at 259, Williamson drafted the following response letter.

> In accordance with Alabama Code 6-5-185, describing the procedure of retraction of a matter of libel and/or slander, the presented statements provided on 12/31/2018 are requested to be retracted and/or modified and presented in the same fashion. . . . Please retract all details provided which represent ill knowledge or hearsay provided by another party which is not based upon presented facts along with evidence. As an individual who should be aware of the law, I expect that you will follow this request and follow up by providing information that can be validated. We previously had a discussion on 12/13/2018 while William Hicks was present which presented the idea that a mutation (sic) understanding has (sic) been met. You verbally stated that you no longer had anything against me or Hicks and shook of (sic) our hands in agreeance. It appears this conversation occurred in false pretenses. . . . It should be noted that retraction is limited to 10 days and action has a two year statute of limitations. Please provide a revised complaint to me and individuals who were provided with this letter with an explanation detailing the removal of libel.

He then placed that response letter in a first-shift Mental Health Security Officer's work locker. Even though Williamson drafted and delivered the letter while at work, and even though the letter concerned matters entirely personal to him, he believes the letter was citizen speech protected by the First Amendment.

Now to the fourth and final type of speech at issue: participation in ADMH's legislative-advocacy program. ADMH has long worked to influence Alabama's mental health policy by "review[ing], track[ing], and respond[ing] to legislative bills introduced during regular and special sessions" of the state legislature, especially

bills that "are of interest or concern to the department." (Doc. 245-6 at 6–7.) If ADMH employees choose to participate in the advocacy program—if they choose, for example, to submit proposed legislation for the department to consider and potentially support—then they must abide by the terms of Policy 15-1. Policy 15-1 provides:

a.  Any employee may submit proposed legislation or a request that legislation be drafted for department consideration.

b.  The proposed legislation or request shall be submitted to the appropriate facility committee and the facility director for consideration. Central Office employees shall submit to the appropriate committee or Office Director.

c.  The receiving director will forward the proposed legislation, with comments to the appropriate Associate Commissioner or return it to the originator.

d.  The Associate Commissioner or designee will review and comment on the proposed legislation and then forward it for further review to the other Associate Commissioners, Division committees, the Commissioner, and other staff with the expertise to be of assistance in review of the proposal.

e.  The Associate Commissioner will place on the agenda for discussion and approval at the Commissioner's weekly staff meetings.

f.  If the proposed legislation has been approved by the Commissioner, it will be submitted to the Governor's office for review and comment.

(*Id.*) Because leaks might prematurely signal ADMH's approval or disapproval of policy initiatives, employees who participate in ADMH's advocacy program are required to act within the confines of Policy 15-1. (Doc. 245 at 61.)

Williamson chose to participate in ADMH's advocacy program. In 2017 he drafted and submitted a bill that did two things. (Doc. 245-7 at 17–20.) First, it expanded the authority of Alabama's Mental Health Security Officers; the bill authorized Mental Health Security Officers to enforce traffic laws, to write traffic tickets, to detain and jail suspects, to "summon a posse comitatus," and to exercise state-wide jurisdiction. (*Id.*) Second, it appropriated a $12 daily subsistence allotment—or a $12 per diem—for all Mental Health Security Officers.

Without approval from any official within Policy 15-1's chain of command, *see* Doc. 245-1 at 114 ("[The facility director] hadn't expressly approved it, no. She did ask for revisions and highlights and stuff like that. But no specified approval at the time."), Williamson emailed his bill to three ADMH supervisors and to Jason Manasco, an attorney with an external lobbying group known as the "Alabama State Employee Association." Williamson wrote the following message that he accompanied along with his email:

> The attached bill **(previously approved)** is being re-forwarded to you in accordance with Alabama Department of Mental Health Policy 15-1. The previous submission was rescinded in efforts to maintain focus on legislative matters for 2017 (medical staff shortage) according to

yourself and seeing that this is a new year, I request that the attached bill be revisited and forwarded to the appropriate Associate Commissioner. The current statute which is very vague requires a sufficient update indicating and clarifying questions which are asked on a regular basis. The attached bill may also be forwarded to the Alabama State Employees Association if we are in need of legislative assistance.

(Doc. 245-7 at 16) (emphasis added). This email suggested, incorrectly, that ADMH approved of a sweeping piece of legislation—legislation that hadn't made its way through the deliberative process set forth in Policy 15-1. Williamson soon after received a written reprimand for violating Policy 15-1. (Doc. 245-2 at 12.)

The question presented is whether the First Amendment protects Williamson's four internal complaints, his two external complaints, his libel-retraction letter, and the email he sent "in accordance with Alabama Department of Mental Health Policy 15-1."

"[W]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Among these limitations are certain speech restrictions, restrictions a governmental entity couldn't impose on ordinary, non-public-employee citizens. *See Waters v. Churchill*, 511 U.S. 661, 671 (1994) ("The government as employer indeed has far broader powers than does the government as sovereign."). The government's expanded authority to regulate public-employee speech is necessary because "[g]overnment employers, like private employers, need a significant degree

of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.

Of course, government power over public employee speech is far from plenary. As the Supreme Court explained in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), citizens who enter public service generally do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest."

To gauge whether a public entity exceeded its authority and impermissibly restricted employee speech, courts engage in a two-step inquiry. First we determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418.[3] If the answer is no, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id*. If the answer is yes, "then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*.[4]

---

[3]     "This threshold inquiry has two elements . . . an employee must have spoken (1) as a citizen and (2) on a matter of public concern." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015).

[4]     Both questions are matters of law, appropriately addressed by the Court at the summary judgment stage. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

Because extending First Amendment protection to Williamson's speech would serve only to "constitutionalize the employee grievance," *Connick v. Myers*, 461 U.S. 138, 154 (1983), the defendants' motion for summary judgment is due to be granted as to Williamson's speech-retaliation claims. In every instance Williamson spoke as an aggrieved employee, not as a citizen. And even if engaged in citizen speech, his speech primarily concerned his private interests as a Mental Health Security Officer at Taylor Hardin, not matters "of political, social, or other concern to the community." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1303 (11th Cir. 2005).

### 1.    Williamson Never Engaged in Citizen Speech.

The Court must first determine whether Williamson spoke as a citizen when he engaged in the four categories of speech discussed above. *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1345–46 (11th Cir. 2019) (internal quotations omitted) ("The first step in determining whether a plaintiff has a viable First Amendment retaliation claim is whether the employee's speech was made as a citizen."). The answer is no.

To distinguish between citizen speech and employee speech, courts ask "whether the speech at issue owes its existence to the employee's professional responsibilities." *Moss*, 782 F.3d at 618. For this, courts consider the employee's job description, whether the speech occurred at the workplace, and whether the speech

concerned the subject matter of the employee's job. *Id.* And the controlling factor—the dispositive question—is whether the employee's statements or expressions were made "pursuant to [his] official duties." *Alves*, 804 F.3d at 1161 (quoting *Garcetti*, 547 U.S. at 421). If yes, then the speech is likely undeserving of First Amendment protection.

First to the four internal complaints: Williamson spoke as an employee, not as a citizen, when he submitted the four internal complaints discussed above. Several considerations compel this conclusion. For one, each complaint concerned the subject matter of Williamson's employment. Why did Williamson take issue with Jackson's "dictatorial" leadership style? Because her "improper control over law enforcement matters" hindered police investigations and otherwise "halted the progress" of ADMH's Mental Health Security Officers. (Doc. 245-12 at 1.) Why did he report Officer Porter's lack of an instructor certification and his nonfulfillment of continuing education requirements? Because a shortage "of [fully] certified law enforcement" officers "pose[d] a detrimental issue for" ADMH facilities and ADMH's Mental Health Security Officers. (Doc. 245-14 at 3.) The reasons behind Williamson's complaints, and how he expressed his complaints—internally, through ADMH's formal grievance channels—are highly indicative of employee speech.

Perhaps more importantly, Williamson's four internal complaints fell within his official duties as a Mental Health Security Officer II. As a Mental Health Security Officer II, Williamson was charged with supervising "police activities" at Taylor Hardin. (Doc. 245-2 at 1.) This included "guarding facility property, patients and employees," maintaining "firearms qualifications," both for himself and for those he supervised, and performing any and all "related duties." (*Id.*) Each of Williamson's internal complaints—his disagreement with Jackson's leadership style, his row with Anderson about police department policies, and his reporting of Officer Porter's lack of continuing education and firearms certifications—fell within these broad supervisory responsibilities. They related to the security of ADMH property, the integrity of ADMH's police investigations, the readiness of Taylor Hardin's police services division, or the appropriateness of policies within the department he supervised.

Williamson disagrees. He believes he spoke as a citizen when he issued the four internal complaints because each was an attempt to expose wrongdoing and "blow the whistle" on illegal activity. But every effort to expose and correct wrongdoing is not citizen speech. In *Garcetti*, for example, a deputy district attorney noticed inaccuracies in an affidavit used by officers to obtain a search warrant. 547 U.S. at 413–14. Concerned about potential constitutional violations, the deputy

district attorney complained to supervisors, compiled his concerns in a disposition memorandum, and submitted that memorandum to his supervisors. Even though he soon suffered "a series of retaliatory employment actions," *id.* at 415, the Supreme Court rejected his First Amendment claim because he spoke not as a citizen, but as an aggrieved employee, when he complained to supervisors about the constitutionally-questionable warrant practices. After all, the memorandum "concerned the subject matter of [his] employment," he "expressed his views inside his office, rather than publicly," and supervising criminal prosecutions fell within the work responsibilities of a deputy district attorney. *Id.* at 421–22. He wrote the memorandum to correct potential wrongdoing, true enough, but the form and substance of his speech fell within his official workplace duties.

This analysis applies to Williamson's internal complaints. Exposing and reporting error, discrimination, and potentially unlawful activity within ADMH was part and parcel with his job as a supervisory police officer. The Eleventh Circuit has repeatedly found that "an employee who makes internal reports regarding mismanagement and fraud generally speaks pursuant to [his] professional duties rather than as a citizen," *Boglin v. Bd. of Trs. of Ala. Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1269 (N.D. Ala. 2018) (citing *Alves*, 804 F.3d at 1164–65), and this case is no exception.

The same is true for the external complaints Williamson submitted to APOSTC and OSHA. Both were "made in accordance with or in furtherance of the ordinary responsibilities" of Williamson's job. *Alves*, 804 F.3d at 1162. The APOSTC complaint, which reported Officer Porter's misdeeds and their effect on other officers' firearm certifications, was "in accordance with" Williamson's duty to supervise police activities and "maintain firearms qualifications" for himself and those whom he supervised. (Doc. 245-2 at 1.) And the OSHA complaint, which reported "staffing shortages" and a resulting inability for police to control "hostile and violent situations" within ADMH facilities (Doc. 245-14 at 22), was "in furtherance of" Williamson's duty to protect Taylor Hardin "property, patients, and employees against fire, theft, vandalism, and hazards" (Doc. 245-2 at 1).

Williamson's libel-retraction letter was also employee speech. Even though the drafting and delivering of a libel-retraction letter doesn't fall within the listed job requirements of a Mental Health Security Officer II, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–52. "The proper inquiry is [instead] a practical one," *id.*, and, by any practical measure, Williamson spoke as an ADMH employee when he drafted a letter on ADMH property and then delivered

that letter a colleague's work locker. The speech "occurred at the workplace," *Moss*, 782 F.3d at 618, and it concerned the subject matter of Williamson's job (i.e., his fitness to serve as a first-shift Mental Health Security Officer).

Williamson's coworkers questioned his ability to perform his job and manage a shift of ADMH police officers. They expressed their concerns by drafting and sending a letter to ADMH leadership. Extending constitutional protections to Williamson's response—a response written and delivered while at work—would "constitutionalize the employee grievance" and violate the Supreme Court's command in *Garcetti*, 547 U.S. at 420.

Finally, several factors suggest Williamson spoke as an employee when he emailed Taylor Hardin's facility director, Annie Jackson, on February 20, 2018. *See King*, 913 F.3d at 1345 (listing factors). For one, the email's purpose was work-related; it involved an employer-led and employer-developed advocacy program governed by an employer-written policy. Second, the substance of the email—that is, the text of Williamson's proposed legislation—concerned the jurisdiction and compensation of Mental Health Security Officers, both of which are work-related matters. And most importantly the email "owed its existence" to Williamson's status as an ADMH employee. *Alves*, 804 F.3d at 1161 ("Under *Garcetti*, the central inquiry is whether the speech at issue owes its existence to the employee's

professional responsibilities."). After all, Williamson sent the email "in accordance with Alabama Department of Mental Health Policy 15-1," and participation in Policy 15-1 is limited to ADMH employees. (*See* Doc. 245-6 at 7.) So the sole reason Williamson had the opportunity to send the email and submit his proposal was the employer-employee relationship.

Even though Williamson included an outside attorney on the email chain, and even though external communication is suggestive of citizen speech, *cf. King*, 916 F.3d at 1349, the email cannot "reasonably be divorced" from Williamson's status as an employee. *See Abdur-Rahman v. Walker*, 567 F.3d 1275, 1283 (11th Cir. 2009). Williamson "was not a concerned citizen who happened to become aware of problems [at ADMH] and decided to do something about it." *King*, 916 F.3d at 1346. He was a Mental Health Security Officer who became aware of issues related to his job and who then attempted to remedy those issues by participating in an employer-created, employer-directed advocacy program. And when he spoke, he spoke by emailing his work supervisors and one external attorney "in accordance with" an ADMH policy. Under any reasonable review of the record and governing case law, this was employee speech and was undeserving of First Amendment protection.

### 2.   Williamson Did Not Speak on Matters of Public Concern.

Even if Williamson engaged in citizen speech, his retaliation claims fail because in every instance he spoke not "on matters of public concern, but instead . . . upon matters only of personal interest." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993). To discern the purpose of an employee's speech, courts consider "the content, form and context" of the speech "as revealed by the record as a whole." *Id.* We ask whether "the main thrust of the speech in question is essentially public in nature or private" in nature. *See Alves*, 804 F.3d at 1162 ("If the 'main thrust' of a public employee's speech is on a matter of public concern, the speech is protected."). "A court may consider the employee's attempts to make the concerns public, along with the employee's motivation in speaking." *Morgan*, 6 F.3d at 754.

Each of Williamson's internal complaints was private in nature. Each concerned *his* job, *his* department, deficiencies *he* perceived within ADMH, or discrimination *he* allegedly suffered while working as a Mental Health Security Officer. On May 3, 2018, he complained about Director Jackson's dictatorial leadership style and its progress-inhibiting effect on "the police services division at Taylor Hardin." (Doc. 245-12 at 1.) On June 8, 2018, he complained about *his* supervisor, how *his* supervisor supervised *his* investigations, and how *his* supervisor mistreated and/or discriminated against *him*. (Doc. 245-9 at 6.) On June 19, 2018, he complained about Anderson's early-arrival policy, speculating that the policy was an

effort to discriminate against *him* because of *his* status as an African American. (Doc. 245-9 at 13–15.) These may all be valid and complaint-worthy concerns. But they hardly are matters of "political, social, or other concern to the community." *Akins*, 420 F.3d at 1303. They were personal in nature, unique to Mr. Williamson, Mr. Williamson's department, and Mr. Williamson's place of employment.[5] *Cf. Alves*, 804 F.3d at 1166 ("[W]e find that Appellants' speech did not constitute speech on a matter of public concern. Their Memorandum is focused on their view that [their supervisor] is a poor leader and a deficient manager, and how [their supervisor's] conduct adversely affected them and other employees of [their place of employment].").

The same is true for the external complaints Williamson submitted to APOSTC and OSHA. Those complaints reported staffing shortages in Williamson's department, wrongdoing by one of Williamson's coworkers (Officer Porter), and the effects of Porter's wrongdoing on Williamson's department. (Doc. 245-14 at 1–8;

---

[5]     Although Williamson's internal complaints referenced racial discrimination and harassment, such allegations don't necessarily convert private grievances into matters of public concern. *Cf. Morgan*, 6 F.3d at 754 ("Morgan contends that her speech—the complaints of sexual harassment—involve public concern, because sexual harassment in the workplace is a matter of vital social interest. . . . [But] [t]he record shows that Morgan's speech was driven by her own entirely rational self-interest in improving the conditions of her employment. Her complaints about Ford's behavior, as serious as they were, centered around her own private matters, not matters of social interest.").

Doc. 245-14 at 22.) Even though the public has some interest in the proper certification and staffing of ADMH's police services division, "the relevant inquiry is not whether the public would be interested in the topic at issue." *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000). The relevant inquiry is instead whether the "main thrust" of the employee's speech was to serve private or public interests. And the main thrust of Williamson's external complaints served private interests, more specifically his interests in changing the methods by which his supervisors ran his department at his place of employment.

Similarly, the main thrust of Williamson's libel-retraction letter "centered around . . . private matters, not matters of social interest." *Morgan*, 6 F.3d at 755. The letter responded to an attack on Williamson's leadership abilities, Williamson's truthfulness, and Williamson's ability to lead the first shift's Mental Health Security Officers. (Doc. 245-22 at 4–9.) The speech "was driven by [Williamson's] own entirely rational self-interest in" responding to an attack on his character and fitness to lead at ADMH, not by matters of social and political interest. *Morgan*, 6 F.3d at 755.

And while it's a closer call, the main thrust of the February 20, 2018 email was to alter the conditions of Mr. Williamson's employment, not to advance matters of public interest. Two considerations compel this conclusion. First, Williamson did

not publicly air the concerns raised in his proposed legislation—concerns about the jurisdiction and compensation of Mental Health Security Officers. He instead spoke individually in an email to three work colleagues and one attorney. *See Alves*, 804 F.3d at 1162 ("Thus, whether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive."). Second, Mr. Williamson's proposed legislation—every word of it—applied to his position as a Mental Health Security Officer. *See Boyce v. Andrews*, 510 F.3d 1333, 1345 (11th Cir. 2007) (quoting *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir. 1993) ("[E]ven as to an issue that arguably could be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight.")). It pertained to his jurisdiction, his authority, and his compensation. (Doc. 245-1 at 112–13.) Though his proposal would theoretically have affected all Mental Health Security Officers, the "main thrust" of the legislation addressed matters of personal interest, not "matters of public concern from the perspective of a citizen." *Id.*

Because ADMH did not punish Williamson for speaking as a citizen on matters of public concern, the Court need not "consider the balance of public and private interests articulated in *Pickering*." *Alves*, 804 F.3d at 1160.

### B.   First Amendment Retaliation: Right to Petition

Williamson also accuses the defendants of retaliating against him for exercising his rights under the First Amendment's Petition Clause, which "guarantees the right of the people . . . to petition the Government for a redress of grievances." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). This claim rests on the same bases as his speech-retaliation claim.

The Petition Clause "is not entitled to any greater protection than the Free Speech Clause," *D'Angelo v. Sch. Bd. of Polk Cnty., Fla*, 497 F.3d 1203, 1211 (11th Cir. 2007). Accordingly, courts apply the *Garcetti* framework before extending protection to a public employee's petition: "[w]e ask whether the public employee made his petition both on a matter of public concern and as a citizen." *Id.*; *see Grigley v. City of Atlanta*, 136 F.3d 752, 755–56 (11th Cir. 1998) ("We hold that a public employee's claim of retaliation in violation of the First Amendment right to petition is subject to the public concern requirement."). Even if Williamson could show the defendants retaliated against him each of the four forms of speech at issue—an unlikely proposition, especially for the internal complaints and the libel-retraction letter—his petition claims still fail because, for the reasons explained above, he did not speak as a citizen on matters of public concern when he made his four internal

complaints, his two external complaints, his libel-retraction letter, and when he participated in ADMH's internal advocacy program.

### C.   First Amendment Retaliation: Free Association

The defendants next moved for summary judgment on Williamson's free-association claim.  Williamson contends the defendants retaliated against him for (1) associating with the Alabama State Employees' Association by sending the February 20 email and (2) for associating with fellow employees when he delivered to those employees his libel-retraction letter. (Doc. 111 at ¶¶ 461–62.) Although "associational activity by public employees need not be on matters of public concern to be protected by the First Amendment," the Free Association Clause does not protect association that "owes its existence" to the employer-employee relationship. *D'Angelo*, 497 F.3d at 1213 ("Restricting associational activity that is not undertaken as a citizen, but that owes its existence to the public employee's professional responsibilities, . . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created.") (cleaned up); *Myles v. Richmond Cnty. Bd. of Educ.*, 267 F. App'x 898, 901 (11th Cir. 2008) ("To enjoy protection under the First Amendment, an employee asserting a free association claim must have engaged in her associational activity as a citizen, not as an employee."). And the two forms of association at issue here—Williamson's (1) associating with the

Alabama State Employees' Association by emailing them "in accordance with Alabama Department of Mental Health Policy 15-1" and (2) his associating with fellow officers by writing and delivering a work-related letter while at work—clearly owe their existence to his position as a Mental Health Security Officer II at ADMH. The association therefore falls outside the scope of First Amendment protections.

### D. First Amendment Speech: Prior Restraint

In addition to his retaliation claims, Williamson argues that Policy 15-1 and the written reprimand he received in March 2018 impose unreasonable prior restraints on his freedom of speech.

"The term 'prior restraint' is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). Prior restraints prohibit or censor speech before the speech takes place, *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005), and are legally and functionally different than "'subsequent punishments,' which regulate a given type of speech by penalizing the speech only *after* it occurs," *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017).

Policy 15-1 is not a prior restraint on employee speech because nothing in the policy forbids speech before it takes place. (*See* Doc. 245-6.) Even though employees who participate in ADMH's advocacy program can face punishment for speaking in ways that violate Policy 15-1's terms, the punishment occurs after the speech and after the policy violation.

However, Captain Anderson likely imposed a prior restraint when he included the following directive in Williamson's March 13, 2018 reprimand, the reprimand Williamson received for sending the February 2018 email and for violating Policy 15-1.

> Violation DMH Policy 15-1 "Organizational Planning #2 "b" states "The proposed legislation or request shall be submitted to the appropriate facility committee and the facility director for consideration". On several occasions you have been instructed not to send anything to an outside agency that has not been reviewed and approved by the Director of Police Services Jason.Manasco@asea.org, which violated the above policy. Lt. Williamson, you are not to send any information pertaining to the Department of Mental Health, Taylor Hardin Secure Medical Facility to any other agency, personal (sic) without the approval of the Director of Police Services and/or Facility Director. . . . Lt. Williamson is to submit all information related to the Department of Mental Health and/or Taylor Hardin Secure Medical Facility for review and approval by the Director of Police Services and/or Facility Director.

(Doc. 245-2 at 12.) The directive was a prospective restriction on Williamson's ability to send internal information, or "information related to the Department of

Mental Health," to outside government agencies; this likely qualifies as a prior restraint on speech.

But not all prior restraints are unconstitutional, especially when the restraint is one imposed by a government employer on a government employee. After all, the Supreme Court has long recognized that government employers "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Employees Ass'n*, 513 U.S. 454, 465 (1995). Such restraints are lawful so long as they appropriately balance the interests of the employee "as a citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Five considerations suggest Anderson's directive did not violate the First Amendment. First, the directive only applied to communications related to Williamson's place of employment.[6] Second, nothing suggests the directive, one commanding a police officer to seek approval from superior officers before speaking about a high-security medical facility to external state agencies, discriminated

---

[6]     This significantly distinguishes this case from *National Treasury*, where "the vast majority of speech at issue . . . [did] not involve the subject matter of government employment." 513 U.S. at 470.

"among speakers based on the content or viewpoint of their messages." *Nat'l Treasury*, 513 U.S. at 468. Third, the uniquely dangerous nature of Taylor Hardin—which houses mentally ill and often dangerous patients—raises the government's interest in limiting external access to internal communications and internal procedures. Fourth, Taylor Hardin's police services division likely qualifies as a paramilitary organization, and the Eleventh Circuit has explained that, when balancing a speech restriction against a public employer's interests in imposing the restriction, district courts should "consider and give weight to the need to maintain a close working relationship in quasi-military organizations like police departments." *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991). More so than other government employers, quasi-military organizations like police departments and police divisions within secure facilities have a need to maintain discipline and chains of command, so limiting disruptive communications—even communications "concerning co-workers' performance of their duties and superior officers' integrity," *id.*—can serve important efficiency and safety interests. *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 629 F.2d 993, 1003 (5th Cir. 1980) ("[D]iscipline is a necessary component of a smoothly-operating police force. Although this necessity of discipline does not rise to the same level as required by the military, discipline must be maintained among police officers during periods of active duty.")

(internal citation omitted); *see Anderson v. Burke Cnty., Ga.*, 239 F.3d 1216, 1222 (11th Cir. 2001) (citations omitted) ("[A] paramilitary organization, such as a fire department, has a has a need to secure discipline, mutual respect, trust, and particular efficiency among the ranks due to its status as a quasi-military organization entity different than other public employers.").

Fifth, and most importantly, Anderson's directive did not prohibit or limit Williamson's ability to submit information about Taylor Hardin or ADMH to all actors; by its terms, the directive was limited to state agencies. (Doc. 245-2 at 12) ("[Y]ou are not to send any information pertaining to the Department of Mental Health, Taylor Hardin Secure Medical Facility, *to any other agency*, personal (sic) without the approval of the Director of Police Services and/or Facility Director."). Nothing prospectively prohibited him from writing to Congressman or Senators, from publishing his criticisms in newspapers or on online forums, or from speaking to non-state-agent actors about perceived shortcomings within the department. Given the police services division's interest (as a quasi-military organization) to work efficiently, to maintain discipline and the chain of command, and to avoid miscommunication with other state agencies, this directive—a limitation on police officers unilaterally communicating with other state agencies on department-related matters—was not unreasonable.

Even if the directive was an unlawful prior restraint, the individual defendants are entitled to qualified immunity. To overcome qualified immunity, plaintiffs asserting claims against government officials in their individual capacities must show both that "the defendant violated a constitutional right," and that "this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). Because the Court is unaware of any binding authority holding unconstitutional a directive like the one at issue here—one ordering a member of a quasi-military organization to seek approval before sending department-related information to other state agencies—Williamson has not shown that the defendants violated a clearly established constitutional right.

### E. Title VII Disparate Treatment

ADMH next moved for summary judgment on Williamson's claims of racial disparate-treatment discrimination, brought under Title VII of the Civil Rights Act of 1964.[7] His claims arise under two theories: (1) discriminatory discipline and (2) a discriminatory failure to promote.

To prevail on a Title VII claim for racial disparate treatment, a plaintiff must show the defendant acted with discriminatory intent. *Denney v. City of Albany*, 247

---

[7] Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

F.3d 1172, 1182 (11th Cir. 2001) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)). He can shoulder this burden "through direct evidence, circumstantial evidence, or statistical proof." *Alvarez v. Royal Atl. Devs. Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

Williamson offered no statistical evidence showing ADMH disciplines or declines to promote African American employees at higher rates than other races. Nor has he put forth direct evidence of racial discrimination; after all, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)). Williamson's briefing cited no such evidence, and the Court found none during its independent examination of the record.

Lacking statistical or direct evidence of racial discrimination, Williamson must prove his disparate-treatment claims through circumstantial evidence. He can do so multiple ways. He might rely on the burden-shifting framework from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). He alternatively might "demonstrate a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis v. City of Union City, Ga.*, 918 F.3d

1213, 1220 n.6 (11th Cir. 2019). In this case the Court finds no convincing mosaic of discriminatory evidence. Williamson claims to have heard two racially inconsiderate comments during his three-year tenure at ADMH, neither of which was directed towards him. (Doc. 245-1 at 77–80, 98.)[8] And even though he presents a variety of other convincing-mosaic arguments, none of them are convincing enough for "a reasonable jury to infer intentional discrimination" by ADMH supervisors. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Having found Williamson's convincing-mosaic unpersuasive, the Court turns to *McDonnell Douglas*'s burden-shifting framework. "The first step of the *McDonnell Douglas* framework requires the plaintiff to make out a case sufficient to withstand a motion for summary judgment (or a motion for judgment as a matter of law)—i.e., a 'prima facie case.'" *Lockheed-Martin Corp.*, 644 F.3d at 1325. The burden then shifts to the defendants to produce a legitimate, nondiscriminatory explanation for the alleged wrongdoing. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Should the defendant produce that legitimate and nondiscriminatory

---

[8]     Both comments were allegedly made by "Officer Paris," one of Williamson's coworkers.

- <u>Comment 1</u>: Officer Paris told Williamson a certain staff member "should not be allowed in [an ADMH facility] because he had a Black Lives Matter shirt on." (Doc. 245-1 at 78.)

- <u>Comment 2</u>: Officer Paris allegedly expressed concerns about "all of the [ADMH] supervisors potentially being African American." (*Id.* at 79.)

explanation, the plaintiff must show by a preponderance of the evidence that the defendant's proffered explanation is pretext for unlawful discrimination. *Id.* The Court will address Williamson's two disparate-treatment theories in turn. Ultimately, both fail to satisfy the *McDonnell Douglas* framework. Both fail to create a question of fact as to whether ADMH discriminated against Williamson because of his race.

### 1.   Discriminatory Discipline

The Court first addresses Williamson's claim of discriminatory discipline. This claim relies on two disciplinary incidents. It first relies on the March 2018 reprimand Williamson received after submitting proposed legislation to the Alabama State Employees Association. Williamson believes race motivated the reprimand. (Doc. 245-2 at 12.) It also relies on Williamson's 2018 and 2019 performance reviews. Those reviews rated Williamson's performance as "partially meets standards," a rating well below the highest designation of "consistently exceeds standards." (Doc. 245-3 at 7–13.) Both reviews included automatic deductions for formal discipline Williamson received during the year being reviewed: a seven-point deduction in 2018 (one reprimand for submitting proposed legislation to an outside agency without approval, one reprimand for violating department policies on

responding to emergency situations) and a seventeen-point deduction in 2019 (one suspension for using department surveillance equipment for personal reasons).

Neither the March 2018 reprimand nor the performance reviews satisfy Williamson's prima facie burden. To establish a prima facie case of discriminatory discipline, the plaintiff must show (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated, and (4) he was qualified to do the job at issue. *Burke-Fowler v. Orange Cnty., Fla*, 447 F.3d 1319, 1323 (11th Cir. 2006); *see Mathis v. Wachovia Bank*, 255 F. App'x 425, 429–30 (11th Cir. 2007). The problem here is element three.

Williamson has not identified a non-African American similarly situated employee whom ADMH treated more favorably. A similarly situated employee is someone similar to the plaintiff "in all material respects." *Lewis*, 918 F.3d at 1218. And although courts evaluate the similarity of employees and proffered comparators on "a case-by-case basis," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as

the plaintiff," and "will share the plaintiff's employment or disciplinary history."
*Id.* at 1227.

Williamson's proffered comparator for the March 2018 reprimand is Kevin
McDaniel, a Caucasian mental health officer at Williamson's facility. Even though
McDaniel and Williamson worked the same job and answered to the same
supervisors, the two are not similarly situated because no evidence suggests they
"engaged in the same basic conduct or misconduct." Williamson argues he and
McDaniel engaged in similar conduct because, just as Williamson contacted an
attorney with the Alabama State Employees Association, McDaniel contacted at
least three outside agencies while working as a mental health officer. (Doc. 245-1 at
42–48.) But unlike Williamson, McDaniel obtained supervisory approval before each
of his external communications. Williamson admitted as much in his deposition. (*Id.*)
Because McDaniel obtained supervisory approval before contacting outside
agencies—and because the March 2018 reprimand involved Williamson contacting
an outside agency *without* supervisory approval—McDaniel's conduct and the
conduct leading to Williamson's reprimand are insufficiently similar for Williamson
and McDaniel to be "similarly situated in all material respects."

Williamson proffered two comparators for his 2018 and 2019 performance
reviews: McDaniel and Officer Jeremy Booth. But neither is a proper comparator for

two reasons. For one, neither Booth nor McDaniel shared Williamson's employment and disciplinary history. Unlike Williamson, neither McDaniel nor Booth received reprimands and suspensions in 2018 and 2019. And without reprimands and suspensions, neither received the corresponding disciplinary deductions on their performance reviews. Second, no evidence suggests Williamson and his proffered comparators "engaged in the same basic conduct or misconduct." In the 2019 review, for instance, Williamson earned a seventeen-point disciplinary deduction for using department surveillance technology for personal reasons. (Docs. 245-3 at 5, 12.) No evidence suggests McDaniel or Booth used the department's surveillance system for personal reasons or that they otherwise misused department equipment.

Even if Williamson had established a prima facie case, ADMH produced nondiscriminatory explanations for the May 2018 written reprimand and for the negative performance reviews.

> Plaintiff's [May 2018] reprimand was based on . . . Plaintiff's violation of ADMH policy 15-1 . . . Plaintiff's 2018 and 2019 appraisal ratings were reduced because his disciplinary actions were subtracted from his overall ratings. Absent his discipline . . . Plaintiff would not have received low appraisal ratings.

(Doc. 245 at 17–18.) These explanations, neither of which involve Williamson's race, satisfy ADMH's burden under *McDonnell Douglas*'s second prong. *See Burdine*, 450

U.S. at 254 ("An employer's burden to articulate a non-discriminatory reason . . . is a burden of production, not persuasion.").

Since ADMH provided nondiscriminatory explanations for its alleged wrongdoing, the burden shifts again to Williamson "to produce evidence that [ADMH's] proffered reasons are a pretext for [racial] discrimination." *Alvarez*, 610 F.3d at 1264. He can show pretext "either directly by persuading the Court that a discriminatory reason more likely motivated [ADMH] or indirectly by showing that [ADMH's] proffered explanations [are] unworthy of credence." *Kragor v. Takeda Pharms. AM., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). If he fails to "proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. Al Transp.*, 229 F.3d 1015, 1024–25 (11th Cir. 2000).

Williamson has not persuaded the Court that racial discrimination motivated his May 2018 reprimand or his negative performance reviews in 2018 and 2019, nor has he shown ADMH's nondiscriminatory explanations are unworthy of credence. Williamson's argument is unfairness—that ADMH scrupulously disciplined him while overlooking policy violations by McDaniel and Booth. Had ADMH penalized

Booth and McDaniel for their alleged transgressions, he argues, they would have had a similar disciplinary history and similarly bad performance reviews.

Although a plaintiff can use similarly situated comparators to show pretext, *see Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001), the Court already explained that Booth, McDaniel, and Williamson are not similarly situated "in all material respects." More importantly, none of Williamson's fairness arguments shows "that racial discrimination was the real reason" for his May 2018 reprimand or his poor performance reviews. *Brooks v. Cnty. Com'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). He accuses McDaniel of improperly "questioning the judgment of nursing staff," of "being insubordinate," and of contacting outside agencies; he accuses Booth of failing to receive proper computer-software training, of fraternizing "with unmarried female coworkers," and of being "inattentive" to his work-related duties.

> **Williamson**: There were instances where Captain Booth—well, Jeremy Booth at the time—would have females in his office which I felt was inappropriate. I did tell Captain Anderson that it was inappropriate. Captain Anderson kind of supported allowing, you know, females to be lingering and all. I didn't think it was inappropriate.
>
> **Attorney for ADMH**: Were these female employees?
>
> **Williamson**: Yes, they were employees.

(Doc. 245-1 at 67.) But even if McDaniel "questioned the judgment" of nursing staff, and even if Booth "fraternized" with female coworkers, no reasonable trier of fact could find, based off these arguments, that Williamson's May 2018 reprimand or his 2018/2019 performance reviews were intentional race-based discrimination. *See Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) ("To show the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."). Summary judgment is thus due to be granted, and Williamson's Title VII claims of discriminatory discipline are due to be dismissed.

### 2.  Failure to Promote

The Court next turns to Williamson's failure-to-promote claim, also brought under Title VII, 42 U.S.C. § 2000e. Williamson applied in 2018 to be a "Mental Health Security Agent I." This would have been a step up in pay and responsibilities from the "Mental Health Security Officer II" position he held. ADMH selected Williamson and four other applicants for an interview but ultimately selected a Caucasian applicant (Kevin McDaniel) to fill the vacancy. He then applied in October 2018 for an open "Mental Health Security Officer III" position. ADMH interviewed Williamson and again selected someone else (Jeremy Booth) for the

position. Williamson believes ADMH denied him both promotions because of his race, not for legitimate business or professional reasons.

Williamson satisfied his prima facie burden as to the Mental Health Security Agent I position. To establish a *prima facie* case for a Title VII failure-to-promote claim, a plaintiff must show he belongs to a protected class, he was qualified for and applied for a position that the employer was seeking to fill, that despite qualifications, he or she was rejected, and the position was filled with an individual outside his protected class. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005). Williamson established each element. He belonged to a protected class (African American), he applied for a vacant position, ADMH does not dispute his qualifications and, despite those qualifications, ADMH selected a Caucasian to fill the vacancy.

Because Williamson shouldered his *prima facie* burden, the burden shifts to ADMH to produce a legitimate and nondiscriminatory explanation for selecting McDaniel over Williamson. *Id.* at 769–770. ADMH satisfied this "exceedingly light" burden, *see id.* (quoting *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983)), producing two non-racial explanations for its decision. First, ADMH claims to have selected McDaniel "due to his superior interview performance." Williamson received the lowest interview score of all five applicants interviewed by ADMH's

three-person selection committee—earning an average of 12.33 points—while McDaniel received the second highest score—an average of 22 points—which placed him only .67 points behind the highest-scoring interviewee. (Doc. 245-3 at 16.) Second, ADMH says it selected McDaniel's because of his superior "law enforcement investigative experience" and his perceived ability to manage criminal investigations. Consider the affidavit submitted by Joseph Rittner, the lead panelist on ADMH's selection committee:

> Applicants were asked questions challenging their knowledge, skills, and abilities to conduct criminal investigations, experience with criminal investigations, the process of preparing a case for prosecution, and testifying in court as to a prosecuted case. . . . Williamson was not able to demonstrate basic skills and knowledge of how to prepare a criminal investigation file. This job duty is essential to the MHSA I position. His interview answers indicated to me that he did not possess the necessary experience to perform the duties required of the position.

(Doc. 246-3 at 19.) Both explanations satisfy ADMH's step-two burden under *McDonnell Douglas*.

Faced with two nondiscriminatory explanations, Williamson can only survive summary judgment if he shows those explanations are pretextual and that ADMH's decision to select McDaniel was "motivated by race." *Brooks*, 446 F.3d at 1163 (quoting *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1339 (11th Cir. 2000)). Williamson advances two main arguments in his effort to show pretext.

He first argues that the highest-rated interviewee, Luther Davis, was an African American male. So ADMH's decision to not select the highest scoring candidate, he claims, is circumstantial evidence suggesting that the first nondiscriminatory explanation (Williamson's low interview scores) is pretext for racial discrimination. How can ADMH claim it relied on interview scores when it ultimately didn't select the highest scoring applicant?

Although Davis scored fractionally higher than McDaniel, the difference was minimal: Davis scored a 22.67 and McDaniel scored a 22. And ADMH says it chose McDaniel, despite his fractionally lower interview scores, because he had considerably more departmental experience than Davis. Williamson may disagree with ADMH's decision to consider inter-departmental experience, but "[a] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation omitted).

Williamson's next pretext argument relies on what AMDH didn't consider: applicant disciplinary history, or whether the applicants faced discipline at their former places of employment. He speculates that ADMH "could have decided to not consider discipline [records] because McDaniel was significantly disciplined" at

his previous jobs. ADMH's decision to not consider disciplinary history, he argues, suggests it preselected McDaniel before the application and interview process even began. But even if the Court could appropriately consider Williamson's speculation, *see Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."), preselection "does not necessarily indicate racial discrimination." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1350 (citing *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979)). The Court concludes that no reasonable trier of fact could consider Williamson's pretext arguments and find ADMH selected McDaniel because of Williamson's status as an African American.

The Court now turns to Williamson's second failure-to-promote claim, involving the Mental Health Security Officer III position to which Williamson applied in October 2018. Williamson again shouldered his prima facie burden. He belongs to a protected class, he applied for an open position, he satisfied all qualification requirements, and ADMH chose a non-African American (Jeremy Booth) to fill the vacancy. *See Vessels*, 408 F.3d at 768. ADMH responded with a nondiscriminatory explanation for choosing Booth—he had more supervisory experience at ADMH than Williamson, Doc. 254 at 18, and this supervisory

experience was directly relevant to the Mental Health Security Officer III position because "a central duty of the . . . position is supervision and management" of other ADMH security officers. (Doc. 245-3 at 21.)

Williamson attempts to show pretext through four arguments. The Court will address each argument in turn.

Williamson first points to an error in the application Booth submitted to ADMH's selection committee. (*See* Doc. 254-4 at 3.) Therein, Booth claimed to have more than ten years of ADMH-related supervisory experience. This was an incorrect representation; in truth Booth had somewhere between three and five years of supervisory experience at ADMH. Williamson believes this error, and ADMH's reliance on the error, is sufficient evidence of pretext for a reasonable jury to find intentional race-based discrimination. But even if ADMH's proffered reasons for selecting Booth over Williamson are untrue, "that does not necessarily mean Williams[on] can survive summary judgment. It does not because even if the proffered reasons were false, Williams[on] must show that the actual reason was race discrimination." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). Even if Booth lacked ten years of supervisory experience, and even if ADMH's experience-based explanation is therefore incorrect, Williamson has not shown the actual reason ADMH selected Booth was race discrimination.

Second, Williamson says ADMH has provided "inconsistent statements within its proffered reasons" for promoting Booth over Williamson.

> The evidence presents that reasons shifted from: (1) on March 24, 2019, that the selected candidate[] had been [an] ADMH police officer[] longer; (2) on May 2, 2019, [that] Booth had more overall experience than the Plaintiff; (3) [that] Booth was generally the best candidate; and (4) [that] Booth had more forensic experience. These inconsistencies have surfaced at several time frames during this litigation.

Although "the identification of inconsistencies in the defendant's testimony is evidence of pretext," *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994), the Court finds no inconsistency here. Each cited explanation shares a common theme: Booth had more experience than Williamson and was therefore a better candidate.

Third, Williamson argues he "was the obvious candidate" for the Mental Health Security Officer III position. He believes his qualifications were so superior that a jury could find racial discrimination, just by comparing his experience and credentials to those of Booth. But "a plaintiff cannot prove pretext by simply arguing or even showing that he was better qualified than the person who received the position he coveted." *Springer*, 509 F.3d at 1349 (quoting *Brooks*, 446 F.3d at 1163). Instead he "must show that the disparities between the successful applicant's and his own qualifications 'were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate

selected over the plaintiff.'" *Id.* (quoting *Cooper*, 390 F.3d at 732). Williamson has not shouldered this heavy burden. He and Booth had similar interview scores—a difference of less than two points—and Booth had more supervisory experience within the ADMH system. Although Williamson had more education and more non-ADMH supervisory experience, a reasonable employer could choose Booth's inter-departmental experience over Williamson's education and two-point interview edge.

Fourth and finally, Williamson claims the selection committee partially "relied on subjective criteria" when it chose Booth over Williamson. One ADMH employee "expressed concerns about [Williamson's] ability to lead the police staff and not cause problems," and the consideration of subjective criteria, he believes, is evidence og intentional racial discrimination. The Court finds this argument unpersuasive. *See Denney*, 247 F.3d at 1185 ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes.").

"[F]ederal courts do not sit to second-guess the business judgment of employers." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). ADMH offered legitimate reasons for not promoting Williamson to the two positions at issue. Because Williamson has not responded with sufficient evidence for a

reasonable jury to find that ADMH's asserted justifications are false and that racial discrimination is the real reason behind his non-promotion, *see Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000), the Court will grant ADMH's summary judgment motion and prejudicially dismiss Williamson's failure-to-promote claims.

## F.  Title VII Retaliation

The defendants next moved for summary judgment on Williamson's Title VII retaliation claim, brought against ADMH.

When a Title VII retaliation claim (like Williamson's) "is based on circumstantial evidence, this [Court] utilizes the three-part *McDonnell Douglas* burden-shifting framework." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (per curium). The Court first determines whether the plaintiff made out a *prima facie* case—whether he showed (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that the adverse action was causally related to the protected activity. *Id.* If the plaintiff succeeds in establishing "a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its employment decision. . . . If the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the

defendant 'was not the real basis for the decision, but a pretext for discrimination.'"

*Id.* (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)).

Determining whether Williamson stated a *prima facie* case is a near-impossible task. His briefing references dozens of written and verbal complaints, some of which qualify as protected activity, some of which do not. And although he identifies three forms of adverse employment actions—formal discipline, denied promotions, and poor performance evaluations—the Court has no way to determine which protected activity allegedly caused which adverse employment action. This makes a *prima facie* analysis, especially a causation analysis, burdensome and imprecise.

But the Court need not determine whether Williamson stated a *prima facie* case because ADMH provided legitimate and nondiscriminatory explanations for each adverse employment action, and Williamson did not respond with evidence from which a reasonable jury could find "that the reason[s] provided by [ADMH] [are] a pretext for prohibited, retaliatory conduct." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). The Court will address each adverse employment action in turn.

### 1.    Formal Discipline

First, the Court addresses the formal discipline. ADMH formally disciplined Williamson on at least three separate occasions. On March 3, 2018, he received a

written reprimand for violating ADMH Policy 15-1, which, again, is the policy governing ADMH's internal advocacy program. (Doc. 245-2 at 12.) On September 19, 2018, he received a written reprimand for calling off a "Code Red" and ending emergency protocols before medical staff finished responding to the underlying emergency. (Doc. 245-3 at 1–2.) And on February 13, 2019, Facility Director Annie Jackson suspended Williamson for allegedly misusing department equipment. (Doc. 245-3 at 5.) The suspension report accused Williamson of using Taylor Hardin's surveillance system to ferret out which first-shift employees wrote and delivered the December 31, 2018 letter—the letter questioning Williamson's ability to lead the first shift's Mental Health Security Officers.

ADMH provided legitimate, nondiscriminatory explanations for each of these disciplinary actions: it issued the March 2018 reprimand because Williamson allegedly didn't comply with the rules for participating in ADMH's internal advocacy program, it issued the September 2018 reprimand because Williamson allegedly responded to an emergency improperly, and it suspended Williamson in February 2019 because he allegedly used public equipment for personal reasons. These explanations satisfy ADMH's "exceedingly light" burden under the second prong of *McDonnell Douglas*. *Perryman*, 698 F.2d at 1142.

So the burden shifts back to Williamson to prove "by a preponderance of the evidence that the reason[s]" provided by ADMH are "pretext for prohibited, retaliatory conduct." *Pennington*, 261 F.3d at 1266. He advances several arguments. He first argues that ADMH deviated from department policy when it suspended him for misusing Taylor Hardin's surveillance equipment. *But see Kidd v. Mando Am. Corp.* 731 F.3d 1196, 1211 n.18 (11th Cir. 2013) (violation of a company policy does not necessarily show the employer acted with discriminatory intent). He argues that Annie Jackson is a habitual liar, known to falsify documents and speak untruthfully. And finally, he argues that several ADMH supervisors were "dictators" who punished him too severely. But most glaring is what Williamson doesn't argue; he doesn't claim that he is innocent of the behavior for which he was punished. After all, he admits that he didn't receive approval before emailing his proposed legislation to an external lobbying group (doc. 245-1 at 109–13), he admits to calling a "Code Green" and ending an emergency protocol before a member of Taylor Hardin's medical staff felt ready (*id.* at 164), and he admits to using the department's surveillance equipment for personal reasons:

> **Attorney for ADMH:** While you were employed at Taylor Hardin, did you use the video surveillance system to try to determine who took the letter from the first shift officers to Annie Jackson –
>
> **Williamson:** Yes.

**Attorney for ADMH:** --about your supervising day shift?

**Williamson**: Can you repeat the last part again?

**Attorney for ADMH**: About your supervising day shift. The letter that we discussed earlier.

**Williamson**: Yes.

(Doc. 245-1 at 163–64.) Given these admissions, the circumstantial evidence cited by Williamson is insufficient for a reasonable jury to find that Williamson's written reprimands and suspension were pretext for unlawful retaliation. *Cf. Nix v. WLCY Radio/Rahall Commc's*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may [discipline] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

###   2.   Denied Promotions

Williamson next argues that ADMH retaliated against him by denying him promotions to the MHSO III and MHSA I positions. As explained in the disparate-treatment section above, Williamson applied for both positions but ADMH filled both with Caucasian applicants. And, as explained above, ADMH provided legitimate and nonretaliatory explanations for both decisions: ADMH claims to have selected Kevin McDaniel for the MHSA I position because McDaniel earned higher interview scores and reported more law enforcement investigative experience than

Williamson; it claims to have selected Jeremy Booth for the MHSO III position because he had the most supervisory law enforcement experience at ADMH.

Because these proffered reasons might motivate a reasonable employer, Williamson can only survive summary judgment if meets those reasons "head on and rebut[s] [them]." *Wilson*, 376 F.3d at 1088. He must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1249, 1289 (11th Cir. 2005) (quoting *Combs*, 106 F.3d at 1538).

In addition to referencing the arguments raised the disparate-treatment section discussed above—arguments the Court will not restate here—Williamson points to two conversations he held with Facility Director Annie Jackson in 2018. Jackson recounts the first conversation as follows:

> I had a meeting with Williamson in which he said that he was not required to follow policies and procedures of Taylor Hardin because he was a law enforcement officer. In response to this statement, I made a comment that he may not be employed long and would not be promoted if he did not learn to follow facility policies and procedures. This was not an attempt to intimidate or threaten Williamson, but instead, was merely intended to advise Williamson that following facility protocols and policies is required as part of his job.

(Doc. 245-4 at 51.) The second conversation, held on June 15, 2018, dealt with Williamson's independence as a law enforcement officer and his authority to

independently respond to wrongdoing within Taylor Hardin. (Doc. 245-13 at 2.) Can Mental Health Security Officers operate outside the normal chain of command, or must they seek and receive supervisory approval before taking certain actions? Mr. Williamson recounts that conversation as follows:

> **Williamson:** I'm with looking at things but if you're not going to do anything, I'm going to make the decision if it's within my power, that's how that's going to happen.
>
> **Jackson:** And I'm going to terminate you.
>
> **Williamson:** Go ahead, and I will sue the hell out of this department.
>
> **Jackson**: That's fucking fine.
>
> **Williamson:** That's fine with me, I'll sue.
>
> **Jackson:** So if that's what you want to do, I'm just telling you the way this will process! So, if you feel like you need to file suit that's up to you. I'm telling you what my expectations are. And my expectations are, if you see something going on in the facility that you need to communicate with your Captain and he will communicate with me . . . then we can move forward from that point. I'm not telling you . . . anybody that works for the department of mental health, there is an obligation for us to ensure that our work does not go negatively on the department.

(*Id.*)

These conversations do not reveal "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in ADMH's stated reasons for selecting McDaniel and Booth over Williamson—McDaniel's superior interview ratings and Booth's supervisory experience within ADMH—such that a reasonable

jury could find ADMH selected those two over Williamson because Williamson opposed racial discrimination in the workplace. Even if Jackson threatened to not promote Williamson "if he did not learn to follow facility policy and procedures," and even if she threatened to fire him should he not well-communicate with his superiors, nothing suggests she threatened to punish him for engaging in activity protected by Title VII, i.e., for opposing racial discrimination or for reporting racial discrimination to the EEOC. *Cf. Gogel v. Kia Motors Mgf. Of Ga., Inc.*, 967 F.3d 1121, 1137 (11th Cir. 2020) ("Therefore, to defeat summary judgment, Gogel had to demonstrate that Kia's proffered reason for its decision—Gogel's solicitation of Ledbetter to sue Kia—was merely pretext for its real reason—Gogel's filing of an EEOC charge—and that but for this latter action Kia would not have fired her.").

### 3.   Performance Evaluations

Williamson also believes his 2017 and 2018 performance evaluations were unlawful retaliation, meant to punish him for opposing racial discrimination and reporting discrimination to the EEOC. ADMH offers the same nondiscriminatory explanation it offered in response to Williamson's disparate-treatment claims: he received poor performance evaluations because of his written reprimands and his suspension, not because he spoke out against racial discrimination or because he filed a complaint with the EEOC. Because Williamson's response brief offers no new

arguments of pretext, the Court, for the reasons discussed in the disparate-treatment section above, will grant ADMH's motion and prejudicially dismiss this retaliation claim.

### G. Title VII Retaliatory-Hostile-Work-Environment Claim

ADMH next moved for summary judgment on Williamson's claim for a retaliatory hostile work environment. The parties briefed this claim using the "severe and pervasive" test articulated in *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012), but the Eleventh Circuit abandoned that test, at least for retaliatory-hostile-work-environment-claims, in *Babb v. Secretary, Department of Veterans Affairs*, 992 F.3d 1193, 1196 (11th Cir. 2021) ("We further hold that *Monaghan* clarified our law governing what we'll call 'retaliatory-hostile-work-environment' claims, and that the standard for such claims is, as we said here, the less onerous 'might have dissuaded a reasonable worker' test articulated in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), and *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008), rather than the more stringent 'severe or pervasive' test found in *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012)."). Under *Babb* and *Monaghan*, the correct questions are whether Williamson faced harassment that "well might have dissuaded" a reasonable employee from engaging in conduct protected by Title VII, and, if so, whether a reasonable jury could find he

faced that harassment because he engaged in conducted protected by Title VII. Because the retaliatory-hostile-work-environment section of Williamson's brief offers no new arguments or evidence this claim fails for the reasons discussed in the retaliation section above. *See Debe v. State Farm Mut. Auto. Ins. Co.*, -- F. App'x --, 2021 WL 2333521, at *2 (11th Cir. June 8, 2021) ("We analyze retaliatory hostile work environment or retaliatory harassment claims like retaliation claims, and ask whether the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (citation omitted). Williamson has not shown that ADMH or ADMH employees used race-based harassment to punish or deter him from engaging in conduct protected by Title VII—for opposing racial discrimination of for participating in the EEOC complaint process.

Assuming Williamson intended to bring a traditional, race-based hostile-work-environment claim (rather than a retaliatory-hostile-work-environment claim), such a claim also fails as a matter of law.  To prevail on a Title VII claim alleging a racially hostile work environment, a plaintiff-employee must show: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the individual's membership in the protected class; (4) it was "severe or pervasive" enough to alter the terms and conditions of employment and create a

hostile environment; and (5) the employer is responsible for this environment either directly or vicariously. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). To meet the fourth element, the plaintiff must show that the conduct is both subjectively and objectively "severe or pervasive." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). In evaluating the objective severity of the harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250–51 (11th Cir. 2014) (citing *Mendoza*, 195 F.3d at 1246).

Williamson did not experience severe and pervasive racial harassment at ADMH. For one, no evidence suggests he suffered frequent racial harassment; no supervisor or employer directed racial slurs towards Williamson, and, in his nearly three years of employment he identified only two race-related comments. Nor did he face "physically threatening" or severe harassment. Accordingly, no reasonable jury could find that ADMH or its employees subjected Williamson to harassment sufficiently severe or pervasive to alter the terms and conditions of his employment.

**H. 42 U.S.C. § 1981**

42 U.S.C. § 1981 "protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006). Williamson's § 1981 claims rest on the same facts and theories as the Title VII claims discussed above. Because "there is no difference in the substantive doctrine of intentional discrimination under Title VII and § 1981," *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1254 (11th Cir. 2000), the Court incorporates the above analysis and will grant summary judgment as to Williamson's § 1981 claims.

## I. Federal Conspiracy Claims: 42 U.S.C. § 1985

The defendants moved for summary judgment on Williamson's federal conspiracy claims, brought against Beshear, Baugher, Hubbard, Rittner, Long, Jackson, Anderson, and Booth in their individual capacities. His first claim arises under the second clause of 42 U.S.C. § 1985(2), which prohibits two or more people from conspiring "for the purpose of impeding, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." His second conspiracy claim arises under 42 U.S.C. § 1985(3). And "to make out a violation of § 1985(3), as construed in *Griffin*

*v. Breckenridge*, 403 U.S. 88, 102–06, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), the

plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of

depriving, either directly or indirectly, any person or class of persons of the equal

protection of the laws, or of equal privileges and immunities under the laws; and (3)

an act in furtherance of the conspiracy; (4) whereby a person is either injured in his

person or property or deprived of any right or privilege of a citizen of the United

States." *United Brotherhood of Carpenters & Joinders of Am., Local 610, AFL-CIO v.

Scott*, 463 U.S. 825, 828–29 (1983). To succeed under either statute a plaintiff must

show the defendants conspired with racial or "otherwise class-based" animus. *Id.*;

*see Cook v. Houston Post*, 616 F.2d 791, 795 (5th Cir. 1980) ("Plaintiffs have not even

suggested a class-based discriminatory motive, therefore [they] have no claim under

42 U.S.C. § 1985(3)."); *see also Mason v. Village of El Portal*, 240 F.3d 1337, 1340

(11th Cir. 2001) (affirming dismissal of a claim brought under §1985(2)'s second

clause because the plaintiff "failed to establish invidiously discriminatory racial

animus" behind the alleged conspiracy).

Williamson appears to accuse the defendants of conspiring to punish and

intimidate him to prevent him from exercising law enforcement authority and

holding wrongdoers at Taylor Hardin accountable. As an example, in January 2018

Williamson obtained an arrest warrant for a Taylor Hardin patient who brought

smokeless tobacco and coffee grounds into the hospital. (Doc. 245-14 at 11–12.) Because obtaining that arrest warrant contradicted "the recommendation of his supervisor and superior officer," Jackson issued Williamson a written warning for acting outside his chain of command. (*Id.*) Williamson contends that this warning, and all other incidents where the defendants "discussed Plaintiff's perceived defiance in bypassing his chain of command to obtain a warrant," shows a conspiracy to "stifle law enforcement authority" and place unlawful limitations "upon law enforcement officers working for the department." (Doc. 247 at 47.)

Williamson also accuses Taylor Hardin's facility director, Annie Jackson, of conspiring with an employee at Bryce Hospital in Tuscaloosa (Audrey McShane) to implement anti-police and racially discriminatory policies at both facilities. But when pressed at his deposition, Williamson offered little-to-no evidence of an unlawful conspiracy:

> **Attorney for Defendants:** On what facts are you basing your claim that the defendants conspired with Audrey McShane at Bryce?
>
> **Williamson:** You said Audrey McShane at Bryce?
>
> **Attorney for Defendants:** Yes, sir.
>
> **Williamson:** The facts are, making contact with Ms. Jackson and from my understanding, that's just circumstantial evidence regarding her making contact with Ms. Jackson and implementing similar policies and procedures.

**Attorney for Defendants:** All right. What circumstantial evidence?

**Williamson:** There are documents I've submitted. I mean, I don't have it before me just to pull them out and show you, but you're in possession of it.

**Attorney for Defendants:** Yes, sir. I'm asking you what your testimony is about the circumstantial evidence.

**Williamson:** Change in policies regarding making arrests, stuff like that, going over meeting her. Of course, there's evidence in the case in the interrogatories that she did make contact with her regarding certain things.

**Attorney for Defendants:** What certain things did she make—did Ms. Jackson make contact with Audrey—

**Williamson:** I would have to speculate.

. . .

**Attorney for Defendants:** Were there any policies that applies—that Ms. Jackson talked with Ms. McShane about and then implemented that applied solely to you?

**Williamson**: No.

(Doc. 245-1 at 138–42.)

Williamson also accuses Jackson of conspiring with other ADMH officials to prevent him from suing in federal court and pursuing the instant claims. But again, he offered little evidence:

**Attorney for Defendants:** Did Ms. Jackson ever intimidate you from participating in the proceedings in this case?

**Williamson:** Yes. In a sense, yes.

**Attorney for Defendants:** How so?

**Williamson:** She expressed that she had a concern or issue with me getting a warrant for a Taylor Hardin Secure Medical Facility patient. I made contact with her, and she got upset and said, Hey, I'll get back to you. And when it came back to me I think I received verbal counseling from Robert Anderson, Jr., or something like that.

**Attorney for Defendants:** And that occurred before this lawsuit was filed, didn't it?

**Williamson:** I think so, yes.

**Attorney for Defendants:** Okay.

**Williamson:** But there were times she expressed that she didn't want me exerting law enforcement authority. I think there was a meeting but that didn't happen before this. There was a meeting after this, I believe, where she told me that she didn't want me using my authority unless she approved it.

(*Id.*)

Williamson also says that officials at Taylor Hardin conspired with state employees in Montgomery, Alabama, to punish him for exercising his law enforcement powers. However, his evidence is that Taylor Hardin officials sent his disciplinary records to the state personnel office, and employees in the personnel archived those records in the state's record-keeping system:

**Attorney for Defendants:** Okay. On what facts are you basing your claim that any of the defendants in this case conspired with state personnel?

Page **65** of **82**

**Williamson:** That would be making contact with state personnel, sending documentation to state personnel, general communications I would say. And also refusing to review complaints—or requests for review.

. . .

**Attorney for Defendants:** Are you making a claim that any of the individual defendants sending documents to state personnel to be put in your personnel file is a conspiracy?

**Williamson:** Yes. Based off of circumstantial evidence, yes, it can be considered a conspiracy. But of course I will have to object to present a legal conclusion.

. . .

**Attorney for Defendants:** So you're [sic] claim is that the defendants conspired to place your disciplinary documents in your state personnel file; is that correct?

**Williamson:** I will say object to vague, ambiguous. I'm not sure, you know, the specification of the claim. But in a sense, yes.

(*Id.* at 143–47.)

Considered together, the crux of Williamson's conspiracy claims appears to be (a) matters discussed exhaustively in the employment-discrimination sections above—his 2017 and 2018 performance evaluations, his written reprimands and warnings, the suspension he received in 2019—and (b) several admonishments from supervisors to not obtain warrants to arrest patients without supervisory approval. Williamson believes that each reprimand, warning, and suspension was part of a

coordinated effort to obstruct justice and deny him and other law-enforcement officers the equal protection of the laws. And he says discriminatory animus towards three classes of people motivated the alleged conspiracies: animus towards (1) law enforcement officials, (2) men, and (3) African Americans.

Williamson's § 1985 claims fail as a matter of law because no reasonable jury could find, based off the evidence presented, that the defendants conspired with discriminatory animus towards a protected class of people. To the Court's knowledge, no Supreme Court or Eleventh Circuit case has held or implied that "law enforcement officers" is a class protected by § 1985(3) or by the second clause of § 1985(2). *Cf. Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 720 (9th Cir. 1981) (holding that "anti-police bias does not constitute the kind of 'class-based invidiously discriminatory motive' envisioned and prohibited by § 1985"). But even if it is, no evidence suggests the defendants—some of whom are law enforcement officers—conspired with an invidiously discriminatory animus towards law enforcement when they commanded Williamson to follow the chain of command and seek supervisory approval for certain actions. The same is true for Williamson's allegations of sex-based discrimination, or discrimination against males. It appears that Williamson has only one basis for this claim: he is male, and the defendants treated him wrongfully. He offered no other direct or circumstantial evidence

suggesting the defendants—some of whom are male—conspired with invidiously discriminatory animus towards males. This falls far short of the invidiousness necessary for an actionable claim under § 1985(2)'s second clause of §1985(3).

And for the reasons explained in the Title VII and § 1981 discussions above, no reasonable jury could find the defendants acted with intentional and invidious animus towards African Americans when they disciplined, warned, and reviewed Williamson for allegedly violating ADMH policy. The defendants offered legitimate and nondiscriminatory explanations for every adverse employment action, and Williamson didn't respond with evidence from which a reasonable jury could find racial animus. He offered no direct evidence of racial discrimination, no colleague or supervisor ever directed a racial slur at Williamson, Doc. 245-1 at 98, and in his two-and-one-half years at ADMH he heard only two racially objectionable comments, *id.* at 78–80. And even if the defendants communicated about Williamson, which, as his colleagues and supervisors, they likely did, no evidence suggests they communicated with animus towards Williamson's membership in a protected class. *Cf. Byrd v. Clark*, 783 F.2d 1002, 1008 (11th Cir. 1986) (affirming summary judgment on § 1985(3) claim because the defendant showed no "class-based animus" against the plaintiff"). His § 1985 conspiracy claims are therefore due to be dismissed.

### J.  Federal Conspiracy Claim: 42 U.S.C. § 1986

The defendants next moved for summary judgment on Williamson's 42 U.S.C. § 1986 claim, brought against Beshear, Baugher, Hubbard, Long, Rittner, and Graham in their individual capacities. "Section 1986 provides a cause of action against anyone who 'has knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" *Park v. City of Atlanta*, 120 F.3d 1157, 1159–60 (11th Cir. 1997). Because a plaintiff cannot state a § 1986 claim without a viable § 1985 claim, *id.*, and because no reasonable jury could find the defendants liable under § 1985, Williamson's § 1986 claims are due to be dismissed. *Cox v. Mills*, 465 F. App'x 885, 888 (11th Cir. 2012) ("Therefore, where there is no underlying conspiracy to support a Section 1985 claim, the derivative Section 1986 claim must also fail.").

## K. Fourteenth Amendment Claims

### 1.   Substantive Due Process

Williamson concedes summary judgment is due to be granted on his substantive-due-process claims, brought against Beshear, Baugher, Hubbard, Long, Jackson, Anderson, and Graham. (Doc. 247 at 77.) The Court will dismiss those claims in an accompanying Order.

### 2.   Procedural Due Process

The Court now turns to Williamson's procedural due process claims, also brought against Beshear, Baugher, Hubbard, Long, Jackson, Anderson, and Graham, both in their individual and official capacities. "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347–48 (11th Cir. 2006) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).

Williamson's procedural due process claims rest on two incidents. First is the five-day suspension he received for using ADMH's surveillance system for personal reasons. (Doc. 245-1 at 163–64.) Second is the Mental Health Security Officer III vacancy, which ADMH filled by selecting Jeremy Booth over Williamson. Williamson argues that both the suspension and the selection of Jeremy Booth violated his Fourteenth Amendment right to be free from property and liberty deprivations without due process of law. In other words, he believes he a had a constitutionally-recognized property interest in (1) not facing suspension and (2) in earning promotion to a higher position. (Doc. 111 at ¶¶ 502–05.) He also argues that had a constitutionally-recognized liberty interest in not being "stigmatized" by disciplinary action and non-promotion. The Court will address those arguments in turn.

First, the Court will address the property deprivation claims. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Such entitlements are "not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source of law such as state law." *Paul v. Davis*, 424 U.S. 693, 709 (1976). To determine whether state law creates a legitimate, constitutionally-protected property interest, courts look to "such sources as statutes, regulations, ordinances, and contracts." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006).

The Court finds that Williamson had no constitutionally-protected property interest in avoiding a five-day suspension or in earning promotion to MHSO III. The Alabama Merit System, which Williamson cites as the primary basis for his property interest, seeks "to assure all citizens of demonstrated capacity, ability and training an equal opportunity to compete for service within the State of Alabama. Ala. Code. § 36-26-3. Although a position's inclusion in the State Merit System bestows certain property interests on the position's holder, *see Todd v. Kelley*, 783 So. 2d 31, 44 (Ala. Civ. App. 2000) ("Because Todd was a merit employee and therefore could be

dismissed only for cause, he had a property right in continued employment with the City."),   Alabama Code § 22-50-41 empowers ADMH to establish its own "personnel policies and salary schedules for its employees" and "to exclude" positions from the State Merit System. And the evidence clearly shows that ADMH excluded Williamson's position (Mental Health Security Officer II) from the State Merit System. Before Williamson applied, ADMH announced the Mental Health Security Officer II position as "**A NON-MERIT SYSTEM POSITION**," Doc. 245-2 at 1, and the State Personnel Director offered the following affidavit:

> The Alabama Department of Mental Health ("ADMH"), formerly known as the Department of Mental Health and Mental Retardation, however, has statutory authority to establish specific personnel policies and salary schedules outside of the State Merit System . . . For this reason, most of the positions within ADMH are exempt from the State Merit System. For example, positions such as Mental Health Security Officer I, Mental Health Security Officer II, and Mental Health Security Officer III, which are positions unique to the ADMH, are not subject to the State Merit System Act or the Rules of the State Personnel Board.

(Doc. 244-1 at ¶ 5.) Because Williamson presented no rebuttal evidence from which a reasonable jury could find a constitutionally-protected property right in his position or in the right to continue in his position without a five-day suspension, he has shown no property interest for purposes of the Due Process Clause.

The Eleventh Circuit reached the same conclusion in *Vaughn v. Shannon*, 758 F.2d 1535 (11th Cir. 1985), another case involving ADMH. Like Williamson,

"Vaughn claimed that he [had] a property interest in his job with the Alabama Department of Mental Health, which entitle[d] him to due process as guaranteed by the Fourteenth Amendment. *Id.* at 1536. According to Vaughn, ADMH had deprived him of a constitutionally-protected property interest when it reassigned him to a less desirable job. *Id.* But after considering Alabama law and affidavits submitted by several ADMH employees, the Court rejected Vaughn's procedural-due-process claim and reached the following conclusion:

> The Alabama Mental Health Board has the authority to establish personnel policies and the authority to include or exclude certain positions from the Merit System in so setting the policy. Vaughn's position as Chief, Evaluation of Community Programs, was therefore exempt from the Merit System, which deprived him of the property interest that would entitle him to due process.

*Id.* at 1537. The Court is unaware of any facts meaningfully distinguishing this case from *Vaughn.*

Just as Williamson had no property interest in avoiding a five-day suspension, he had no constitutionally-recognized property interest in being promoted to MHSO III. *See Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988) (explaining how a prospective promotion is generally "not a property or liberty interest protected by the Fourteenth Amendment"); *Shi v. Montgomery*, 679 F. App'x 828, 835 (11th Cir. 2017) ("Similarly, a prospective promotion is not a property or liberty interest protected by the due process clause."). ADMH has a legal obligation to hire and

promote "individuals to exempt positions [like MHSO III] only through an open and competitive process," Ala. Admin. Code § 850-6-36-.05; Williamson had no "legitimate claim of entitlement" to promotion once the competitive process ended. *Cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

His liberty-deprivation claim likewise fails as a matter of law. This claim accuses the defendants of imposing "a stigma" on Williamson "which has foreclosed [his] freedom to take advantage of alternate employment opportunities." (Doc. 111 at ¶ 508.) The defendants wrongfully imposed a five-day suspension, he argues, and the suspension reflects so poorly on him that is has crippled his chances of finding new employment in the field of law enforcement. Williamson believes the stigma caused by the suspension—the harm to his reputation within the law enforcement community—amounts to a deprivation of liberty without due process of law. As evidence, he submitted a series of unsuccessful job applications, applications sent mostly to other law enforcement agencies.

But even if the five-day suspension unfairly harmed Mr. Williamson's reputation, the Supreme Court has repeatedly "held that injury to reputation, by itself, does not constitute the deprivation of a liberty or property interest protected under the Fourteenth Amendment." *Rehberg v. Paulk*, 611 F.3d 828, 851–52 (11th Cir. 2010). The plaintiff must instead show stigma "as a result of government action

significantly altering [his] constitutionally recognized legal rights." *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1438 (11th Cir. 1998) (emphasis added).

So the question is whether the suspension itself, disassociated from the resulting stigma, "significantly altered" one or more of Williamson's constitutionally-recognized legal rights; the answer is no. For the reasons explained above, Williamson had no constitutionally-recognized right to continued employment (and non-suspension) as a MHSO II. *See Vaughn*, 758 F.2d at 1537. And although "the liberty component of the Fourteenth Amendment's Due Process Clause includes the right to pursue a profession," *Ming Wei Liu v. Bd. of Tr. of Univ. of Ala.*, 330 F. App'x 775, 780 (11th Cir. 2009), nothing suggests the five-day suspension foreclosed Williamson's right or ability to pursue future employment as a law enforcement officer. *Id.* ("[T]o survive summary judgment, a claimant must present evidence suggesting that a governmental act effectively banned him or her from a profession."); *see also Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1187 (11th Cir. 1985) (finding that published comments regarding public employee's nonrenewal did not implicate a liberty interest because they did not "foreclose [his] freedom to take advantage of other employment opportunities").

Because he has not shown a deprivation of a constitutionally-recognized property or liberty interest, Williamson's procedural-due-process claims are due to be dismissed.

### 3.  Equal Protection

The defendants next moved for summary judgment on Williamson's equal-protection claims (counts 3 and 5), brought under 42 U.S.C. § 1983. Because these claims rely on the same evidence and arguments as the Title VII and § 1981 race-discrimination claims discussed above, the Court will dismiss these claims for the same reason it will dismiss those: no reasonable jury could find the defendants engaged in intentional racial discrimination when they disciplined Williamson and declined to promote him.  *Underwood v. Perry Cnty. Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005) (quoting *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982) ("[W]hen section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same.")); *Cross v. Ala. Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507–08 (11th Cir. 1995) (same).

**L. State Law Claims (Violation of Alabama's State Employees' Protection Act, Breach of Contract and Promissory Estoppel, Defamation, Invasion of Privacy, Negligence, Negligent Retention, Supervision, and Hiring, Wantonness, Tortious Interference, Misrepresentation, Fraud, and Civil Conspiracy)**

All remaining claims arise under Alabama state law, meaning the Court has discretion whether to exercise supplemental jurisdiction over them. Because every federal claim at issue here is due to be dismissed, and because the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial," *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004), the Court will dismiss Williamson's state-law claims without prejudice. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

### III. Plaintiff's Motion for Summary Judgment and for Permanent Injunction (Docs. 219 and 220)

For the reasons explained above, Williamson's motion for summary judgment motion is due to be denied.

### IV. Plaintiff's Motion to Strike Portions of Defendants' Summary Judgment Brief (Doc. 231)

Williamson moved to strike portions of the defendants' response to his summary judgment motion because (1) the response purportedly does not comply with the Uniform Initial Order and (2) because the defendants cited Williamson's deposition testimony, even though Williamson hadn't yet had thirty days to review the transcript. *See* Fed R. Civ. P. 30(e). But even if the defendants' response brief

violates the Uniform Initial Order and/or Rule 30(e), striking portions of a response brief "is a drastic remedy to be resorted to only when required for purposes of justice." *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 360 F.2d 862, 868 (11th Cir. 1962). The Court finds no cause to apply that "drastic remedy" here. The motion to strike is therefore due to be denied.

### V.   Motion for Protective Order (Doc. 223)

On November 11, 2019, Williamson moved for a protective order preventing the defendants from reopening his deposition. But because this no longer appears to be a live issue—because the Court is unaware of any ongoing efforts to further depose Williamson—this motion is due to be terminated as moot.

### VI.  Motion to Strike the Affidavit of Kevin McDaniel (Doc. 236)

Williamson also moved to strike an affidavit submitted by Kevin McDaniel because the "text is . . . misaligned on the second and third pages" and because "the document's first page stops before having to continue to the second." (Doc. 236 at 3.) Williamson believes these "physical contrast[s]" suggest "the witness did not have personal knowledge of what is being testified to within his affidavit." The Court will deny this motion.

### VII.  Motion for Leave to File Under Seal (Doc. 241)

On December 9, 2020, Williamson moved for leave to file a second motion for summary judgment. (Doc. 237.) Approximately one month later, he moved for leave to file certain exhibits to that proposed second summary judgment motion under seal. (Doc. 241.) The Court denied Williamson's motion for leave to file a second summary judgment motion, *see* Doc. 265 at 10, so the accompanying motion for leave to file under seal is due to be terminated as moot.

## VIII. Motion to Strike the Affidavits of Anderson, Beshear, Jackson, and Rittner (Doc. 251)

Williamson next moved to strike four affidavits, claiming they each violate the so-called "sham affidavit rule." According to the sham affidavit rule, "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). But because the referenced contradictions are minor and capable of reasonable explanation, the motion to strike is due to be denied. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1986)) ("Every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.").

## IX. Motion to Strike Evidence of Panel Recommendations (Doc. 252)

Williamson moved to strike multiple summary judgment exhibits for purportedly violating Federal Rule of Evidence 1002, also known as the "best evidence rule." After careful consideration, this motion is due to be denied. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (evidence is admissible at summary judgment—even if it isn't admissible at trial—so long as it's "capable of being reduced to admissible form").

## X.   Defendants' Motion to Strike Williamson's Declaration (Doc. 255)

Defendants moved to strike dozens of statements in an affidavit Williamson submitted in opposition to the defendants' summary judgment motion. Because consideration of the disputed statements would not alter the outcome of the defendants' summary judgment motion, the motion to strike is due to be terminated as moot.

## XI.   Williamson's Motion to Strike Graham's Reply Affidavit (Docs. 256 and 267)

Williamson moved to strike an affidavit that Defendant Graham submitted in support of her reply to Williamson's response to summary judgment. Because the Court neither considered nor referenced the disputed affidavit, this motion is due to be terminated as moot.

## XII.   Williamson's Motion to Strike Graham's Reply Brief (Doc. 257)

Next, Williamson moved to strike the summary judgment reply brief submitted by Graham because it "exceeds [page] limitations [by] at least six pages." The Court finds no good cause to strike Graham's brief and will therefore deny this motion.

### XIII.  Williamson's Unopposed Motion to Permanently Seal Doc. 247–21 (Doc. 259)

Williamson filed an unopposed motion to permanently seal certain portions of Document 247–21. The Court temporarily sealed Document 247-21 in a previous order. This motion is due to be granted.

### XIV.  Williamson's Motion for Leave to File Sur-reply (Doc. 260)

On March 8, 2021, Williamson moved for leave to file a sur-reply in opposition to Defendant Graham's motion for summary judgment. Because this motion is due to be granted, the Court considered Williamson's proposed sur-reply (Doc. 260-1) when ruling on Graham's motion.

### XV.  Joint Motion to Allow Plaintiff to File a Sur-Reply (Doc. 263)

Because the Court addressed the substance of this motion above, this motion is due to be terminated as moot.

### XVI.  Williamson's Opposed Motion for Judicial Notice (Doc. 264)

Williamson moved the Court to take judicial notice of the following facts:

1) Plaintiff's proposed revisions to Alabama Code § 36-21-2 are being sponsored by State Representative Phillip Pettus.

2) Plaintiff's proposed legislation and revisions to Alabama Code § 36-21-2 garnered the attention of the public representation.

3) Plaintiff's proposed revisions to Alabama Code § 36-21-2 are currently before the State of Alabama Legislature.

Because these facts are not "generally known" within the Northern District of Alabama and because they cannot be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," this motion for judicial notice is due to be denied.

## XVII. Williamson's Opposed Motion for Issuance of Subpoenas in Blank (Doc. 275)

Since defendants' motions for summary judgment are due to be granted, this motion is due to be terminated as moot.

## XVIII. Conclusion

The Court will enter a separate Order carrying out these findings.

**DONE** and **ORDERED** on August 13, 2021.

_____
L. Scott Coogler
United States District Judge

203323